1  MAUREEN E. McCLAIN (State Bar No. 062050)
   Email: mcclain@kmm.com
2  ALEX HERNAEZ (State Bar No. 201441)
   Email: hernaez@kmm.com
3  KAUFF McCLAIN & McGUIRE LLP
   One Post Street, Suite 2600
4  San Francisco, California 94104
   Telephone:  (415) 421-3111
5  Facsimile:   (415) 421-0938
   Attorneys for Defendant
6  DOLLAR TREE STORES, INC.

7  BETH HIRSCH BERMAN (VA Bar No. 28091)
   Email: bberman@williamsmullen.com
8  WILLIAMS MULLEN
   Dominion Tower, Suite 1700
9  999 Waterside Drive
   Norfolk, VA 23510
10 Telephone:  (757) 629-0604
   Facsimile:   (757) 629-0660
11
   *Pro Hac Vice* Attorneys For Defendant
12 DOLLAR TREE STORES, INC.

13                UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15

| | |
|---|---|
| 16 MIGUEL A. CRUZ, and JOHN D. HANSEN, individually and on behalf of all others similarly situated, | CASE NO. C 07 2050 SC CASE NO. C 07 04012 SC |
| 17 | |
| Plaintiffs, | **SUPPLEMENTAL DECLARATION OF BETH HIRSCH BERMAN IN SUPPORT OF DOLLAR TREE STORES, INC.'S REPLY ON SUMMARY JUDGMENT AS TO JOHN D. HANSEN** |
| 18 v. | |
| 19 DOLLAR TREE STORES, INC., | |
| 20 Defendant. | |
| 21 | **DATE:** March 21, 2008 **TIME:** 10:00 a.m. |
| 22 | **DEPT:** Ctrm. 1, 17th Floor **JUDGE:** Hon. Samuel Conti |
| 23 | |
| 24 ROBERT RUNNINGS individually, and on behalf of all others similarly situated, | **COMPLAINTS FILED:** April 11, 2007 July 6, 2007 |
| 25 Plaintiff, | **TRIAL DATES:** No dates set. |
| 26 v. | |
| 27 DOLLAR TREE STORES, INC., | |
| 28 Defendant. | |

KAUFF McCLAIN &
McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

SUPPLMENTAL DECLARATION OF BETH HIRSCH BERMAN IN SUPPORT OF DOLLAR
TREE STORES, INC.'S REPLY ON SUMMARY JUDGMENT AS TO JOHN HANSEN

CASE NO. C 07 2050 SC
CASE NO. C 07 04012 SC

1   I, Beth Hirsch Berman, declare as follows:

2       1.    I am over the age of eighteen and have personal knowledge of the facts

3   set forth below.  If called upon as a witness, I could testify competently thereto.

4       2.   · I am a shareholder in the law firm of Williams Mullen, P.C., pro hac vice

5   counsel for Dollar Tree Stores, Inc. in the above captioned matter.

6

7       3.    On October 11, 2007 and November 1, 2007, I attended the deposition of

8   John D. Hansen.  Attached hereto as Exhibit A is a true and correct copy of the relevant

9   portions of the transcript of that deposition.

10

11      I declare under penalty of perjury that the foregoing is true and correct.

12  Executed in Norfolk, Virginia this 13th day of March, 2008.

13                        _Beth Hirsch Berman_

14                        BETH HIRSCH BERMAN

15

16

17

18

19  1254478v1

20

21

22

23

24

25

26

27

28

KAUFF, McCLAIN
& McGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA  94104
TELEPHONE (415) 421-3111

C:\Documents and

SUPPLEMENTAL DECLARATION OF BETH HIRSCH BERMAN
IN SUPPORT OF DOLLAR TREE STORES, INC.'S REPLY ON
SUMMARY JUDGMENT AS TO JOHN HANSEN

CASE NOS:  C 07 2050 SC AND C 07 04012 SC

# EXHIBIT A

REC'D NOV 7 2007

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

MIGUEL A. CRUZ, and John
D. Hansen, individually
and on bahalf of all
others similarly
situated,



COPY

      Plaintiffs,

                  Case No.   C07-02050 SC

   vs.

DOLLAR TREE STORES, INC.,

      Defendant.


DEPOSITION OF JOHN D. HANSEN


DATE:         THURSDAY, OCTOBER 11, 2007

TIME:         10:05 a.m.

LOCATION:    Kauff, McClain & McGuire
              One Post Street, Suite 2600
              San Francisco, California


PREFERRED REPORTERS
Certified Shorthand Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227


REPORTED BY:  Wendy L. Van Meerbeke, CSR #3676

1

1    Q. Is it correct that the merchandising

2    department at Dollar Tree encourages store managers

3    to be creative in setting up displays?

4    A. Not really.

5    Q. I've seen some bulletins, for example,

6    that say, "This is a great display in Portland,

7    Oregon. Look how unusual it is."

8    A. Yes, you can do that with certain displays

9    that aren't really set. You know, they mostly --

10    the sets they have in their book, they want them

11    done that way. Otherwise, I wouldn't say that I'm

12    a fantastic merchandiser. I can probably see

13    something and make great changes to it, but as far

14    as starting a project, I'm probably not as great as

15    I'd like to be. I'm hoping to find some very

16    creative person that could help me in that

17    department.

18    Q. So you like the assistance of the proposed

19    displays that come in the planner; is that right?

20    A. Yes.

21    Q. But you don't follow it to the T?

22    A. I try to. Yes. It depends on also what

23    sells. I mean, one part of the display will sell a

24    heck of a lot faster than the other part. You have

25    to improvise somewhat.

1 **Q. So you emphasize that part of the display,**

2 **I assume?**

3 **A. Right.**

4 **Q. You're the person who can see that?**

5 **A. Correct.**

6 **Q. You're tracking the sales in your store?**

7 **A. Correct.**

8 **Q. And that's the reason why you have 200 top**

9 **SKUs to look at; is that right, in part?**

10 **A. Yeah. Uh-huh.**

11 Q. So what did Ms. Hammond say to you which

12 dissuaded you from quitting?

13 A. Um, she just encouraged me, felt that

14 because my numbers were extremely good at --

15 Q. Your sales numbers?

16 A. Yes. Um, she was wondering what was going

17 on, why I was leaving, and just encouraged me that

18 I was doing a good job. And it was the first time

19 I had really heard anything like that. You know, I

20 didn't -- I just had never talked to her before.

21 Q. Mr. Tellstrom is not into positive

22 feedback, from your point of view?

23 A. No, no. He wasn't at all. There was

24 never one word of positive feedback. And that was

25 really -- my biggest complaint was I didn't know

1    I felt that the attitude I brought to the

2 place changed the aura of the whole store. I felt

3 I had a very positive attitude. I felt that was

4 the reason I was so successful.

5    Q. As I understood your answer, one of the

6 things you did was make sure you kept track of the

7 customer volume and flow and made sure you directed

8 cashiers to the cash registers if you needed more

9 cashiering; is that right?

10    A. Um, yeah. I tried -- during the busiest

11 times, I tried to have an appropriate amount of

12 cashiers, but that wasn't always possible.

13    Q. So we're talking about two different

14 things; aren't we? We're talking about your

15 scheduling to start with, and then we're talking

16 about just observing what's going on in your store

17 and making sure people are at a place to cashier?

18    A. Right. Uh-huh.

19    **Q. And how did you do the scheduling? Did**

20 **you actually review what your store's busiest hours**

21 **were?**

22    **A. Um, Compass was supposed to be able to do**

23 **that. I didn't feel like it was working the way it**

24 **should have. Mostly, it just seemed to be, um,**

25 **filling a hole where a hole needed to be filled,**

1 and I could do that myself.

2 Um, it's -- it was supposed to show you

3 where the busiest time was and things like that,

4 um, and put your best cashier in at that time. To

5 me, it just didn't seem to work that way. Um --

6 Q. How did you schedule then not using

7 Compass or around Compass?

8 A. I mostly scheduled to make sure that on

9 the -- you know, on the weekends, there was one

10 extra cashier during the busiest time, and then the

11 rest of the time, I tried to schedule my employees

12 to where there was an overlap where they were

13 supposed to have lunch and where they were supposed

14 to have, um, a change in the guard, so to speak.

15 Um, and that was the only way -- because I

16 had to have them pretty much back to back, the

17 cashiers, that was the only way I really saw the

18 best way. And it worked pretty well.

19 Q. Can you describe to me how you physically

20 did that? Did you sit down Monday with a list of

21 all of your employees?

22 A. Actually, once I had a set thing, I just

23 went with it.

24 Q. How did you do the set thing?

25 A. I just pretty much figured out how much

1  time I have during the day, what coverage I needed

2  where, when my manager was coming in, when they

3  needed to take their lunch, when they needed -- you

4  know, when they were going to change.  And then for

5  the second shift, the same thing.

6     Q.  Did you actually write this out?

7     A.  Um, yeah, I think I had -- like, when I

8  first got there is pretty much when I made the

9  schedule I used pretty much the whole way through.

10  And then it took a couple just to try to figure

11  out -- you know, after observing what was going on

12  and seeing, you know, what the flow was and things

13  like that.

14       In fact, when I first got there, the

15  weekends I didn't have the extra cashier.  Later

16  on, I would add that extra cashier on the weekends

17  to make sure -- because people were complaining

18  about the lines.

19     Q.  Is it correct that it was your decision as

20  to how many cashiers to have at any given time in

21  the store?

22     A.  Yes.  It was my decision, but I had to

23  work within the framework of the hours that were

24  given.

25     Q.  You were given sales per employee hours;

1 line.

2 Q. Then you make a management decision to

3 help customers; right?

4 A. Um, if that's a management decision, I

5 expect -- if I have an extra cashier that day, I

6 expect them to do the same thing, um, you know.

7 It's just customer service, is what it is.

8 Q. If you have an extra cashier that day, you

9 direct them to do that; correct? You say, "Get on

10 the register"?

11 A. They're -- I direct them to do it, and

12 they are to do it. If -- you know, they are to

13 offer the customer service to make sure that they

14 have a pleasant experience in the store. And it's

15 just more a general rule in the store.

16 **Q. But there are some functions that actually**

17 **require a manager to perform on the cash register;**

18 **isn't that right?**

19 **A. Some -- I'm not understanding that.**

20 **MR. FIETZ: I think she means manager-only**

21 **functions, if I may.**

22 **THE WITNESS: I don't think so.**

23 **MS. McCLAIN: I prefer to clarify my own**

24 **questions.**

25 **THE WITNESS: Sorry.**

1    MS. McCLAIN:

2    **Q. That's all right. Like taking returns or**

3  **markdowns or voids; aren't those items that only a**

4  **manager can do?**

5    **A. Yeah. Or an assistant can do it also.**

6    Q. When I use the term "manager," I generally

7  refer to the management team.

8    A. Okay.

9    **Q. So is it correct that the times when you**

10  **would run a register now at 2262 -- actually**

11  **operate as a cashier would be either when you were**

12  **doing those manager-only functions or when you**

13  **decided to jump in and help because the line was**

14  **long?**

15    **A. I would say or if I was giving a cashier a**

16  **break and there was nobody else to cashier. That**

17  **would be another instance.**

18    Q. Do you view it as a function of your job

19  to make sure that cashiers have their breaks?

20    A. Absolutely.

21    Q. Do you fulfill that function? In your

22  stores, do you make sure that all hourly employees

23  have breaks and meal periods?

24    A. Yes. I feel I'm pretty good at that.

25  It's when I'm not there, though.

1    Q. I'm just asking what you know about.

2        Can you give me an estimate of how much

3 time you spent doing functions other than

4 management-only functions on the register at 2262

5 last week?

6    A. Last week?  I honestly can't think of

7 exactly how much.

8    Q. A couple of hours, a couple minutes, a

9 day?

10    A. It was definitely several hours.  I

11 remember on Saturday, I was on almost the whole

12 day, so --

13    Q. Saturday being October 6th; is that right?

14    A. Sure.  Uh-huh.

15    Q. That's the Saturday you're referring to?

16 Last Saturday?

17    A. Yes, yes.  Uh-huh.

18    Q. Why was that?

19    A. It was very busy.

20    Q. And you decided you didn't want long lines

21 in the store; is that right?

22    A. It was -- yeah.  It would have been really

23 bad if I wasn't on there.

24    Q. How many hours was store 1868 open in a

25 week?

00111

1 places; correct?

2    A. Correct. Correct.

3    Q. For example, at Christmastime, you're not

4 supposed to have Mother's Day goods out; right?

5    A. Right.

6    Q. Seems reasonable; doesn't it?

7    A. Right.

8    Q. So Dollar Tree is organized in some

9 fashion by merchandising season; correct?

10    A. Yes.

11    Q. And those seasons make sense to you; don't

12 they?

13    A. Yeah.

14    Q. And presumably, that's the way you draw

15 customers in; correct?

16    A. Um, yeah. I mean, I think they -- Dollar

17 Tree's little secret that people don't know, the

18 fact they can get certain items for a dollar that

19 they didn't know they could get.

20    Q. Do you occasionally go to a different

21 Dollar Tree store and say, "Wow, that's a terrific

22 display. I'm going to see if I can copy that or

23 make mine look something like that"?

24    A. I've seen that once or twice, just, you

25 know, maybe front-end stuff that always seems to be

1 what to do with this wall because there's never

2 really any explanation for what to do with that

3 one.

4    Q. Such as what do I do with -- can you give

5 me an example of that?

6    A. Our front wall is always supposed to be

7 something seasonal, but it just seems to -- every

8 season but Christmas seems to be a problem with it.

9    Q. In what way?

10    A. Just the fact that it -- it's not --

11 there's no display in the book to merchandise it.

12 A lot of the stuff is always put somewhere else,

13 so, you know, you have -- what can I do to make

14 this look seasonally correct and make it look nice?

15    Q. The front wall is your individual

16 creation; is that right?

17    A. Yeah.

18    Q. We'll have to go look at your front wall.

19    A. I had one at 1868. I don't really have

20 one anymore.

21    Q. Is that because of the configuration in

22 the store?

23    A. Uh-huh.

24    Q. Did you know Mr. Cruz before you two got

25 together?

1   Q. And whether or not you cut the shrink to

2   the lowest number the store ever had, you cut the

3   shrink; is that right?

4   A. Cut the shrink in half from what it was

5   the year prior. Uh-huh.

6   Q. And you did that in the ways you've told

7   us: watching more carefully and making sure the

8   store was clean, making sure that procedures like

9   checking bags --

10   A. Uh-huh.

11   Q. -- were followed; correct?

12   A. And scanning damages, make sure all that

13   was being done. Yes.

14   Q. And would you view this as a listing of

15   the most significant aspects of your job as a store

16   manager for Dollar Tree?

17   MR. FIETZ: Objection. Vague.

18   MS. McCLAIN:

19   Q. That is, did you pick out the important

20   aspects to you?

21   A. Um, I felt -- I felt it was one that

22   glorified my position there.

23   Q. But it's truthful?

24   A. It's truthful. It doesn't list

25   everything, but it's truthful.

1  would -- what do you call it?  The deposit slips,

2  make sure that they got to the bank.  So I check

3  those.  I print up all these -- all the things that

4  are supposed to be in the playbook, the --

5  there's -- I'm supposed to print up the order

6  scorecard, department sales, top 200.  So I print

7  those up.  The top ten in my department doesn't

8  come every week.  I make sure all the pull and

9  holds are in there also.

10       I just print those up, staple them, punch

11  a hole and put them in the book and analyze what I

12  can, and that's pretty much it.

13       Q.  Do you do the scheduling on Monday?

14       A.  I will start the schedule on Monday.  I

15  usually just get a -- start the cashiers, which is

16  usually kind of done by Compass, but I'll just look

17  at it briefly to adjust things the way I like them.

18       Q.  What sort of adjustments do you make?

19       A.  Um, make sure that there isn't a gap, so

20  there's always two people in the store.  The

21  Compass tends to end one at 4:30 and start another

22  one at 5:00.  I'm not sure what they're expecting

23  to be in there.

24       So I just make sure those holes are

25  filled.

1   Q.  When you see that, do you change one of

2 the schedules?

3   A.  Yes.  I'll adjust somebody's schedule to

4 fill the gap or -- or add a cashier down here and

5 bump what I can.  I usually have to add a little

6 bit of cashiering to try to fill the gaps, so to

7 speak.

8   Q.  Is it correct then that the Compass

9 scheduling of cashiers is subject to your change?

10 You can alter it?

11   A.  Yeah.  They -- they ask that you don't,

12 but I don't see any way that you could not change

13 it.

14   Q.  Who asked that you don't do it?

15   A.  Well, Rick would always say, "Just leave

16 what is there."  After -- I think he has changed

17 his mind after showing him several times that it

18 just wouldn't work.

19   Q.  In any event, Rick says to you, "Leave it

20 as it is," and you don't agree with it so you make

21 changes; is that right?

22   A.  Yeah.  Correct.

23   Q.  Is it your pattern to spend a good part of

24 Monday in the office doing these kinds of

25 activities?

1    A. No, no. Never had any money issues.

2    Q. It looked to me like the one schedule we

3 looked at that you had some time when you would

4 interact with your freight manager; is that right?

5    A. Right.

6    Q. Did you try to do that every day or twice

7 a week?

8    A. For a long time, especially during the

9 holidays, that's where I spent a lot of my time to

10 make sure the merchandising was done correctly.

11    Q. The freight manager was normally leaving

12 fairly early in the morning; is that right?

13    A. Yeah.

14    Q. They had been there during the night?

15    A. They were usually leaving by 8:00, 9:00

16 o'clock -- by 9:00 o'clock, usually. Uh-huh.

17    Q. It was your practice to on a regular basis

18 get in there early enough to talk with them before

19 they left; is that right?

20    A. Either that or work with them the whole

21 time, come in with them when they came in.

22    Q. Occasionally, you came in, um, at midnight

23 or after that to work with the freight manager?

24    A. Correct.

25    Q. And why would you do that?

1    A. Um, I just felt like, you know, when the

2    cat is there, the mice won't mess around. I really

3    felt that that was the main thing, just to make

4    sure that, you know, things were getting done that

5    needed to be done, make sure that sets were done

6    the way they should be done.

7    Q. You felt your presence would enforce the

8    rules; is that right?

9    A. Yeah, basically, that's it. I would do my

10   own stocking and walk around the store occasionally

11   and just say, you know, "Let's do this. Let's do

12   that," and then go back to what I was doing. So

13   just to kind of reinforce what -- you know, that --

14   this needs to get done. Let's not mess around.

15   Q. It sounds like you were there in basically

16   a supervisorial capacity; is that right?

17   A. Um, well, I was kind of there on both. I

18   was doing both supervising and stocking at the same

19   time. Yes.

20   Q. But it sounds like your motivation for

21   being there was supervisorial in nature. Do you

22   agree with that?

23   A. Um, I think -- I needed that extra

24   stocker. I needed somebody that could stock and

25   make sure that -- so it was, one, because my

1  presence -- I felt more work would have been done

2  by everybody else, and I was that extra added work

3  that could -- made sure that everything got done.

4  And it was also done in a manner to -- the way I

5  wanted it so --

6     Q.  Were you illustrating that to the stocking

7  crew?  Were you, in essence, training them when you

8  did that?

9     A.  Um, no, I think it was more of, you know,

10  they knew what they needed to do.  Most of them had

11  been trained to that point.

12     Q.  You said, "And it was then done in a

13  manner in the way I wanted it."  How did you

14  illustrate that?

15     A.  Just that, let's say, occasionally they

16  would put things in the wrong place like, you know,

17  the Dollar Tree has their ways of doing things.

18  There's not supposed to be something in this

19  basket.  There's supposed to be -- things are

20  supposed to be pegged, things like that.  It's just

21  certain things that Dollar Tree likes to have the

22  way they like to have things.

23     So, you know, people get lazy

24  occasionally, so I just wanted to make sure they

25  were doing it correctly, not to say that my freight

1  manager couldn't have done that, but it just felt

2  like it was happening, you know --

3     Q.  Why couldn't your freight manager do that?

4  Why couldn't you say to Jose, "Things aren't being

5  placed where they ought to be, and make sure your

6  crew is doing better"?

7     A.  I think, um, Jose did a good job as far as

8  getting the freight out, but his attention to

9  detail wasn't quite the way I wanted it, so I had

10  to make sure that things weren't just being thrown

11  onto the shelves and that things were actually, you

12  know, goes the way they were.

13     Q.  If you had a freight manager that you had

14  more confidence in, would that have resulted in you

15  spending less time in those after-midnight hours?

16     A.  Um, yeah, because, actually, I did have

17  more confidence in Jose later on.  Well, not -- I

18  had to have more confidence in him later on because

19  we were so low on assistants.  I think definitely,

20  I mean, a lot of -- I mean, I don't know.

21        I could say a lot of my problems were

22  probably because of Jose's attention to detail

23  weren't what they should have been.  Uh-huh.

24     Q.  So if we looked at your schedules, would

25  we find that there's a point in time when you

1  said, "Fill it out"?

2  A. Yeah.

3  Q. Then you reviewed the application, looked

4  at it?

5  A. Right. Pretty much, everyone that came in

6  I would look -- I would just ask them about their

7  availability, and I would look at their experience,

8  look at them.

9  Q. Would you talk to them?

10  A. Briefly, yeah. Just see how they held

11  themselves.

12  Q. What qualifications were you looking for?

13  A. Just anyone that had a brain and looked

14  like they could hold themselves very well and

15  handle -- you know, the way they kind of interact

16  with you is the way I felt they were going to

17  interact with the customers. That was pretty much

18  it.

19  Q. You didn't hold applicants to supporting

20  the Diamondbacks?

21  A. No, absolutely not. Not at the time.

22  **Q. Did you usually make a hiring decision at**

23  **the same time that the applicant was there?**

24  **A. Um, you mean in the first initial --**

25  **Q. Did you have them come back, or both?**

1   A. I would make the decision at that point

2   whether or not to go forward with an interview with

3   them, and then I would call them back for the

4   interview. Yeah. Very rarely did I bring somebody

5   in that I hadn't met, like just an application was

6   thrown on my desk, unless it was a great

7   application. I can only think of one person like

8   that.

9   Q. So you would have this filled out, you

10   would review it, and then you would call them in if

11   you thought it was worth pursuing; is that right?

12   A. Yes.

13   Q. And you made that decision based upon

14   experience, in general, and availability?

15   A. Availability, you know, somewhat of

16   experience. You didn't need a whole -- depending

17   what the job was, you didn't need a lot of

18   experience. But mostly the person -- you know,

19   themselves, if I thought they were a

20   qualified individual.

21   Q. You would schedule an interview?

22   A. Interview. Right. Uh-huh.

23   Q. Did you do those interviews alone or did

24   you have an assistant manager sitting in?

25   A. Actually, I usually did them alone.

1    Q. Those were in your office, I assume?

2    A. Uh-huh.

3    Q. Yes?

4    A. Yes.

5    Q. How long do you think you'd spend on any

6 given interview?  What was the range?

7    A. Probably 20 minutes.

8    Q. Then would you make a hiring decision on

9 the spot normally, or would you send the applicant

10 home and think about it?

11    A. I think I hired one person on the spot.

12 Most of them I sent home just to make sure, because

13 if I had other interviews, I wanted to make sure.

14    Q. There were times when you were making a

15 selection process, you were hiring one person out

16 of ten applicants, for example?

17    A. Usually I only did like five or six.

18 Yeah.

19    Q. But is that --

20    A. Yes.

21    Q. -- um, a typical range?

22    A. Uh-huh.

23    Q. So you were interviewing five people for

24 every one person you hired?

25    A. Um, not always, but yes.

1    **Q. But often?**

2    **A. Yes. Yeah. I mean, the amount of**

3    **qualified applicants was few and far between,**

4    **actually, in my mind. They had to have teeth. I**

5    **mean, that was kind of a bad thing, actually,**

6    **believe it or not. It was hard to find.**

7    **Q. Were there times where you had associate**

8    **positions that were not filled?**

9    **A. Um, yeah. There was a couple times where**

10   **it was just a matter of finding the right person.**

11   **It was kind of funny. One time I was really**

12   **needing somebody, and I just prayed about it, and**

13   **she walked in the door about ten minutes later.**

14   **That was the one person I practically hired on the**

15   **spot mostly because she had experience at another**

16   **Dollar Tree. So yeah.**

17    Q. Did you call the other Dollar Tree to find

18   out how she did there?

19    A. It was in a different county. Yeah, I

20   tried to, but the manager had already been gone and

21   things like that. So it was --

22    Q. Following through on the process then, did

23   you then call the person you selected back and say,

24   "I'd like to offer you a job"?

25    A. Uh-huh.

1  Q. The next item is oversee daily store

2  activities, including opening and closing of store.

3  You've already told us about reviewing the deposit

4  documents at closing and how you walked around the

5  store overseeing activities all day.

6      I assume you viewed that as a

7  responsibility of yours; correct?

8  A. Correct.

9  Q. What did you do to oversee opening?

10  A. Um, to oversee?

11  Q. Uh-huh. How did you open the store, if

12  you were there to open it?

13  A. I made sure -- I seemed to be opening --

14  if I was there, I was opening, usually.

15  Q. What does that mean?

16  **A. I would, um, count the safe, make sure all**

17  **the money is there to start with, um, take the**

18  **deposit to the bank, um, fill the drawers -- the**

19  **cashier drawers with appropriate change, put them**

20  **into the drawers -- into the cashier drawers and,**

21  **um, you know, make sure there's enough change in**

22  **the safe.**

23  **Um, usually the store should be ready when**

24  **I walk in, so, you know, as far as the cleanliness**

25  **of the store and things like that, um, should have**

1 been done the night before. So opening -- that was

2 really the main thing, is making sure that those

3 things -- that we were ready to start business that

4 day.

5    Q. Taking care of the money, essentially?

6    A. Essentially, yes.

7    Q. Is it correct that the only people who

8 were authorized to take deposits to the banks and

9 fill the cashier drawers were store managers or

10 assistant store managers?

11    A. Yes.

12    Q. That is not a function that an hourly

13 associate could do; is that right?

14    A. They had no access to the safe. No.

15    Q. The next item is ensure customer and

16 associate safety. Did you view that as a

17 responsibility of yours?

18    A. Yes.

19    Q. How did you ensure customer safety? Were

20 there steps that you took to do that?

21    A. Just store -- make sure there wasn't

22 things on the floor, really.

23    Q. Did you have training sessions with

24 employees about work-related injuries ever?

25    A. Um, occasionally. Not as much as I should

1 have. Yes.

2    Q. It was your responsibility to process

3 worker compensation claims; correct?

4    A. Yes.

5    Q. So if someone was injured, it was your

6 responsibility to make sure they filled out a form

7 and the notice got made to the proper people?

8    A. Correct.

9    Q. You said occasionally you had training

10 sessions with employees about work-related

11 injuries, but not as much as you should have. What

12 does that mean?

13    A. We were supposed to have -- I think we

14 were supposed to have them once a month, and it

15 just isn't happening.

16    Q. You had them occasionally, but not that

17 frequently; is that right?

18    A. Hardly frequently at all. Yeah.

19    Q. The session -- I'm sorry.

20    A. Go ahead. I'm fine.

21    Q. The sessions that you had, what topics did

22 you cover in them? These were employee-wide

23 sessions?

24    A. Unfortunately, no. They were just mostly

25 individual because you never really had the hours

1 to have a whole companywide one.

2   Q. So if you saw an employee engaging in

3 something you saw was an unsafe habit, you would

4 talk to them; is that right?

5   A. Yes.

6   Q. Can you give me an example of that?

7   A. Um, mostly just lifting, um, or it had to

8 do mostly with the stockers, the way they were

9 unloading the truck. Maybe they were doing things

10 that could cause them to be injured, which that was

11 probably the most injury prone time.

12   Q. So you were watching how the stockers were

13 physically doing their job and talking to them if

14 you thought they could improve body mechanics?

15   A. Uh-huh.

16   Q. Is that right?

17   A. Correct.

18   Q. And that's in fact a talent of yours,

19 correct, because you have a personal training

20 background; correct?

21   A. Correct.

22   Q. So you could actually give them good tips,

23 presumably?

24   A. Yeah. Go to the gym.

25   Q. Get a personal trainer.

1   **A. Right.**

2   **Q.  This making sure that employees were**

3   **physically safe, then making sure that customers**

4   **were safe, did you view that as primarily the**

5   **responsibility of the store manager?**

6   **A.  Um, I felt overall, yes.  I felt everybody**

7   **needed to be somewhat involved because I can't be**

8   **in all places at all times.**

9   **Q.  But you were responsible for making sure**

10   **that everyone was paying attention to that; is that**

11   **fair?**

12   **A.  Yes.**

13   Q.  Protect all company assets including store

14   cash, merchandise and equipment.  We've talked

15   about this some in terms of guarding against shrink

16   and making the deposit slips and making sure that

17   cash doesn't accumulate in the store.

18   A.  Uh-huh.

19   Q.  Did you view that as primarily a store

20   manager function as opposed to hourly associates?

21   A.  Um, it was, I would say, the assistant had

22   quite a bit of responsibility with that, too.

23   Q.  So this would be the entire management

24   team; is that right?

25   A.  Yes.

1 flexibility anywhere. Nobody could be moved around

2 because all the shifts were already covered.

3    Q. How many cash registers did you normally

4 have operating at 1868?

5    A. Two.

6    Q. Were there times when you only had one

7 open?

8    A. Most of the time it was only one until the

9 next one needed to be open.

10    Q. So one to two?

11    A. One to two. Uh-huh.

12    **Q. With regard to accounting, it was really**

13 **your responsibility to know all the facts and**

14 **figures about that store; right?**

15    **A. Sure.**

16    **Q. The sales, the number of employee hours,**

17 **the deposits, everything that went into that**

18 **business; is that right?**

19    **A. Uh-huh. As much as I could see, you know.**

20 **As much information as they allowed me to look at.**

21    Q. What information were you missing; do you

22 know?

23    A. I just never saw -- before, I never saw a

24 margin. I never saw how much anything cost. I

25 never saw how much even a piece of paper cost that

1  something I could do and he said, yes, he could

2  mark them down.

3  Q. Who determined what the markdown would be?

4  A. Um, I asked him. I said, "What can I do?

5  Can I go four for a dollar?" And he said, "That

6  will be fine."

7  Q. You made a suggestion and he accepted it?

8  A. Yeah.

9  Q. We've talked about your responsibilities

10  and how you implemented them for cleanliness and

11  appearance of store. We've certainly talked about

12  your view that, um, you were responsible for

13  customer service; correct?

14  A. Uh-huh. Yes.

15  Q. You've told us about how you handled

16  customer complaints and problems. Did you ever

17  receive written customer complaints?

18  A. I received one. Um, yeah, actually, that

19  was the last one with Kassondra that I really had a

20  problem.

21  Q. This complaint had to do with Kassondra's

22  attitude toward the customer?

23  A. Yeah.

24  Q. And you received a complaint in writing?

25  A. Yes.

1    Q. What did the customer say?

2    A. Um, that Kassondra was just very

3 argumentative and that --

4    Q. With which you agreed; right?

5    A. Yes, very much so. And that she just went

6 on and on with the customer instead of just ending

7 it, being a good person that's trying to sell

8 somebody something and just stopping. She just

9 never stopped and made hand gestures at her and

10 things like that.

11    So that's -- that was the --

12    Q. That was really one of your reasons for

13 termination; is that right?

14    A. Yes.

15    Q. How did you handle the customer? Did you

16 talk to them? Did you respond?

17    A. Absolutely.

18    Q. Did you call them?

19    A. Yes. And I -- since most of the -- at

20 that time, like I said, the responsibility was on

21 Rick to do the disciplinary action against

22 Kassondra. I tried to turn it over to Rick and

23 nothing ever happened.

24    Q. So you assumed responsibility for it,

25 essentially?

1 **A. Well, I just assumed as far as I could go**

2 **with it.**

3 **Q. You called Candace?**

4 **A. I did call Candace about it. Um, Rick**

5 **needed to follow through with the disciplinary**

6 **action of Kassondra, but it never happened.**

7 **Q. As I understood your testimony, you**

8 **essentially were responsible for initiating the**

9 **termination; is that right?**

10 **A. Um, yes.**

11 **Q. Did you call the customer by telephone?**

12 **A. Yeah, I believe I did. Yes.**

13 Q. Other than talking to the customer about

14 it and apologizing, is there anything else you did

15 to resolve that complaint?

16 A. Um, that was all I could do. Uh-huh.

17 Q. You didn't offer them a bunch of cups?

18 A. No.

19 MR. FIETZ: Plates. They didn't have the

20 plates.

21 THE WITNESS: I told them, "Everything is

22 a dollar. Go for it." No.

23 MS. McCLAIN:

24 Q. I thought it was the cups that were left.

25 Is that right? Did I have that wrong?

1    A. What's that?

2    Q. Somebody bought all the plates?

3    A. The cups were left.

4    Q. Maybe it was the cups that were left.

5        MR. FIETZ: I must have misunderstood. I

6 thought you said -- I thought you meant the store

7 bought a bunch of plates and they didn't have cups.

8        THE WITNESS: No, no, no. Somebody had

9 bought all the plates.

10       MR. FIETZ: I see. I see. I see.

11       THE WITNESS: And left the cups.

12       MR. FIETZ: My mistake.

13       THE WITNESS: So they sold individually.

14       MS. McCLAIN:

15    Q. It was a good sale, that four for $1?

16    A. It was. It was. Yeah, yeah.

17    **Q. Complete management reports in a timely**

18 **and accurate manner. We've talked about all your**

19 **paperwork responsibilities?**

20    **A. Yes.**

21    **Q. That was essentially all the reports you**

22 **looked at on Monday; correct? You provided sales**

23 **information?**

24    **A. Correct.**

25    Q. You provided inventory information?

1    A. Correct.

2    Q. And one was doing stocking; correct?

3    A. Correct.

4    Q. Although you have told me that there were

5  times when you were on the cash register as a

6  management function, either checking out what the

7  cashier had done all day or handling those

8  management functions of returns or voids?

9    A. Um, yeah. There was --

10   Q. So there's some cashiering time, which is

11  part of your management job; correct?

12   A. Correct.

13   Q. And did you last week spend more than 50

14  percent of your time running a cash register and

15  stocking?

16   A. Last week? I'm trying to remember last

17  week. Um, I would say the actual work that I

18  did -- yeah, that would probably consist of what I

19  did -- you know, the majority of what I did.

20   Q. Fifty-one percent?

21   MR. FIETZ: Objection. Lacks foundation.

22   MS. McCLAIN:

23   Q. Sixty percent?

24   A. I -- I can't recall. I can't really put a

25  percent on it because it seems to just be a -- you

1 know, a big blob in the day. It's just, you know,

2 um, I do my stuff on Monday, and that was really

3 the rest of it. That's all -- that's all I really

4 have to do.

5    Q. We talked about all of your paperwork on

6 Monday. But you don't restrict your personnel

7 functions to Monday; do you?

8    A. No. Recently with this store, I'm taking

9 over a store so there seems to be a lot of issues

10 that I'm needing to tie up from the previous

11 management.

12    Q. Such as?

13    A. Payroll issues. There's a lot happening

14 right now. Very disturbing, actually.

15    Q. Some questions of what the previous

16 manager did with respect to payroll?

17    A. Correct.

18    Q. The previous manager was Mr. Berger;

19 correct?

20    A. Correct.

21    Q. And what kind of problems are you finding?

22    A. Missing hours, literally ignoring -- when

23 you type in a shift, it goes into the computer.

24 The manager has the authority to ignore it, whether

25 that punch ever happened. It's still documented in

1 there.

2      I found a lot of days ignored and either

3 not even paid or given as sick pay or given as

4 vacation pay.

5    Q. Is someone investigating this?

6    A. Um, I just found it yesterday.

7    Q. Who have you told about it?

8    A. Rick. And I left a whole file for him

9 last night.

10    Q. You've been spending a fair amount of time

11 investigating this payroll issue?

12    A. Yesterday took up a lot of my day to do

13 that. Um, but I'd say, you know, hearing the

14 complaints in the last week -- I'vd had a couple of

15 them that I have found issues of, you know, people

16 writing on the -- on the -- if Compass -- if the

17 time clock is not working, you're supposed to write

18 down your stuff. Well, if that's not entered in

19 the Compass, they don't get paid. So I found

20 sheets that didn't correlate with what was in

21 Compass.

22    Q. So you've been doing an audit of the time

23 worksheets versus the Compass records; is that

24 right?

25    A. Yes. Uh-huh.

1    A. I'm not supposed to.

2    Q. Have you?

3    A. I'm supposed to do it only if the product

4 runs out.

5    Q. You've never said to yourself, "I think

6 this product is better on that end clip (sic)"?

7    A. It's not my job to do that.

8    Q. Never, never done it?

9    A. No.

10    **Q. And so how would we ever be able to, um,**

11 **ascertain how much time you spent stocking?**

12    **A. Um, there's no record. It would just**

13 **be --**

14    **Q. A guess?**

15    **A. A guess. Yeah.**

16    **Q. And have you made any effort at any point**

17 **in time when you were worked at Dollar Tree as a**

18 **store manager to keep a running log of minutes or**

19 **hours that you spent stocking?**

20    **A. Unfortunately, no.**

21    THE VIDEOGRAPHER: The time is

22 approximately 4:33 p.m. We're now off the record.

23    (Recess taken.)

24    THE VIDEOGRAPHER: The time is

25 approximately 4:44 p.m. We are back on the record.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MIGUEL A. CRUZ, and JOHN D. )
HANSEN, individually, and on )
behalf of all others similarly )
situated, )
)
    Plaintiffs, )
)
vs. ) Case No: C07-02050 SC
)
)
DOLLAR TREE STORES, INC., )
)
    Defendant. )
_____)

**COPY**

DEPOSITION OF JOHN D. HANSEN
VOLUME II

DATE:     Thursday, November 1, 2007

TIME:     9:32 a.m.

LOCATION:   Kauff, McClain & McGuire
        One Post Street,  26th Floor
        San Francisco, California 94104

PREFERRED REPORTERS
Certified Shorthand Reporters
201 E. Watmaugh Road
Sonoma, California 95476
707-938-9227

Reported By:  Linda Vaccarezza, RPR, CSR #10201

292

1 waiting on customers at the cash register?

2    A   It's hard to say for sure, because it's

3 off and on a lot.  You're trying to get things

4 done out on the floor, and you get called over to

5 the register, or you see that there's a line.  So

6 it's -- it's very difficult to be specific on

7 that.

8    Q   Do you recall that week as a heavy week

9 for your work on a cash register or normal or do

10 you have any ability to draw a comparison?

11   A   To be honest, it wasn't an

12 extraordinarily busy week.  It was a little

13 busier, but I would say the last few days was

14 probably busier than last week.  So I can't

15 really -- I'm sorry, what was the question that

16 you last asked?

17   Q   Could you compare that week to other

18 weeks as being either a normal, heavy or light

19 week on the register for you?

20   A   Oh, I see.  For me, personally, I didn't

21 feel like I was extraordinarily on there.  But,

22 yeah, I can't really -- no.

23   **Q   How about stocking shelves?  Did you**

24 **spend a portion of your time last week stocking?**

25   **A   Stocking and cleaning quite a bit.  Yes.**

1    **Q   Can you tell me what percentage of your**

2    **time you spent of your overall hours?**

3    **A   I can't really say specifically, but**

4    **quite a bit.  I just remember that being quite a**

5    **bit of my time.**

6    Q   Was there a reason for that?

7    A   We are consistently transitioning into

8    Christmas right now.  So whatever -- once

9    something sells, others need to come out.

10        We had a huge truck that the stockers

11   needed to focus on to get that out, to make sure

12   our everyday sales came up.  So I tried to keep

13   up with the seasonal.

14   Q   Were you actually putting the seasonal

15   goods into displays or just putting them on the

16   shelves?

17   A   Yeah.  Both.

18   Q   Did you have any unusual customer issues

19   last week?

20   A   No.  I can't think of any.

21   Q   Did you do any work on controlling

22   shrink last week?

23   A   Nothing more than usual.

24   Q   You did ordering last week?

25   A   Yeah.  Yes, I did.

1 that says Manager Order Retail Percentage to

2 Total.

3   A   Yes.

4   Q   And go down to the 12/7/2006 date,

5 you'll see a percentage of 42 percent.

6   A   Okay.

7   Q   My question is: Can you tell me what

8 would account for that variation in percentage of

9 ordering?

10   A   Couple of different things. Back room

11 being so full, afraid to order stuff. Pressure

12 from above to order more. That's really --

13   Q   A customer run on balloons?

14   A   Yeah. I guess so.

15   Q   Or whatever.

16   **A   Usually it's -- I mean, I always tried**

17 **to make sure that I ordered the basics that**

18 **always sold, and balloons was one of them. And**

19 **drinks. Things like that. Didn't want to run**

20 **out of those things.**

21   **Q   And those were your specific orders;**

22 **they weren't on automatic replenishment; is that**

23 **right?**

24   **A   Correct. Correct. And if I felt my**

25 **back room was overly stuffed, I didn't want to go**

1 into too much of the other thing because I felt

2 ASR was going to take care of them.

3    Q   So this is a judgment call that you made

4 on a week-to-week basis?

5    A   Yes.

6    Q   How busy is the store, how stuffed is my

7 stockroom, what are customers asking for?

8    A   A lot of times I would order a lot on

9 one order.  And, I mean, that would carry over.

10 I wouldn't need as much stuff.

11       I mean, I would go through the order

12 book and realize, what am I -- I have a thousand

13 screwdrivers, what do I need 100 more for.  And I

14 would still be able to order it, but, you know --

15 so I would just go through the order book that

16 way, and figure what do I need to order and what

17 I don't.

18    Q   Do you find your deliberations in that

19 regard any different at 2262 given the fact that

20 it's not as busy?

21    A   No, it's not -- all the same.

22    Q   You're going through the same analysis?

23    A   Yes.

24    Q   Maybe different products --

25    A   Yes.