MAUREEN E. McCLAIN, Bar No. 062050
MATTHEW P. VANDALL Bar No. 196962
KRISTA STEVENSON JOHNSON, Bar No. 185241
LITTLER MENDELSON
A Professional Corporation
650 California Street, 20th Floor
San Francisco, CA 94108.2693
Telephone:    415.433.1940
Facsimile:    415.399.8490
Email:        mmcclain@littler.com
Email:        mvandall@littler.com
Email:        kjohnson@littler.com

Attorneys for Defendant
DOLLAR TREE STORES, INC.

BETH HIRSCH BERMAN, VA Bar No. 28091
WILLIAMS MULLEN
A Professional Corporation
999 Waterside Drive
1700 Dominion Tower
Norfolk, VA 23510
Telephone:    (757) 629-0604
Facsimile:    (757) 629-0660
Email:        bberman@williamsmullen.com

*Pro Hac Vice* Attorneys for Defendant
DOLLAR TREE STORES, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIGUEL A. CRUZ and JOHN D. HANSEN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DOLLAR TREE STORES, INC.,<br><br>Defendant. | Case Nos. C 07 2050 SC and C 07 04012 SC<br><br>**DEFENDANT DOLLAR TREE STORES, INC.'S NOTICE OF MOTION AND MOTION TO DECERTIFY THE CLASS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing:          July 23, 2010<br>Time:             10:00 a.m.<br>Dept.:            1, 17th Floor<br>Judge:            Hon. Samuel Conti |
| ROBERT RUNNINGS individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DOLLAR TREE STORES, INC.,<br><br>Defendant. | Trial Date:       March 7, 2011<br>Complaints Filed: April 11, 2007<br>                  July 6, 2007 |

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108 2693
415 433 1940

DEFT'S MOTION TO DECERTIFY THE CLASS;
MEMORANDUM IN SUPPORT THEREOF

CASE NOS. C 07 2050 SC
and C 07 04012 SC

# TABLE OF CONTENTS

PAGE

I.   ISSUES TO BE DECIDED ................................................................... 2

II.  SUMMARY OF ARGUMENT AND STATEMENT OF FACTS ..................................... 2

III. LEGAL ARGUMENT .......................................................................... 4

A.   New Case Law Decided Since Class Certification Compels Decertification. ............. 5

1.   Vinole And Wells Fargo Have Changed The Relevant Legal Analysis. ......... 5

2.   Legal Authority Cited In The Class Cert. Order Should Be Re-Evaluated In Light Of The Intervening Change In Law. ................................. 7

B.   New Facts Developed Since The Class Cert. Order Compel Decertification. ............. 8

1.   CMs Varied Approaches To And Understanding Of The Certification Process Requires Decertification. ................................................... 8

a.   Plaintiffs Admit That The Certification Process Does Not Provide A Valid Description Of What The CMs Do. ............................. 8

b.   Expert Analysis Of The Certification Process Warrants Decertification Of The Class. ......................................................... 9

c.   CMs' Testimony Shows That The Certifications Are Not Evidence Of Common Job Duties. ................................................... 10

2.   Decertification Is Warranted Because Of The Different Experiences And Job Duties Among Dollar Tree Store Managers. ................................... 11

3.   DT's Training Program Does Not Show The Type Of Common Experience Necessary For Class Certification. ........................................ 16

4.   The Class Members' Varying Use Of Tools Provided By Dollar Tree To Ensure Independent Decision-Making Shows Differences In Their Job Duties. ............................................................................. 17

a.   CMs Used The Management Tools In A Variety Of Ways. .............. 17

b.   CMs Had Varying Approaches To Ordering And Displaying Merchandise In Their Stores. .......................................................... 19

c.   CMs Had Varying Experiences With Human Resources Functions. ............................................................................ 20

C.   Because No CM Or Group Of CMs Can Provide Accurate Testimony On Behalf Of The Entire Class, A Class Action Is Not The Superior Method Of Determining These Claims. ................................................................... 21

1.   It Is Not Appropriate To Try An Exemption Case Containing Numerous Factual Issues Using Representative Testimony. ........................ 21

2.   Plaintiffs' Scattershot Proposals For A Trial Plan Do Not Pass Legal Muster. ............................................................................... 24

3.   Credibility Issues Require An Individualized Inquiry. ............................. 28

D.   Class Certification Is Not Appropriate For Meal And Rest Period Claims. .............. 29

IV.  CONCLUSION ............................................................................. 30

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFT'S MOTION TO DECERTIFY THE CLASS;                    i.                    CASE NOS. C 07 2050 SC
MEMORANDUM IN SUPPORT THEREOF                                                  and C 07 04012 SC

TABLE OF AUTHORITIES

PAGE

CASES

*Alba v. Papa John's USA, Inc.,*
   2007 U.S. Dist. LEXIS 28079 (C.D. Cal. 2007)..............................................7

*Blackwell v. SkyWest Airlines, Inc.,*
   245 F.R.D. 453 (S.D. Cal. 2007) ........................................................30

*Brinker v. Superior Court,*
   165 Cal.App.4th 25 (2008)
   (depub., rev. grant. Oct. 22, 2008).....................................................30

*Brinkley v. Public Storage, Inc.,*
   167 Cal.App.4th 1278 (2008)
   (depub. rev. grant. Jan. 14, 2009) ......................................................30

*Brown v. Federal Express,*
   249 F.R.D. 580 (C.D. Cal. 2008) ........................................................30

*Howard v. GAP, Inc.,*
   2009 U.S. Dist. LEXIS 10596 (N.D. Cal, Oct. 29, 2009) ...............................6

*In re Wells Fargo Home Mortgage Overtime Pay Litig.,*
   571 F.3d 953 (9th Cir. 2009) .....................................................3, 5, 6, 7

*In re Wells Fargo Home Mortgage Overtime Pay Litigation,*
   2010 U.S. Dist. LEXIS 3132 (N.D. Cal. Jan. 12, 2010) ..........................passim

*Jimenez v. Domino's Pizza, Inc.,*
   238 F.R.D. 241 (2006) ..................................................................22

*Johnson v. Big Lots,*
   561 F.Supp.2d 567 (E.D. Louisiana 2008) .......................................23, 26

*Kenny v. Supercuts, Inc.,*
   252 F.R.D. 641 (N.D. Cal. 2008)........................................................30

*Krzesniak v. Cedent Corp.,*
   2007 U.S. Dist. LEXIS 47518 (N.D. Cal. 2007) .......................................7

*Marlo v. United Parcel Service, Inc.,*
   251 F.R.D. 476 (C.D. Cal. 2008) ...............................................4, 21, 25

*Mendoza v. Home Depot, USA, Inc.,*
   2010 U.S. Dist. LEXIS 13025 (C.D. Cal. Jan. 21, 2010) ..............................6

*Pablo v. Servicemaster Global Holdings, Inc.,*
   2009 WL 2524478 (N.D. Cal. 2009) ................................................6, 21

*Perez v. Safety-Kleen Sys., Inc.,*
   253 F.R.D. 508 (N.D. Cal. 2008).........................................................30

*Ramirez v. Yosemite Water Co.,*
   20 Cal. 4th 785
   85 Cal. Rptr. 2d 844,
   978 P.2d2 (1999)............................................................................23

*Rodriguez v. Gates,*
   2002 U.S. Dist. LEXIS 10654 (C.D. Cal. 2002)........................................25

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

DEFT'S MOTION TO DECERTIFY THE CLASS;     ii.     CASE NOS. C 07 2050 SC
MEMORANDUM IN SUPPORT THEREOF                          and C 07 04012 SC

**TABLE OF AUTHORITIES**

(CONTINUED)

**PAGE**

*Salazar v. Avis Budget Group, Inc.*,
  251 F.R.D. 529 (S.D. Cal. 2008) ................................................................ 30

*Sav-on Drug Stores, Inc. v. Superior Ct.*,
  34 Cal. 4th 319
  17 Cal. Rptr. 3d 906
  96 P.3d 194 (2004).......................................................................................... 22

*Sepulveda v. Wal-Mart Stores*,
  237 F.R.D. 229 (C.D. Cal. 2006)
  *aff'd in relevant part*,
  275 F. Appx 672 (9th Cir. 2008)................................................................ 7

*Spagnola v. Chubb Corp.*,
  2010 U.S. Dist. LEXIS 1115 (S.D.N.Y. Jan. 7, 2010)........................... 22

*Tierno v. Rite Aid Corp.*,
  2006 WL 2535056 (N.D. Cal. 2006) ......................................................... 7

*Trinh v. JP Morgan Chase & Co.*,
  No. 07-CV-1666 W(WMC),
  2008 WL 1860161 (2008).............................................................................. 23

*Vinole v. Countrywide Home Loans, Inc.*,
  571 F.3d 935 (9th Cir. 2009) ........................................................... passim

*Wang v. Chinese Daily News, Inc.*,
  231 F.R.D. 602 (C.D. Cal. 2002) ............................................................... 7

*Weigele v. FedEx Ground Package System, Inc.*,
  2010 U.S. Dist. LEXIS 33305 (S.D. Cal. 2010) ................................. 6, 7

*Whiteway v. FedEx Kinkos Office and Print Svcs., Inc.*,
  Case No. 05-CV-02320 (N.D. Cal., Oct. 2, 2009)................................ 7, 23

**STATUTES**

29 C.F.R. § 541.102 ...................................................................................... 22

**OTHER AUTHORITIES**

Wage Order 7-2001(1)(A)(1)....................................................................... 22

Wage Order 7-2001(1)(A)(1)(e)................................................................. 22

Wage Order 7-2001(2)(K)............................................................................ 22

**RULES**

Fed. R. Civ. P., Rule 23 ........................................................................ 4, 26, 30

Fed. R. Civ. P., Rule 23(a)(1) .................................................................... 2

Fed. R. Civ. P., Rule 23(a)(2) ................................................................ 2, 5

Fed. R. Civ. P., Rule 23(a)(3) ................................................................ 2, 5

Fed. R. Civ. P., Rule 23(a)(4) .................................................................... 2

Fed. R. Civ. P., Rule 23(b)(3) ................................................................ 2, 5

Fed. R. Civ. P., Rule 23(b)(3)(D) ........................................................... 22

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

**NOTICE OF MOTION AND MOTION TO DECERTIFY THE CLASS**

TO THE COURT, ALL PARTIES, AND ALL ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on July 23, 2010 at 10:00 a.m., in the Courtroom of the Honorable Samuel Conti, Courtroom 1, 17th Floor, 450 Golden Gate Avenue, San Francisco, California, Defendant Dollar Tree Stores, Inc. ("Defendant") will, and hereby does, move the Court for an order decertifying the class.

Defendant's motion is based upon this Notice of Motion and Motion, Memorandum of Points and Authorities, the Declaration of Matthew P. Vandall and all declarations and other exhibits attached thereto, the Declaration of Krista Stevenson Johnson and all depositions and other exhibits attached thereto, the Declaration of Pam Wolpa, the Declaration of Jerry Clemens, the Declaration of Charlene Montgomery, the Declaration of Robert Crandall, the Rebuttal Declaration of Robert Crandall, Objections to the Expert Reports of David Lewin, Ph.D., Request for Judicial Notice, oral argument of counsel at the hearing, and all other pertinent papers contained in the Court's files.

Dated: June 18, 2010

                                     */s/ Maureen E. McClain*
                                     MAUREEN E. McCLAIN
                                     LITTLER MENDELSON
                                     A Professional Corporation
                                     Attorneys for Defendant
                                     DOLLAR TREE STORES, INC.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108 2693
415 433 1940

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    ISSUES TO BE DECIDED

Whether the Court should decertify a class action of 718 Dollar Tree Store Managers, certified on May 26, 2009 under Federal Rule of Civil Procedure, Rule 23(a)(1)-(4) and (b)(3), based on the change in the law since class certification, the continued development of facts showing that individualized issues predominate over common issues and that a class action is not the superior method of trying these claims, and the failure of Class Counsel to present a specific plan for trial.

## II.    SUMMARY OF ARGUMENT AND STATEMENT OF FACTS

Dollar Tree Stores, Inc. ("DT") urges the Court to decertify this class of 718 Store Managers managing some 273 retail locations in California for the following reasons:  (1) since the Court certified the class, the Ninth Circuit has changed the law regarding class certification; (2) discovery has unearthed new facts and admissions by Plaintiffs demonstrating that class certification is no longer appropriate; and (3) Plaintiffs have failed to set forth any plan to try this case on a class basis that would pass legal muster.

On May 26, 2009, the Court issued its Order certifying this case as a class action (Dckt. #107, "Class Cert. Order").  The Court found that while "the work experience of particular [Store Managers] varies considerably," the "legal issues and many of the factual questions are the same for all putative class members."  (Class Cert. Order, pp. 12-13.)  Further, the Court found that it could rely on the DT Store Manager Position Description and Responsibilities ("Job Description") to determine individual Class Members' ("CMs") exempt or non-exempt status.  (*Id*. at pp. 16-20[1]).  The Court concluded that standardized policies and practices supported Class Certification (*id*. at p. 21) and noted that the Court "retains the option of decertification." (*Id.*, p. 22-24.)

On July 7, 2009, six weeks after the issuance of the Class Cert. Order, the Ninth Circuit decided two cases that altered the legal landscape for certifying class actions in California.  In *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 945-46 (9th Cir. 2009) (*Vinole*), the Ninth Circuit

---

[1] The Job Description is attached as Exhibit B to the Declaration of David McDearmon filed herewith as Exhibit W to the Declaration of Matthew P. Vandall in Support of Defendant's Motion to Decertify the Class (the "Vandall Dec.").

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108-2693
415.433.1940

DEFT'S MOTION TO DECERTIFY THE CLASS;
MEMORANDUM IN SUPPORT THEREOF          2.          CASE NOS. C 07 2050 SC
and C 07 04012 SC

upheld a district court denial of class certification, emphasizing the importance of an individualized inquiry into the way potential class members actually carried out their work. The same day, the panel decided *In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009) (*Wells Fargo*), finding that the district court abused its discretion in certifying a class when it relied on a uniform exemption policy "to the near exclusion of other factors relevant to the predominance inquiry." On remand, the *Wells Fargo* district court decertified the class, finding, among other things, that in light of the differences between the class members, representational testimony of the sort proposed by Plaintiffs in this case was an inappropriate method of determining exempt status under California's outside sales exemption. *In re Wells Fargo Home Mortgage Overtime Pay Litigation*, 2010 U.S. Dist. LEXIS 3132, *24 (N.D. Cal. Jan. 12, 2010) (*Wells Fargo District Court*).

In addition to a shift in the law, DT has developed through discovery a robust factual record that supports decertification. These relevant facts are summarized here:

1.      Plaintiffs have repeatedly admitted that the job duties of CMs varied from week to week and from CM to CM such that one CM cannot speak for any other. In the words of Class Counsel: "Plaintiffs cannot determine whether the duties identified in Defendant's Requests for Admission are *categorically* exempt or non-exempt" (Vandall Dec., ¶H, Ex. D, p. 8 (emph. in original)), and "They may be exempt during some work weeks and may not be exempt during other work weeks." (*Id.*, Ex. E, 7:24-25.) Further, Plaintiffs admitted that they:

> do not know whether all other DT Store Managers would testify they shared [a referenced] job responsibility and/or when they had it, and/or whether they would describe [it] in the same way [as another CM]. . . ." (*Id.*, ¶K, Ex. H, 2:24-26 and *passim*.)

In a December 23, 2009 letter to the discovery Magistrate, Class Counsel argued they would need to speak with potentially hundreds of CMs to answer RFAs concerning how CMs performed their jobs. (*Id.*, ¶M, Ex. J.)

2.      Discovery regarding Dollar Tree's Certification Process, through which CMs certified that they either did or did not spend more than 50% of their actual work time performing a list of 17

LITTLER MENDELSON
Professional Corporation
650 California Street
20th Floor
San Francisco, CA
94108-2693
415 433 1940

DEFT'S MOTION TO DECERTIFY THE CLASS;
MEMORANDUM IN SUPPORT THEREOF          3.          CASE NOS. C 07 2050 SC
and C 07 04012 SC

exempt tasks (the "Certification Process"), also supports decertification. CMs offered conflicting testimony regarding their understanding of and approach to the Certification Process. Defendant's expert, statistician Robert Crandall, analyzed the CMs' certification responses and found, *inter alia*, that "there is a wide variation across CMs in terms of the percentage of work-weeks certified as exempt." (Exs. 3 through 10 to the Crandall Declaration filed herewith.) Plaintiffs' own expert does not dispute this; he testified that the certifications do not describe "what people spent their time actually doing or how much time they spent doing it." (Lewin, 118:8-17.)[2]

3.    Since May, 2009, Defendant has taken 58 depositions of CMs in this case and in the single plaintiff exemption cases of *Fierro v. Dollar Tree* and *Smith v. Dollar Tree.* (Johnson Dec., ¶5.) Those depositions (together with the seven depositions taken before May 2009) conclusively establish a lack of commonality over such topics as how CMs were trained, how they viewed their jobs, how they performed the 17 duties and responsibilities listed in the Job Description and the Certification Process, and how CMs used the managerial tools available to them.

Finally, Class Counsel has not presented a specific plan as to how this case can be tried so as to satisfy Rule 23's requirements. Plaintiffs must concede that there are individuals in the class who qualify for the exemption,[3] and, in the words of Judge Patel in *Wells Fargo District Court, supra,* at *24 (citation omitted), it is not possible to certify "an overbroad class containing both allegedly injured and uninjured parties" as there is no viable way to separate the two groups.

## III.    LEGAL ARGUMENT

Plaintiffs bear the burden of proving that class certification remains appropriate. *See Marlo v. United Parcel Service, Inc.*, 251 F.R.D. 476, 480 (C.D. Cal. 2008) (decertifying class after

---

[2] Relevant excerpts of all deposition testimony, including the testimony of CMs and the parties' experts, are attached to the Declaration of Krista Stevenson Johnson in Support of Defendant's Motion to Decertify the Class ("Johnson Dec.") as Exhibits 1-60 and arranged in alphabetical order by last name. For ease of reference, DT references each deponent by last name in this briefing rather than the corresponding exhibit number within the Johnson Declaration.

[3] *See, e.g.*, Maldonado, 112:17-113:2 ("I spend my time doing my manager paperwork, and my coaching and training process, 70 percent"), *see also* Black, 146:4-24 ( "I don't do anything without trying to train somebody to do something else"); Avila, 119:12-25 (testifying that he completed the certifications honestly because he saw his role as predominately managerial).

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108 2693
415 433 1940

subsequent discovery, motion practice, and trial preparation revealed that the requirement of predominate common issues was not satisfied). If Plaintiffs cannot *prove* a sufficient degree of homogeneity in the performance of their job duties, the Court must decertify the class and allow Plaintiffs' claims to proceed individually. The facts developed in discovery since the issuance of the Class Cert. Order demonstrate that the Plaintiffs cannot establish the commonality or typicality requirements of Rule 23(a)(2) and (3), and they cannot show that common issues predominate over individual issues. Accordingly, a class action is simply not a superior method of adjudicating Plaintiffs' claims. Fed.R.Civ.P., R. 23(b)(3).

### A. New Case Law Decided Since Class Certification Compels Decertification.

#### 1. *Vinole* And *Wells Fargo* Have Changed The Relevant Legal Analysis.

Since the date of the Class Cert. Order, the Ninth Circuit has decided two cases bearing on the predominance analysis in exemption cases. *See Vinole, supra*, 571 F.3d 935 at 944; *Wells Fargo, supra*, 571 at 959. In *Vinole*, the Ninth Circuit found that, where the plaintiffs' claims require a "fact-intensive, individual analysis of each employee's exempt status", the District Court appropriately declined to certify the class. In *Wells Fargo*, the panel emphasized that where the applicability of an asserted exemption hinges on how an employee actually performs his or her work, the employee's job *duties*, not an exemption *policy*, must control in deciding whether common issues predominated. *Wells Fargo*, 571 F.3d at 959.

On remand, the District Court in *Wells Fargo* denied class certification of the claims of home mortgage consultants under the outside sales exemption. The court identified "three principles" from *Wells Fargo* and *Vinole* that mandated decertification: (1) "an employer's uniform exemption policy is only one of many factors" in the predominance analysis; (2) employer asserted exemption defenses are "fact-intensive" requiring the court to "weigh the complexity of that inquiry in the predominance calculus"; and (3) "when an employer asserts an exemption defense . . . the resolution of which depends upon how employees spend their time at work, unless plaintiff proposes some form of common proof, such as a standard policy governing how and where employees perform their jobs, common issues of law or fact are unlikely to predominate." *In re Wells Fargo Dist. Ct.*, 2010

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108-2693
415 433 1940

DEFT'S MOTION TO DECERTIFY THE CLASS;
MEMORANDUM IN SUPPORT THEREOF

5.

CASE NOS. C 07 2050 SC
and C 07 04012 SC

U.S. Dist. LEXIS 3132 at *20.

*Weigele v. FedEx Ground Package System, Inc.*, 2010 U.S. Dist. LEXIS 33305, *22 (S.D. Cal. 2010), a recent exemption case in which the district court decertified a class of over 500 managers, is directly on point.  In *Weigele*, the plaintiffs alleged that FedEx created standardized policies and procedures, such as manuals, task lists, and work flow processes, for many elements of their operation, which showed that the managers "perform a finite set of uniform duties". *Id.* at *19. The plaintiffs also alleged that targets set by FedEx required the managers at issue to perform physical tasks to meet them. *Id.* at *4. Finally, the plaintiffs cited to studies FedEx had conducted, which caused FedEx to conclude that "Too much of our management's time is spent loading" and "Focus is to free up Managers from loading." *Id.*  On these facts, after *Wells Fargo* and *Vinole*, the court granted FedEx's motion to decertify the class. *Id.* at *32. The *Weigele* court found:

> . . . Defendant's common processes and training are not overly supportive of a finding that common issues predominate.   For example, the training materials provide instruction regarding the tasks a Dock Service Manager would perform. . . . This guidance, however, does not appear to instruct Plaintiffs to perform non-exempt tasks and would provide no help to the Court in determining the actual work mix performed by Plaintiffs.   The common processes are similar, speaking to the small detail of particular tasks, but not how managers were to balance their responsibilities. . . . Nor has the Court been able to find anything in these documents which instructed Plaintiffs to do a clearly non-exempt task, such as package-handling.   And to the extent Plaintiffs performed indirect work as a consequence of the strictures of Defendant's policies, that is an individual issue because it requires inquiry into situations inherently specific to the particular Dock Service Manager. *Id.* at *23-24.

*Weigele* illustrates the more focused and individualized analysis required in class certification cases after *Wells Fargo* and *Vinole*. *See also Mendoza v. Home Depot, USA, Inc.*, 2010 U.S. Dist. LEXIS 13025, *23, 31 (C.D. Cal. Jan. 21, 2010) (denying certification in spite of the plaintiffs' contention that all class members followed the same "standard operating procedures"); *Pablo v. Servicemaster Global Holdings, Inc.*, 2009 WL 2524478, *6 (N.D. Cal. 2009) (class certification not appropriate where parties submitted class member declarations showing variation in how they spent their time); *Howard v. GAP, Inc.*, 2009 U.S. Dist. LEXIS 10596, *11-13 (N.D. Cal, Oct. 29, 2009) (individual issues predominated where the alleged "common" policy was a lawful

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108-2693
415.433.1940

written policy that plaintiffs claimed was modified by an unwritten unlawful policy); *Whiteway v. FedEx Kinkos Office and Print Svcs., Inc.*, Case No. 05-CV-02320 (N.D. Cal., Oct. 2, 2009) (*Whiteway 2009 Order*) (decertifying class action on grounds that plaintiff could not show how the testimony of 10-20 class members could be extrapolated to the class); RJN, Ex. D.

### 2. Legal Authority Cited In The Class Cert. Order Should Be Re-Evaluated In Light Of The Intervening Change In Law.

Certain authority cited in the Class Cert. Order must be re-analyzed in light of *Wells Fargo, Vinole* and their progeny. For example, *Tierno v. Rite Aid Corp.*, 2006 WL 2535056 (N.D. Cal. 2006) and *Alba v. Papa John's USA, Inc.*, 2007 U.S. Dist. LEXIS 28079 (C.D. Cal. 2007), were decided before *Wells Fargo* and *Vinole,* and those cases relied heavily upon the reasoning in *Wang v. Chinese Daily News, Inc.*, 231 F.R.D. 602 (C.D. Cal. 2002), which was specifically rejected by *Vinole*. *See Vinole*, 571 F. 3d at 946, n. 14 ("we do not embrace any dispositive reliance in [*Tierno* or *Alba*] on the rule from *Wang*").[4] Further, *Whiteway v. FedEx Kinko's Ofc. and Print Svcs., Inc.*, 2006 WL 2642528, *1 (N.D. Cal. 2006), also cited in the Class Cert. Order, no longer supports class certification because, in reliance on *Vinole*, the *Whiteway* court later decertified the class, finding whether plaintiffs were non-exempt could only be decided by individualized inquiry and not representative testimony. *Whiteway 2009 Order* at *5.[5]

Under the new state of the law, common policies alone do not warrant class certification if they do not show the actual work mix of all individuals in the putative class. *Weigele*, 2010 U.S. Dist. LEXIS 33305 at 23-24; *see In re Wells Fargo,* 571 F. 3d at 959; *Vinole,* 571 F.3d at 946.

---

[4] *Krzesniak v. Cendant Corp.*, cited in the Class Cert. Order, should not compel adherence to that Order. The *Krzesniak* Court found that standardized written procedures, and the small size of the class and small number of work locations (no more than 76 employees in 37 locations), showed that a class action would be manageable and appropriate. *Krzesniak v. Cedent Corp.*, 2007 U.S. Dist. LEXIS 47518 (N.D. Cal. 2007). Here, the class is more than nine times larger and there is no evidence that CMs uniformly followed DT policies at the 273 DT stores.

[5] Similarly, *Sepulveda v. Wal-Mart Stores*, 237 F.R.D. 229 (C.D. Cal. 2006) *aff'd in relevant part,* 275 F. Appx 672 (9th Cir. 2008), discussed in the Class Cert. Order, is also applicable to the extent that it supports the mandate of *Vinole* and *Wells Fargo* that a court should look beyond the existence of standardized policies and procedures and analyze what the class members actually do in determining whether class certification is appropriate in an exemption case. 237 F.R.D. at 248.

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108 2693
415 433 1940

**B.      New Facts Developed Since The Class Cert. Order Compel Decertification.**

     **1.      CMs Varied Approaches To And Understanding Of The Certification Process Requires Decertification.**

Pursuant to the Class Cert. Order, the "most convincing evidence" supporting class treatment was the Certification Process.  (Class Cert Order, pp. 16-20.)  However, new evidence developed since the Class Cert. Order, including Plaintiffs' admissions, DT's expert analysis, and CM testimony, shows that the Certification Process did not create uniform work experiences among CMs, and it provides this Court with no help in determining the *actual* work performed by CMs in this case.

     **a.      Plaintiffs Admit That The Certification Process Does Not Provide A Valid Description Of What The CMs Do.**

Plaintiffs admit that the Job Description, to which CMs certified compliance or non-compliance each week, does not provide a complete picture of the CMs' job duties:

- When asked to admit or deny that each of the 17 duties and responsibilities in the Job Description were exempt, Plaintiffs objected that they would have to "speculate" as to the exempt nature of each job duty as applied to the Class. (Vandall Dec., ¶F, Ex. B, 2:9-10 and *passim*);

- In support of Plaintiffs' objections to the RFAs, Class Counsel argued, ". . . inherent in the structure of these RFAs is the presupposition that [the Certification Process] fully expresses what Store Managers do from day to day and describes duties that would be found to be legally exempt.  Plaintiffs do not agree with this assumption." (Vandall Dec., ¶H, Ex. D, p. 7.);

- Class Counsel also argued, "each of these RFA are also overbroad on a temporal basis since, for example, the needs of a particular store manager change from pay period to pay period and, if Defendant is correct in this regard, could also change depending on 'variations in store size, sales volume, products offered by each store, employee complements, supervisory styles and merchandizing approaches.' [citing Defendant's Class Certification Opposition]  <u>Consequently, Plaintiffs cannot determine whether the duties identified in Defendant's RFA are *categorically* exempt or non-exempt.</u>" (*Id.*, p. 8 (*emph. in original*).);

- In a telephonic hearing with Judge Spero, Class Counsel stated that CMs "may be exempt during some work weeks and may be not exempt during other work weeks." (*Id.*, Ex. E, 7:24-25.);

- In the same hearing, Class Counsel argued that "[w]e are talking about managers that . . . are doing a hundred things, perhaps, during a given day." (*Id*, 13:14-17.); and

- When Plaintiffs finally responded to DT's RFAs, they qualified each answer by

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108-2693
415.433.1940

DEFT'S MOTION TO DECERTIFY THE CLASS;
MEMORANDUM IN SUPPORT THEREOF

8.

CASE NOS. C 07 2050 SC
and C 07 04012 SC

defining the specific duty and responsibility at issue as being comprised of as many as 48 discrete tasks. (Vandall Dec., ¶I, Ex. F, 2:15-3:9 and *passim*).

Further, Plaintiff's expert, David Lewin, admitted that the "the Certification Forms do not provide any information about the work activities the SMs performed or the amount of time they spent performing such activities. . . ." (Vandall Dec., ¶GG, Ex. JJ (Lewin Rebuttal, ¶10).) Lewin testified that the 17 duties and responsibilities are "managerial" (Lewin, 57:3-14), but also "overly broad . . . in terms of knowing what people do in their work." (Lewin, 52:5-15; Vandall Dec., ¶FF, Ex. II (Lewin Dec., ¶8).)

Because not even Plaintiffs (or their expert) agree that the Job Description can be used to determine whether the CMs' job duties are "categorically" exempt or non-exempt, there is no basis to use the Job Description or the Certification Process as evidence supporting Class Certification.

> **b.** **Expert Analysis Of The Certification Process Warrants Decertification Of The Class.**

DT's expert Robert Crandall analyzed certification responses, which comprised 29,431 workweeks of the Class Period. (Crandall Dec., ¶15.) Approximately 62% of the class certified that they spent the majority of all workweeks in managerial tasks, approximately 2.5% reported that they never spent the majority of their time performing managerial tasks, and about 35% fell somewhere in between. (*Id.*, ¶¶22-23, Exs. 2, 3A, 3B, 3C.) Thus, there is a large amount of variation in the responses to the certification forms.

There were measurable differences in responses between CMs, stores, and districts during the Class Period. (Crandall Dec., pp. 10-27.) An evaluation of the percentage of weeks that CMs gave "yes" answers on their certification forms shows variations on a weekly basis even among CMs in the same districts and regions. (*Id.*, ¶¶24, 28, Exs. 4A-4C, 7.) Furthermore, percentages of "yes" responses changed when CMs transferred from one store to another, suggesting store characteristics influenced the amount of time a CM spent in exempt duties. (*Id.*, ¶¶24-27, Exs. 5A-5B, 6.) Crandall also noted changes in "yes" responses when CMs worked under different District Managers, suggesting that DM management styles may have affected manager responses. (*Id.*, ¶¶29-31, Ex. 8.)

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108 2693
415 433 1940

Crandall also noted a correlation in sales volume per associate with differences in "yes" certifications, which suggests that store sales activity and customer flow are related to the proportions of reported exempt and non-exempt weeks. (*Id.*, ¶¶39-40, n. 16, Ex. 9.)  Finally, Crandall's analysis also shows that "yes" responses varied based on unique factors, which included proportion of full-time staff, customer flow (measured as sales volume per associate), whether a store was understaffed, and whether a store had experienced employee loss. (*Id.*, ¶¶38-47, Ex. 10.)

Crandall's analysis reveals that not only are there differences in responses between CMs, but that those differences can be tied to unique and changing characteristics that were faced by the CMs during the class period. (*See id.*, ¶¶33-35.)  Given the variation in responses among CMs in varying workweeks during the class period, the Certification Process cannot support continued class certification.

### c. CMs' Testimony Shows That The Certifications Are Not Evidence Of Common Job Duties.

Finally, as illustrated by the Chart below,[6] CMs had different interpretations and approaches to the Certification Process.

| CM Approach To The Certifications | Evidence |
|---|---|
| CMs responded honestly and understood that a "yes" response on the certification form meant that they spent more than 50% of their actual work time performing the managerial tasks listed in the job description. | Buitron, 183:4-185:10; Patrick, 173:6-174:25; Toto, 193:17-194:10, 315:7-12; Black, 145:7-146:9, 182:19-183:3; Maldonado, 114:2-116:4; Huntsman, 155:13-158:21; Faria, 19:10-24, 23:7-9; Hayes, 14:25-15:7, 17:9-13; Hodge, 12:25-16:4; Moreno, 257:16-258:20; Kauhn, 177:9-178:6; Schneider, 200:19-201:23, 304:16-305:4; Messer, 129:13-22; Moore, 20:9-21:24, 22:11-13; Pineda 998:14-100:11; Musk, 27:9-29:3. |
| CMs completed the certifications without significant thought or attention. | Holland, 241:16-24, 253:1-254:3; Avila, 119:12-125. |
| CMs honestly completed the certifications based on a misunderstanding of the Certification Process and now believe that their certifications were not accurate as submitted. | Chapman, 11:14-22, 12:12-13:3; 13:5-9; 14:2-17:20; Reyes, 162:2-164:11, 167:1-10, 171:1-12; Sanders, 85:15-87:14; Hawley, 23:20-27:9. |
| CMs were not truthful when they submitted their | Armstrong, 25:17-27:6; Ayala, 133:21- |

---

[6] All of the factual summaries of CM testimony in this brief are specific to the Class Period.

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

| CM Approach To The Certifications | Evidence |
|---|---|
| certifications for various reasons. | 135:20; Dougherty, 68:3-70:4; Fierro, 219:6-14; Lugo, 25:6-25; Martinez, 51:25-52:20; Mayhew, 127:11-129:16; Penunuri, 38:12-15, Walton, 41:5-43:10, 48:16-20; and Whitton, 23:25-26:6. |

The varied testimony of CMs regarding the Certification Process amply demonstrates the need for individualized inquiry and, hence, the Court should decertify the class.

### 2. Decertification Is Warranted Because Of The Different Experiences And Job Duties Among Dollar Tree Store Managers.

During the Class Period, Store Managers at DT worked independently without regular on-site supervision. One Store Manager was responsible for each store and was the only overtime-exempt employee in each store.[7] (Vandall Dec., ¶X, Ex. W (McDearmon Dec., ¶10).) Every CM reported to one District Manager ("DM") who was responsible for and traveled between 8-15 stores in his or her district.[8] (*Id.*, ¶10.) The CMs were paid a salary and were eligible for bonuses. (*Id.*, ¶9.) However, there were numerous differences among the 273 DT stores in California, and among the CMs during the Class Period. Some Dollar Tree stores in California were small operations, roughly 6,000 to 7,000 square feet, while others were 25,000 or more square feet. (*See* Vandall Dec., ¶X, Ex. Y (Jacobson-Allen Dec., Ex. A), showing unique physical characteristics, including number of end caps, size of stockroom, number of deliveries, number of payroll hours, and inventory per square feet of some stores managed by CMs; RJN, Ex. B.) In addition, stores had between nine and 80 hourly associates during non-holiday periods, and between one and five AMs. (*Id.*; *see also* Toto, 112:21-24.)

CMs had a variety of different managerial experiences during the class period. Seventy-nine

---

[7] In some instances, a DM had an office in a store, but the DM was not in charge of the store and was rarely present; rather, DMs traveled between the stores in their districts. *See, e.g.*, Cross, 26:2-24, 27:18-22. A few CMs testified, however, that DMs assumed control of their stores during their visits. (*See e.g.*, Avila, 66:23-68:21; Hall, 123:20-124:22; Patrick, 69:24-70:16, 71:5-12.)

[8] Store Managers who were also DSTs also had a "dotted line" reporting relationship to the Regional Training Manager regarding their training responsibilities. (Hernandez, 12:20-13:1.)

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

CMs received bonuses for being District Store Trainers ("DSTs") during the class period. (Montgomery Dec., ¶3, Ex. 1.)  Some CMs managed two stores at once during the class period.  (*See e.g.*, Banks, 110:22-111:14; Chin, 143:6-17; Gonzalez, 141:6-18; Hodge, 143:16-144:20; James, 144:24-145:16.)  Other CMs opened new stores and testified that they performed different job tasks during the weeks before their stores were open to the public.  (*See*, Dougherty, 195:20-21, 204:25-206:16; Faria, 111:7-18; Hamman, 23:16-24:8.)

The quality and ability of a store's freight team impacted CMs' job duties and their ability to delegate physical tasks.  CM Schneider testified that the quality of his freight crew affected his job duties with respect to the amount of time he spent on training and scheduling as well as requiring him to pick up the slack of underperforming associates.  (Schneider, 66:2-67:24.)  CM Buitron testified that having a poor freight manager "definitely" affected her job duties because she would have to focus on the tasks the Freight Manager should be performing but was not getting done.  (Buitron, 43:6-45:22.)[9]

The management styles of the DMs also affected the manner in which CMs performed their jobs.  For example, CM Lugo had two DMs during the Class Period, Mike Spinuzzi, who "was very aggressive, straightforward" and "a screamer" (Lugo, 79:1-10), and Marita Henton who "was more manageable" but "real wishy-washy".  (*Id.*, 80:2-12.)  Per Lugo, DM Henton "had her own ideas that were outside, for example, the monthly planner or the sales planner and she would make [Lugo] do the work to conform to her ideas."  (*Id.*, 81:24-82:6.)  Further, DM Henton would require Lugo to physically "move the whole store" around before a corporate visit while DM Spinuzzi did not.  (*Id.*, 80:3-18).  DM Spinuzzi, however, required Lugo to leave her store to help out at other DT Stores by

---

[9]  *See also* Cross, 16:13-20, 19:10-20:14 (spent more time monitoring productivity and re-training when he had an underperforming freight team); Dougherty, 362:1-21, 364:10-24 (her freight team spoke Spanish and she did not which affected her performance of freight related tasks).  The quantity and quality of Assistant Managers and hourly associates also impacted CM job duties.  (*See e.g.,* Clemens Dec., ¶¶6, 7 (various factors, including store personnel, cause his job to vary over time); Chin, 25:24-27:14, 29:24-30:12; 79:19-82:13 (testifying that these factors required her to spend more time on training and physical tasks); Holland, 91:6-21 (testifying that working with associates with stronger innate abilities makes the Store Manager's job easier); Mayhew, 66:1-15, 69:9-22 (testifying that he spent more time on training and that he "would have to put in [more time] to do what had to be done").)

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFT'S MOTION TO DECERTIFY THE CLASS;
MEMORANDUM IN SUPPORT THEREOF

12.

CASE NOS. C 07 2050 SC
and C 07 04012 SC

performing stocking tasks for at least 10 eight-hour days while DM Henton never made Lugo do that. (*Id.*, 116:15-118:11.)

Similarly, CM Avila worked for DMs Terrie Peters and Woody Clifford during the Class Period. DM Clifford visited Avila's store daily[10] because it was his "home store". (Avila, 53:12-16.) He would literally "hang out" in Avila's store (*id.*, 54:3-6) and would "tell [Avila's] people what to do." (*id.*, 67:8-19.)[11] DM Peters, in contrast, visited Avila's store twice a week, never assumed control of the store, and did not have much involvement in Avila's day-to-day decision-making. (*Id.*, 54:19-24, 68:2-6, 70:18-23.)[12]

Avila also worked as a DM during the Class Period, and he testified that he had a "more hands-off style" than DM Clifford. (Avila, 69:16-70:1.) DM Avila recognized that the store manager was the "leader of the store" and DM Avila "helped where [he] was needed." (Avila, 69:21-23.) DM "Clifford would like to actually go into the stores and throw freight and merchandise, where [DM Avila] had more of a delegation style." (Avila, 70:2-14.)

The record shows important differences in CM duties and experiences even among CMs who managed the same store. For example, CMs Avila, Fierro and Toto all managed Store No. 1254 in San Jose at different times during the Class Period. (Avila, 28:18-22; Fierro, 113:20-114:6; Toto, 11:21-13:11.) The chart below reflects certain of their varied experiences managing that store:

---

[10] CMs reported varied levels of contact with their DMs throughout the Class Period. For example, some CMs saw their DMs on a daily basis. (Armstrong, 100:9-14; Avila, 53:12-16.) Other DMs visited CM stores on a weekly, bi-monthly or even monthly basis. (Ayala, 46:5-11 (2 times per month); Deubert, 25:7-10 (same); Buitron, 86:8-18 (once a week); Doubleday, 46:11-24 (once a month).) Other CMs reported that the amount of time DMs spent in their stores during those visits ranged from 10 minutes to all day. (Gomez, 139:10-17 (DM visits ranged from 10 minutes to 5-6 hours); Durston, 23:12-24:2 (30 minutes to all day); Gore, 60:14-61:2 (1 to 8 hours per visit).)

[11] Avila complained to DM Clifford about this and DM Clifford changed his behavior. (Avila, 67:20-68:1.)

[12] Other CMs had similarly varied experiences. For example, Pineda believed that his DM was 100% in control of his store. (Pineda, 30:5-7, 30:18-20, 36:20-37:16, 40:13-42:5, 44:24-45:11.) Other CMs made the day-to-day decisions at their stores and would consult with their DMs about issues on an as needed basis. (Deubert, 25:16-24; Chapman, 81:13-82:4, 88:25-89:10, 91:12-93:22, 99:4-25; Huntsman, 70:6-71:14, 73:5-74:10, 76:6-7:38; Corona, 33:9-11, 58:19-59:6, 65:16-23, 66:5-9; Buitron, 86:8-18, 90:3-92:13; Hamman, 69:23-70:15, 81:7-12, 81:14-82:5, 82:9-18.)

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108 2693
415 433 1940

| Store 1254 Issue | CM Avila | CM Fierro | CM Toto |
|---|---|---|---|
| No. of Subordinate Employees | 30 associates, 5 full-time Assistant Managers. Avila, 42:7-43:3. | 35-36 associate during the non-holiday time period and up to 50 associates during the holiday time period. Fierro, 123:13-21. | Approximately 80 associates during the non-holiday time period and 92 employees during the holiday time period. Toto, 112:21-24, 113:3-5. |
| Scheduling | Before COMPASS came out, Avila could do the schedule in 2 uninterrupted hours; with COMPASS, it took 1 hour. Avila, 103:1-24. | It took Fierro 15 minutes to set up the schedule every week on COMPASS. She spent 30 minutes per week in scheduling as of March 2006. Fierro, 163:24-164:2, 213:19-23. | Toto spends 8 hours per week on scheduling during the non-holiday time period and 12 hours per week on scheduling during the holiday time period. Toto, 143:13-24, 180:5-9. |
| Ordering | Avila ordered twice a week. His day-to-day experience changed based on the merchandise mix. Avila, 95:19-96:12, 112:4-19. He could ask permission to order items he thought would sell well at his store and sometimes he was given such permission. Avila, 113:20-114:17. | Fierro ordered merchandise 3 times per week, ordered 50% of the merchandise in San Jose, and spent about 3 hours per week ordering. Fierro, 167:1-9, 167:14-15, 177:3-7. Fierro testified that she "decide[s] how and when to run certain promotions in [her] store." Fierro, 195:17-21. | Toto spends about an hour a day on ordering, felt free to order whatever he wanted and found himself "requesting [a] thousand cases of special products all the time." Toto, 111:5-19, 204:13-23. |
| Training | Avila was a DST at Store 1254. Avila, 43:15-44:4; 46:24-47:2. | Fierro was a DST and she trained MITs during the last 4-5 years of her employment. Fierro, 129:7-17. When she had MITs in her store, the MITs were with her 100% of the day. Fierro, 148:17-23. | Toto was never a DST and did not train new Store Managers at Store 1254. Toto, 23:11-14. |
| Use of Monthly / Seasonal Planners | All the end caps in Store 1254 were covered by the recommended guidelines in the monthly planners. Avila, 125:25-126:5. | The monthly planner had to be exact. Every floor stock, sign and end cap had to be exact. Fierro, 187:9-188:10. | Toto exercises discretion with respect to 70% of all end caps. Toto, 83:15-18. |
| Certification Process | Avila completed the certifications honestly because he saw his role as predominantly | Occasionally, Fierro was honest in her certifications; but she was not honest most of | Toto honestly completed his certifications. Toto, 193:17-194:10, 315:7-12. |

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

| Store 1254 Issue | CM Avila | CM Fierro | CM Toto |
|---|---|---|---|
| | managerial. He always did managerial work. Avila, 119:12-25. | the time. Fierro, 219:11-14. | |
| Unloading Trucks | Avila supervised the freight coming off the truck and did not physically move it himself. Avila, 90:1-14. Avila did not do much stocking at Store 1254. Avila, 89:16-25. | Fierro spent a minimum of 18 and a maximum of 30 hours per week dealing with freight deliveries and had to spend some time physically unloading the trucks. Fierro, 189:14-20, 191:4-7. | Toto unloaded only one truck at Store 1254. Toto, 241:19-242:15. He regularly supervised the process by assigning tasks to the freight team rather than doing the tasks himself. Toto, 229:2-231:1. |
| Ringing a Cash Register | If there was no one else to cashier, Avila would jump on a register, but that happened with very limited frequency. Avila, 90:18-91:5. | Fierro, spent from anywhere between 4-24 hours per week working on the cash register. Fierro, 214:10-20. | Toto rang a register approximately twice per week for 20 minutes at a time. Toto, 32:17-25, 304:8-20. |

The interpretations of the tasks within the Job Description also require an individualized inquiry. For example, CM testimony on the subject of supervision (Task No. 1 in the Job Description) demonstrates wide variance in either CM comprehension of the task or CM performance of the task:

| CM Testimony on Supervision | Evidence |
|---|---|
| Constantly involved in supervision of 2 or more associates in performing the 17 duties and responsibilities listed in the job description. | Banks, 30:10-13; Gonzalez, 31:7-9; Hayes, 19:18-21; Messer, 40:21-41:5; Moreno, 260:6-261: 22; Durston, 36:7-37:23, 59:23-60:5; Huntsman, 150:4-24; Hamman, 51:9-52:4; Maldonado, 62:8-63: 25, 116:14-15; Corona, 33:18-23; Gonzalez, 29:12-14, 31:7-9; Dougherty, 225:2-4, 229:23-230:23. |
| Estimates that approximately 80% of the time is spent supervising store associates. | Faria, 29:22-30:5, 31:25-32:6; Patrick, 175:10-176:7 |
| Spent more than 50% of the actual work time each week supervising two or more store associates at each store. | Buitron, 185:17-186:8. |
| CM supervised ordering, receiving, stocking and pricing "properly" by getting directly involved in the tasks themselves; hence, the level of supervision needed from the CM changed from day to day. | Moore, 37:2-38:3, 68:14-24. |
| Estimates that CM spends between 2 and 3 hours in an 8 hour day supervising store associates. | Schneider, 210:17-25. |

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFT'S MOTION TO DECERTIFY THE CLASS;
MEMORANDUM IN SUPPORT THEREOF          15.          CASE NOS. C 07 2050 SC
                                                    and C 07 04012 SC

The Court should decertify the class based upon the variations in work experience, DM styles, supervisory authority, and store-level differences in duties.

### 3. DT's Training Program Does Not Show The Type Of Common Experience Necessary For Class Certification.

In the Class Cert. Order, the Court found that "Dollar Tree's training program for SMs is standardized throughout California." (Class Cert. Order, 20:5-6.) The evidence adduced since the date of the Class Cert. Order belies that finding: of the 718 CMs, only 451 (62.8%) were coded as participating in the Management In Training ("MIT") program. (Montgomery Dec., ¶4, Ex. 3.) Only 51 CMs were coded as participants in "Career Path" training, which was a shorter training program for CMs promoted from within DT. (Montgomery Dec., ¶4, Ex. 3; Hernandez, 125:5-22.) However, the MIT program itself cannot be considered "standardized," because DSTs, themselves store managers, trained CMs at individual stores, without supervision, performing functions that were necessary for the operation of the stores in which they trained. (*See, e.g.,* Corona, 48:11-49:9; Diehl, 13:16-14:5; Dougherty, 56:16-57:17; Huntsman, 27:19-28:16; Penunuri, 18:2-19:16.) Further, deposition testimony shows a significant variance in training experience:

| Class Member Training | Evidence |
|---|---|
| CMs did not participate in the MIT Program. | Buitron, 26:2-10; Durston, 22:25-23:4; Faria, 13:12-16; Gonzalez, 46:24-47:3; Hamman, 134:19-22; Lugo, 73:10-12; Chin, 23:18-24:1; Moore, 77:18-20; Navarro, 41:24-42:1; Sanders, 25:22-26:23; Whitton, 66:9-11. |
| CMs participated in an 8-week MIT Program | Ayala, 13:13-20; Banks, 9:14-16; Black, 12:7-17; Corona, 48:11-15; Doubleday, 15:13-15, 16:21-24; Hayes, 7:13-19; Maldonado, 11:3-5, 15:15-23; Mayhew, 7:10-19; Messer, 14:7-12; Patrick, 19:6-20; Pineda, 9:14-23; Reyes, 8:1-16, 113:3-11; Sarefield, 65:2-6; Schneider, 18:13-21, 19:3-8; Toto, 12:17-23; Trinidad, 13:4-10, 60:11-12; Walton, 13:18-22. |
| CMs participated in an MIT Program that was less than 8 weeks. | Cruz, 28:12-13, 28:21-29:3; Diehl, 10:3-5 (4 weeks); Dougherty, 14:2-14 (6 weeks); Huntsman, 27:19-24, 28:6-19 (2 weeks); Hodge, 54:11-19 (6-8 weeks); Martinez, 25:20-26:5 (less than 6 weeks); Penunuri, 17:9-11, 18:2-4 (2 weeks); Valli, 10:5-9 (4-5 weeks). |
| CMs classified as MITs for more than 8 weeks. | Gore, 12:10-23 (1 year); Runnings, 23:18-23 (7 months). |

The assertion that all CMs received standardized training at DT is no longer supported by the record.

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFT'S MOTION TO DECERTIFY THE CLASS;
MEMORANDUM IN SUPPORT THEREOF

16.

CASE NOS. C 07 2050 SC
and C 07 04012 SC

4.    **The Class Members' Varying Use Of Tools Provided By Dollar Tree To Ensure Independent Decision-Making Shows Differences In Their Job Duties.**

In the Class Cert. Order, the Court cited to DT's "standardized practices and procedures," including common management tools to assist with management tasks such as scheduling, ordering and displaying products, and HR functions, as further evidence supporting Class Certification. (Class Cert. Order, p. 21-22.) The record shows that these tools did not result in a sufficient level of homogeneity among CMs to warrant continued class certification.

a.    **CMs Used The Management Tools In A Variety Of Ways.**

CM testimony regarding variances in use of certain tools contradicts the notion that DT's tools resulted in uniformity in work activities. CMs testified repeatedly that there was no typical day and no way to determine what they were doing or for how long in a typical work week.[13]    In addition, CMs testified to using DT's scheduling tools, planners, and other materials in different ways. (*See* Crandall's analysis of this issue at Crandall Dec., pp. 38-44.) CM testimony shows that while many of the CMs testified that they used COMPASS for scheduling cashiers only, there are also CMs who testified that they did not use COMPASS and instead hand-wrote their schedules. (*See e.g.,* Hansen, 58:19-60:18; Penunuri, 112:5-13; Holland, 47:18-25.)

---

[13] Many CMs testified that there was no typical day (Valli, 35:25-36:10 (every day is a different day); Durston, 107:9-18 (her days were not routine; every day was different); Diehl, 105:9-20 (every day brought new challenges), and that they could not estimate the amount of time they spent performing various tasks listed in the Job Description.  (Lugo, 38:18-21, 40:13-19, 41:4-21, 47:6-12, 48:23-49:3, 55:17-56:11, 60:1-5, 64:19-23, 67:17-68:14, 69:7-70:16, 71:9-19; Valli, 35:25-36:10, 71:17-73:21, 74:15-80:14, 82:15-25, 184:8-13; Gomez 80:8-20; Moore, 31:18-32:9, 32:21-33:1, 34:20-24, 41:22-42:1, 48:2-6, 52:11-16, 54:21-55:6, 55:25-56:5, 62:19-63:2, 68:5-9, 72:15-25, 73:8-12, 74:23-75:3, 75:24-76:3, 76:4-20, 100:10-18, 106:21-107:12, 131:24-132:3; Penunuri, 46:8-20, 48:9-15, 55:21-56:18, 60:10-13, 60:14-61:6, 62:3-18, 65:14-23, 66:2-15, 68:8-70:3, 70:23-71:3, 71:4-21; Armstrong, 54:18-22; Sarefield, 23:22-24:4, 28:20-29:1, 30:8-15, 35:13-18, 37:25-38:11, 40:19-25, 42:16-22, 44:12-45:1, 48:6-11, 50:8-14, 52:8-14, 53:14-20, 53:21-54:12, 54:19-55:3, 55:19-57:23; Whitton, 29:18-30:2, 33:2-10, 39:18-23, 42:6-9, 47:6-9, 48:8-14, 50:19-23, 54:19-23, 59:4-7, 64:1-9, 64:20-65:6, 65:7-15, 88:23-25; Hall, 41:1-4, 52:19-53:3, 61:7-24, 63:22-25; Navarro, 37:16-19, 53:5-19, 88:15-21, 124:17-24; Hoyt, 60:19-62:2, 62:11-16, 64:23-65:3, 65:4-66:10, 84:14-85:8, 113:2-8, 140:16-22, 143:11-15; Doubleday, 64:15-22, 130:6-22, 134:12-135:5, 135:16-136:5; Hebert, 148:1-15, 149:5-11, 151:12-152:3, 157:8-158:4, 158:9-160:17; Hayes, 19:18-21; Corona, 51:9-20; Gonzalez, 30:20-31:9, Walton, 57:9-13; Deubert: 78:2-12, 80:10-22, 81:12-20; Gore, 35:4-8.)

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108 2693
415 433 1940

DEFT'S MOTION TO DECERTIFY THE CLASS;    17.    CASE NOS. **C 07 2050 SC**
MEMORANDUM IN SUPPORT THEREOF                and C 07 04012 SC

The differences in CM approaches to specific other DT tools is further illustrated here.[14]

| CM Approach To Various Tools | Evidence |
|---|---|
| **Playbook** | |
| CMs varied use of reports in the Playbook to analyze sales, expenses, and profit. | Banks, 76:25-77:24; Black, 123:20-22, 124:6-21; Corona, 135:11-136:1; Faria, 62:7-63:6; Gonzalez, 40:2-11; Kauhn, 117:3-118:21; Maldonado, 80:23-87:8; Hodge, 14:4-16; Martinez, 79:17-80:1; Pineda, 112:14-114:17; Chapman, 129:4-131:16; Diehl, 168:19-170:1; Durston, 80:10-25; Fierro, 150:12-13, 171:23-172:12; Gore, 43:16-44:9, 46:6-48:9; Hamman, 95:14-25; Hayes, 84:13-85:13; Holland, 255:5-256:16; Moore, 63:22-64:15; Musk, 55:17-56:6, 66:17-67:2; Schneider, 225:7-228:25; Trinidad, 55:23-56:9; Valli, 154:6-18. |
| CM merely printed the reports in the Playbook and put them in a binder for use on an as needed basis. | Armstrong, 132:18-133:8, 133:5-8; Runnings, 100:13-18. |
| CM did not use the Playbook or cannot recall whether it was used. | Cruz, 332:16-333:21; Sarefield, 62:15-63:3; Walton, 67:22-23. |
| **Seasonal Planners** | |
| CMs see the planners as a guide but the CM retains discretion to make merchandising placement decisions. | Black, 16:2-17:8; Buitron, 123:5-124:13, 125:2-126:8; Dougherty, 125:7-15, 126:1-20, 138:13-139:25, 171:2-172:12; Faria, 137:25-140:12; 142:4-143:14; Huntsman, 103:1-107:25, 116:9-117:2, 114:5-115:2; Patrick, 185:22-190:19; Maldonado, 26:9-27:16, 29:6-21, 37:22-38:22; Moreno, 127:15-129:15. |
| CMs see the planners as requirements they cannot deviate from with respect to merchandise placement throughout the store. | Avila, 125:25-126:8; Moore, 58:19-60:3; Pineda, 109:6-16; Trinidad, 107:15-108:2. |
| CM testified that her reliance on planners changed from being mere guidelines to being more "mandatory" over time within the Class Period. | Fierro, 187:24-188:7. |
| **Store Walks** | |
| CMs conduct store walks constantly | Deubert, 47:13-48:4; Maldonado, 63:1-25; Diehl, |

---

[14] A "Playbook" is a binder of various management reports and memoranda sent to the CMs periodically by DT. (Hernandez, 82:14-83:3.) The "Seasonal Planner" is one document in the Playbook, which contains information about seasonal merchandise and displays. Other documents in the Playbook include company and store-specific sales analysis reports. (Hernandez, 166:20-168:19.) A "store walk" is when a Store Manager walks every aisle of his or her store to ascertain the store's condition, and to determine what tasks need to be performed, and to verify that past assigned tasks have been completed. (Hayes, 81:22-82:10.)

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108 2693
415.433 1940

| CM Approach To Various Tools | Evidence |
|---|---|
| throughout the day. | 34:1-15; Durston, 69:6-15; Mayhew, 16:4-16; Moore, 106:21-107:16; Montes, 78:2-6, 162:14-20; Penunuri, 111:5-17. |
| The number of store walks depends upon the conditions of CMs' store. | Moore, 106:21-107:16; Banks, 89:20-91:16; Cross, 137:21-138:14. |
| CMs conduct store walks 2-4 times per day. | Black, 55:9-56:5; Buitron, 51:6-13; Corona, 141:6-8; Faria, 109:1-9; Hayes, 80:9-81:10; Hodge, 116:5-19; Lugo, 126:20-127:22; Montes, 78:2-18; Martinez, 162:21-25; Patrick, 91:1-92:16; Reyes, 88:23-90:3; Sarefield, 61:6-24; Toto, 30:9-18, 42:18-43:7. |
| CMs conduct store walks once a day. | Armstrong, 127:7-17; Avila, 100:2-7; Fierro, 168:2-14; Hamman, 92:24-93:11, 170:14-19; Kauhn, 81:23-82:8; Valli, 152:18-153:3; Whitton, 87:4-21. |
| CM did not walk the store. | Gore, 99:15-19. |
| CM does not know DT's policy concerning store walks or whether he complied with such policy. | Ayala, 73:24-74:23. |

The Court should decertify the Class based upon the CMs divergent use of the purportedly "common" tools.[15]

### b.   CMs Had Varying Approaches To Ordering And Displaying Merchandise In Their Stores.

CM testimony also establishes material differences among CMs in ordering and displaying products.   At each DT store, CMs were expected to delegate the placement of merchandise according to "flows," which means that complementary products are placed on shelves near one another in various departments.   (Hensley, 97:3-16; Dunaway, 87:14-88:10.)   A percentage of the products sold at every DT Store are set up for automatic stock replenishment ("ASR").   However, the ASR percentages changed from store to store and over time.   (*See e.g.,* Toto, 56:17-24 (80% of the products at Store 1254 were on ASR); Armstrong, 15:19-20 (65-70% at Store Nos. 1216 & 1266); Dougherty, 114:4-25 (50% in 1233 & 1283); Martinez, 114:15-117:3 (changed over time);

---

[15] CMs also testified that the tools and procedures they used changed over the course of the Class Period.   (*See, e.g.,* Martinez, 114:15-117:3 (ASR allocation also changed over time at the individual store level); Hebert, 132:11-21 (same); Vandall Dec., ¶X, Ex. X (Pearson Dec., ¶7) (the scheduling program, COMPASS, was introduced after the start of the class period); *see also* Avila, 103:1-24 (describing differences in the time spent scheduling using both COMPASS and its predecessor during the class period).)   This lack of uniformity within the purportedly "common" tools themselves also supports decertification of the class.

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFT'S MOTION TO DECERTIFY THE CLASS; MEMORANDUM IN SUPPORT THEREOF          19.          CASE NOS. C 07 2050 SC and C 07 04012 SC

Hebert, 132:11-21 (changed over time); *see also* Vandall Dec., ¶X, Ex. Y (Jacobson-Allen Dec., Ex. A); RJN, Ex. B.)

Apart from ASRs and goods delivered directly from outside vendors, CMs ordered merchandise through the DT order book. According to Buitron, "everybody orders differently." (Buitron, 144:20-25.) For example, Schneider ordered based on the seasonal buying preferences of his customer base (*e.g.*, more black balloons for Halloween, potting soil in the Spring, and goggles during the Summer months). (Schneider, 74:24-76:13.) Hodge, however, did not change his ordering based upon customer preferences. (Hodge, 36:24-37:2, 38:2-6, 102:22-103:1.) SM Corona was "aggressive" with ordering and made sure she ordered daily so that she could keep enough product on hand to sell. (Corona, 117:24-120:7, 125:7-19, 130:22-131:8, 122:13-124:19; *see also* Holland, 338:16-21 (has tried to do aggressive ordering for the purpose of setting up in store promotions); *compare* Hawley, 102:3-24 (testifying that he was a "smart order person" rather than an aggressive orderer in that he "order[ed] what [he] need[ed] versus . . . people that just order the most they can get of everything").) Some CMs ordered at varied intervals throughout the week. (*See e.g.*, Corona, 117:24-118:4 (daily); Banks, 139:2-5 (daily); Avila, 95:19-21 (twice a week); Reyes, 78:13-22 (sometimes twice, sometimes four times per week), Hodge, 100:21-101:4 (five times per week).) The CMs also reported spending varied amounts of time on ordering in a typical work week. (Buitron, 149:16-23 (1 hour per day); Corona, 125:7-19 (30 minutes per day); Doubleday, 114:24-115:8 (1/2 a day, once a week); Fierro, 177:3-9 (3 hours a week in San Jose and 90 minutes per week in Campbell).)

Similarly, photographs taken in February 2009 show the differences in seasonal displays among seven stores in the Bay Area, which demonstrates the variances in decision-making between stores. (Declaration of Pam Wolpa, ¶¶3-9, Exs. A-G.) There is no evidence to suggest a common ordering experience among CMs.

### c.   CMs Had Varying Experiences With Human Resources Functions.

While CMs had access to an online corporate HR system called "Lawson" or "HR Self-Serve", they were expected to and did make independent hiring and firing decisions. During their

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108-2693
415.433.1940

DEFT'S MOTION TO DECERTIFY THE CLASS;
MEMORANDUM IN SUPPORT THEREOF            20.            CASE NOS. C 07 2050 SC
                                                       and C 07 04012 SC

depositions, CMs provided divergent testimony on these hiring and firing experiences. Black testified that he hired about 100 employees on his own during the Class Period. (Black, 39:22-40:4.) Chin testified that she received direction from her DM to "hire, hire, hire" so she hired 30 hourly associates in a two to three day period. (Chin, 70:2-16.) Moore testified that he interviewed job applicants but that some of his DMs wanted to meet the applicants before he could hire them while other DMs just okayed his hiring decisions. (Moore, 45:16-46:23.) Sanders testified that he had the authority to recommend that his employees be fired and that his firing recommendations were followed. (Sanders, 57:2-58:2, 89:6-11.) Trinidad, however, testified that his DM fired the associates in his store. (Trinidad, 76:8-14.) Similarly, Buitron and Chapman made hiring recommendations for AMs (Buitron, 158:11-159:19; Chapman, 76:2-77:6) while Durston and Doubleday never made such recommendations. (Durston, 27:16-18; Doubleday, 57:18-24.)

CMs also provided wide-ranging testimony with respect to the amount of time they spent on HR tasks. For example, Faria estimated that she spent anywhere between 40-70% of her time recruiting, interviewing, hiring, and training associates. (Faria, 50:6-51:14.) Gore, however, did no hiring or interviewing. (Gore, 69:25-70:17.) And, Moore testified that the amount of time he spent on hiring changed from week to week based on the hiring needs of the store, the time of year, and store sales. (Moore, 48:2-13.)

Courts routinely decline to certify misclassification cases where, as here, differences in duties between class members reveals a predominance of individual issues. *See, e.g. Pablo v. Servicemaster Global Holdings, Inc.*, 2009 WL 2524478, at *6 (N.D. Cal. Aug 17, 2009). Because there are material and measurable differences in CM job duties, the class should be decertified.

**C.      Because No CM Or Group Of CMs Can Provide Accurate Testimony On Behalf Of The Entire Class, A Class Action Is Not The Superior Method Of Determining These Claims.**

**1.      It Is Not Appropriate To Try An Exemption Case Containing Numerous Factual Issues Using Representative Testimony.**

The Plaintiffs here cannot prove that a class action is the superior method of prosecuting their claims. *See Marlo v. UPS, Inc.*, 251 F.R.D. 476, 487 (C.D. Cal. 2008) (class should be decertified if

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108 2693
415 433 1940

DEFT'S MOTION TO DECERTIFY THE CLASS;
MEMORANDUM IN SUPPORT THEREOF

21.

CASE NOS. C 07 2050 SC
and C 07 04012 SC

the class counsel does not adequately explain how the case will be tried); *see* Fed.R.Civ.P., R. 23(b)(3)(D) (a class action is not superior where there are likely to be difficulties in trial management). "The greater the number of individual issues, the less likely that superiority can be established." *See Spagnola v. Chubb Corp.*, 2010 U.S. Dist. LEXIS 1115 at \*68 (S.D.N.Y. Jan. 7, 2010). Further, "representative testimony is typically only allowed in the unpaid overtime context to establish the number of hours employees worked and the amount they were paid, not whether a class of employees was exempt from the overtime laws' coverage". *Wells Fargo District Court*, 2010 U.S. LEXIS 2132 at \*24.

In *Vinole, supra*, the plaintiffs argued, as do Plaintiffs here, that the burdens necessitated by individualized inquiries regarding job duties and the use of common tools could be mitigated through "innovative procedural tools," such as questionnaires, statistical or sampling evidence. 571 F. 3d at 947. However, both the district court and the Ninth Circuit found that "[t]hese arguments are not persuasive in light of our determination that Plaintiffs' claims require a fact-intensive, individual analysis of each employee's exempt status." *Id.* The Ninth Circuit concluded that denial of class certification was appropriate to "ameliorate the need to hold several hundred mini-trials with respect to each [employee's] actual work performance". *Id.* at 948; *see Jimenez v. Domino's Pizza, Inc.,* 238 F.R.D. 241, 252 (2006) (refusing to certify class because "the predominating issue in this case is the actual mix of duties worked which entails a need to conduct an individual inquiry for each class member"); *see also Sav-on Drug Stores, Inc. v. Superior Ct.*, 34 Cal. 4th 319, 326, 17 Cal. Rptr. 3d 906, 96 P.3d 194 (2004) (finding class treatment is proper only when class action is "advantageous to the judicial process and to the litigants"). Given that (1) the California executive exemption requires the trier of fact to determine whether each CM actually spent more than 50% of his or her time on exempt tasks during each work week in the Class Period,[16] and (2) there are

---

[16] To fall under the executive exemption of the California Labor Code, the employee at issue must spend more than 50% of his or her work time on exempt duties. Wage Order 7-2001(1)(A)(1) and (2)(K); RJN, Ex. A. Such duties include various tasks that are listed in the Job Description such as interviewing, training, scheduling, directing the work of subordinates, maintaining proper sales records, evaluating performance and efficiency, planning how work is to be performed, and other similar activities. 29 C.F.R. § 541.102; *see* Wage Order 7-2001(1)(A)(1)(e) (activities constituting exempt work shall be construed in accordance with federal regulations).

unique circumstances present for a substantial number of CMs concerning the time they spent (or could recall spending) on managerial tasks, this case will result in potentially hundreds of individual trials.   A class action simply is not the superior method of prosecuting these claims given Defendant's assertion that the executive exemption defense must be applied to each Class Member.

Indeed, a proper exemption analysis evaluates how much of each individual's time is spent in exempt duties requiring the exercise of independent discretion and judgment, and whether such time was consistent with the employer's realistic expectations. *Ramirez v. Yosemite Water Co.*, 20 Cal. 4th 785, 802-803 (1999), 85 Cal. Rptr. 2d 844, 978 P.2d 2 .  Here, the evidence shows that CMs are expected to and do perform exempt duties.   Further, CMs testified about differences in the duties they performed during the Class Period and how much time they spent performing such duties. Thus, any trial necessarily will require DT to "pick the class apart, plaintiff by plaintiff, going into the day-to-day job duties of each of the plaintiffs to prove that these [CMs] are properly classified as exempt." *See Johnson v. Big Lots*, 561 F.Supp.2d 567 (E.D. LA 2008) (*citing Trinh v. JP Morgan Chase & Co.*, No. 07-CV-1666 W(WMC), 2008 WL 1860161 (2008)).

The varied experiences of the CMs precludes the use of representative testimony for purposes of establishing liability because the testimony of a purportedly "representative" number of CMs cannot be extrapolated to the remainder of the class.   *See, Whiteway 2009 Order*, *supra* (decertifying class where the plaintiff could not show how testimony from limited number of class members could be extrapolated to approximately 500 class members); *Wells Fargo District Court*, 2010 U.S. Dist. LEXIS at *24-25 (because of the requirement of individualized fact-finding, "representative" testimony of a statistical sample was not appropriate); *see also Johnson*, 561 F.Supp.2d at 579 (finding, in federal executive exemption case, after trial began, "the 'representative' testimony [of the opt-in plaintiffs] is not representative of plaintiffs' experiences" because of the "variations in employment responsibilities").  DT's expert Crandall sets forth how the variation in time spent on exempt and non-exempt activities could result in store managers falling on either side of the 50% "primary duties" test.  (Crandall Dec., pp. 53-54; Crandall Rebuttal, ¶12.)  If the class is not decertified, it is likely that the trial will splinter into individualized issues.  The Court

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108 2693
415 433 1940

DEFT'S MOTION TO DECERTIFY THE CLASS;
MEMORANDUM IN SUPPORT THEREOF                    23.                    CASE NOS. **C 07 2050 SC**
and **C 07 04012 SC**

should decertify the class now to bypass this inevitable outcome.

      **2.**     **Plaintiffs' Scattershot Proposals For A Trial Plan Do Not Pass Legal Muster.**

Plaintiffs have failed to present any trial plan that would be fair or workable here.  In their Motion for Class Certification, Plaintiffs proposed that the Court could determine the exempt status of each of the duties of the job description (Class Cert. Motion, p. 24), a proposal that is contradicted by their responses to RFAs that the 17 duties listed in the Job Description do not describe what CMs actually do (Vandall Dec., ¶I, Ex. F), and their qualification of their answers with a lengthy list of tasks encompassed in each job duty before responding whether the duty was exempt or non-exempt. (*Id.*)   (*See* pp. 8-9, *supra.*)   Plaintiffs' expert stated that although each of the 17 duties are "managerial" (Lewin, 57:3-14), he does not think that the Job Description alone is sufficient to describe what CMs do.  (Lewin, 57:15-25.)

Since the Class Cert. Order, Plaintiffs have seemingly taken a new position: that this case must be decided on representational testimony.   (Vandall Dec., ¶¶V, W Ex. V (Motion for Case Management Order, 3:14-17) "the parties and this Court must determine, before anything else, (1) how many class members will ultimately testify and (2) who those exemplar trial plaintiffs will be").)  However, Plaintiffs themselves have consistently stated that neither the experiences of named Plaintiffs nor other CMs with regard to their performance of certain job duties can be extrapolated to the class as a whole.   In a Joint Letter to the Magistrate regarding Plaintiffs' responses to RFAs asking Plaintiffs to admit that the testimony of a CM on a particular topic was representative of the class as a whole, Class Counsel argued:

- "It is clear that Plaintiffs are asked to not only admit that they shared some 48 particular job responsibilities (*i.e.*, that they are responsible for disciplining store employees), but that they agree with each deponent's characterization of those responsibilities, . . ." (Vandall Dec., ¶M, Ex. J, p. 8);

- "Even if Plaintiffs could reasonably be expected to comment on whether a given Store Manager's testimony is "representative" of the class (which they cannot do at this time), . . ." (*Id.*)

At the telephonic hearing regarding the propriety of the responses, Class Counsel argued as follows:

LITTLER MENDELSON
Professional Corporation
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFT'S MOTION TO DECERTIFY THE CLASS;
MEMORANDUM IN SUPPORT THEREOF

24.

CASE NOS. C 07 2050 SC
and C 07 04012 SC

1       . . . a lot of these questions refer to deposition testimony that
characterizes the manner in which each duty is completed in a very
2       specific and personal way. And we intend, in our amended responses
to give more general answers about whether or not that duty was
3       completed in an exempt or not exempt fashion, I guess, for each
particular person, and not saying that the specific . . . manner in which
4       that particular deponent completed a duty is, in fact, representative of
the whole. (Vandall Dec., ¶N, Ex. K, 7:4-12.)

5

6    Given these admissions, Plaintiffs' suggestions to this Court that the parties select exemplar

7 plaintiffs for a class trial is perplexing at best.

8        In another variation on the trial plan, Plaintiffs' expert testified that it would be possible and

9 appropriate to survey ***all CMs*** after a determination of whether various tasks are exempt or non-

10 exempt, to determine how much time they spent in each job duty. (Lewin, 96:1-97:22; Vandall

11 Dec., ¶GG, Ex. JJ (Lewin Rebuttal Report, ¶17).) However, a trial plan that requires each class

12 member to individually establish liability is not a manageable plan. *See, Wells Fargo Dist. Ct.*, 2010

13 U.S. Dist. LEXIS 3132, at *21 (inquiries into how much time the class members spent in job duties

14 would "inevitably consume the majority of a trial"); *Marlo, supra,* 251 F.R.D. at 487 (rejecting

15 proposed plan to establish non-exempt status using an unscientific telephone survey, and finding

16 unpersuasive Plaintiffs' suggestion that the defendant could "knock out" exempt class members

17 during the damages phase); *Rodriguez v. Gates*, 2002 U.S. Dist. LEXIS 10654, at *43-44 (C.D. Cal.

18 2002) (a class action is not superior where the court would have to conduct a trial or summary

19 judgment type proceeding for every class member). Further, Plaintiffs have failed to describe how a

20 representational trial will look, or to identify how many Class Members are "representative". Nor

21 has their expert opined on such topics. (Lewin, 98:13-99:5.) Finally, a survey asking CMs to

22 allocate their time between various job duties will not provide accurate results; the CMs have

23 consistently testified that they cannot allocate their time and that "every day is different". (*See e.g.,*

24 *Valli*, 35:25-36:10; *see also* fn. 12, *infra*.)

25        Leaving aside Plaintiffs' own admissions, courts disfavor representational testimony in the

26 class certification context. In *Wells Fargo District Court*, 2010 U.S. Dist. LEXIS 3132, at *24, the

27 court acknowledged that it had "been unable to locate any case in which a court permitted a plaintiff

28 to establish the non-exempt status of class members, especially with respect to the outside sales

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108.2693
415.433.1940

DEFT'S MOTION TO DECERTIFY THE CLASS;
MEMORANDUM IN SUPPORT THEREOF
25.
CASE NOS. C 07 2050 SC
and C 07 04012 SC

exemption, through statistical evidence or representative testimony." As was the case in *Johnson, supra*, a likely result here is that the differences in testimony at trial will result in an unmanageable trial and/or revisiting class certification issues at trial. (Crandall Dec., pp. 8-9, 53-53.) Given the disparity in duties between the CMs here and the need to address how each individual member of the class spends the majority of his work day, the Court will be required to examine the unique circumstances of individual CMs and to conduct a "mini-trial" for each CM to determine whether he or she primarily performed exempt work. For the reasons discussed *infra*, conducting hundreds of mini-trials is anathema to the efficiencies promised by Rule 23.

Consistent with these arguments, a comparison of the individual experiences of CM Buitron, whose deposition was taken after Class Certification in this matter, and named Plaintiff Robert Runnings ("Runnings") demonstrates the fact-intensive nature of the exemption analysis in this case, and the reality that no one CM can testify on behalf of all CMs.

| Relevant Topic for Exemption Analysis | Buitron Testimony | Runnings Testimony |
|---|---|---|
| DM Involvement in Store Decisions | DMs did not provide Buitron with much direction on day-to-day operational decisions. Buitron, 88:13-89:13. | DMs "closely" supervised Runnings and were often physically present in the store providing direct instruction. Vandall Dec., ¶DD, Ex. GG (Runnings' Opp. Brief) at pp. 12:9-12; *id.*, Ex. HH (Runnings Dec.), ¶12. |
| Overall Authority at the Stores Managed | Buitron made all the decisions about how to run her stores using her own discretion and judgment and she maintained control over their daily operations. Buitron, 91:24-92:13, 157:2-158:7. | Runnings was "rarely, if ever, permitted to make any decision of real or substantial significance to the operation of his store." and Vandall Dec., ¶DD, Ex. GG (Runnings' Opp. Brief) at pp. 12:9-12. |
| Use of Seasonal Planners/ Merchandising Seasonal Products, Endcaps, and Display Tables | Buitron views the sales planners as a set of suggestions and the "vast majority" of aisles and end caps at her stores were discretionary by department allowing Buitron to select specific items and determine their placement. Buitron, 113:2-21, 116:13-118:18, 119:21-120:14. | Runnings used the planners as a guideline for building displays at his store and he always followed the guidelines. Runnings, 108:21-109:7. Runnings developed 75% of the end caps himself without any corporate suggestions at Store 2939. |

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108-2693
415.433.1940

DEFT'S MOTION TO DECERTIFY THE CLASS;
MEMORANDUM IN SUPPORT THEREOF

26.

CASE NOS. C 07 2050 SC
and C 07 04012 SC

| Relevant Topic for Exemption Analysis | Buitron Testimony | Runnings Testimony |
|---|---|---|
| | | Runnings, 105:13-106:6. |
| Ordering Merchandise | Of the products that were not automatically replenished or delivered by outside vendors, Buitron chose what to buy based upon her review of the order book and her own assessment of what sold at her stores. Buitron, 141:10-143:23. If an item sold well, she ordered enough of it to make an impactful presentation. *Id.*, 143:11-17. | Runnings did not feel that he could exert control over the type and quantity of products that were sold in his store. Vandall Dec., ¶DD, Ex. GG (Runnings' Opp. Brief) at pp. 12:20-13:1; *see also*, Runnings, 113:3-23; Vandall Dec., ¶DD, Ex. HH (Runnings Dec.), ¶12. |
| Hiring Authority | "I make the decision on who to hire and who not. You know, as a – you know, once you do their interview if they do well, then you're going to pretty much hire them or not hire them." Buitron, 163:3-13. <u>All</u> of her recommendations for AM hires were followed. *Id.*, 159:22-19. | Runnings was not authorized to choose his own management team or hire as many hourly associates as he wanted. Vandall Dec., ¶DD, Ex. GG (Runnings' Opp. Brief) at p. 10:7-9; *id.*, Ex. HH (Runnings Dec.), ¶12. |
| Firing Authority / Employee Discipline | Buitron was authorized to and in fact did suspend associates that she discovered were stealing without getting approval from anyone else at DT. Buitron, 61:17-63:18. Similarly, she has fired associates herself (with the approval of Asset Protection) and the one time she recommended to her DM that an AM be terminated, her recommendation was followed. *Id.*, 167-169:1. | Runnings testified that he had no firing authority. Runnings, 163:16-17. |
| Participation In or Delegation of Stocking, Moving Items From the Stock Room to the Sales Floor, and Cashiering | Buitron was not expected to and she did not physically stock shelves, ring a cash register or move freight from the back room to the store shelves; rather, she delegate such tasks to her subordinates. Buitron, 127:5-128:16, 134:4-136:16 178:1-179:23, 205:7-23. If Buitron found herself short-staffed, she would call another associate to work rather than perform any physical labor herself. *Id.*, 135:9-25. | Runnings "spends over seventy-five (75%) of his work time performing manual labor, such as 'throwing freight', stocking product, and cashiering." Vandall Dec., ¶DD, Ex. GG (Runnings' Opp. Brief) at p. 8:12-14; *see also* Runnings, 47:12-17, 280:25-281:19; Vandall Dec., ¶DD, Ex. HH (Runnings Dec.), ¶¶4, 16. |
| Use of Payroll Hours | Buitron received additional payroll hours anytime she asked for them. | Runnings performs non-managerial duties because he |

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108 2693
415 433 1940

27.

| Relevant Topic for Exemption Analysis | Buitron Testimony | Runnings Testimony |
|---|---|---|
| | Buitron, 233:2-234:1. | does not have payroll hours them to hourly workers. Vandall Dec., ¶DD, Ex. GG (Runnings Opp. Brief) at p. 10:4-7; *id.* Ex. HH (Runnings Dec.), ¶¶3, 12 and 14(e). |
| Certification Process | Buitron regularly certified "yes," indicating compliance with DT's policy that she spent the majority of her work week in managerial duties. Buitron, 183:4-186:8. | Runnings regularly certified that he was non-compliant on his weekly payroll certification forms. Vandall Dec., ¶DD, Ex. GG (Runnings' Opp. Brief) at p. 10:12-13; *id.*, Ex. HH (Runnings Dec.), ¶¶7 and 10. |

Plainly, the experience of "representative" Runnings cannot be relied upon to represent the experience of Buitron, nor can Buitron represent Runnings' experience. To have a fair trial of any individual CM's claims, the Court will be forced to inquire how each Class Member performed his or her job, the direction they experienced from district management, and the level of discretion they felt they were empowered to and did exercise. Thus, a trial in this case would unavoidably require the Court to conduct "several hundred mini-trials with respect to each [CM's] actual work performance" to determine their exempt status. *Vinole,* 571 F.3d at 947.

### 3. Credibility Issues Require An Individualized Inquiry.

At least 26% of the CMs deposed (*e.g.*, 15 of 58 CMs) either admitted dishonesty or made insupportable statements on the record; hence, the trier of fact will need to make individual inquiries into the credibility of each CM on the subjects of the time they spent on exempt versus non-exempt tasks as well as their alleged damages,[17] if any, no matter how this case is tried:

- CMs testified that the declarations Plaintiffs submitted in support of class certification were "misleading" in several material respects. (Toto, 241:1-245:12 (his declaration was "very misleading" because it does not accurately reflect his regular work schedule, its statements concerning meal periods were not true and it "does not reflect [his] job duties at all" with respect to unloading freight tasks); Dougherty, 259:24-262:18; 266:18-

---

[17] Class Counsel's trial plan involves sending a survey to CMs asking them, while they remain covered by the attorney-client privilege, how much time they spent performing the tasks listed in the position description. Obviously, if a CM is willing to lie under oath, they may also lie when asked to provide survey information in support of a finding of liability.

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108-2693
415.433.1940

DEFT'S MOTION TO DECERTIFY THE CLASS; MEMORANDUM IN SUPPORT THEREOF

28.

CASE NOS. C 07 2050 SC and C 07 04012 SC

271:25, 272:2-275:18 (testifying that ¶¶ 8, 13, 14 of her declaration were misleading); Faria, 122:9-16, 123:18-124:16, 127:16-128:1425, (her deposition testimony and her declaration were contradictory because she "did not even understand what [the declaration said]" and that she just "looked at it really quickly" and "signed it and sent it back"));

- One former CM now contends that she was harassed and intimidated by Class Counsel who refused to listen to her attempts to explain her responses to various "interview" questions and insisted that she respond only by saying "yes" or "no". (Vandall Dec., ¶Z, Ex. CC (Declaration of Bertha Castro, ¶¶ 3, 4).) Naturally, if this is how the Plaintiffs' declarations were compiled, they all are subject to collateral attack;

- Some CMs lied under oath (see e.g., Hoyt, 67:3-19, 68:24-69:17 (he spent time monitoring shrink by watching video cameras at a store with no video cameras to watch)) while others provided demonstrably false testimony. (See e.g., Hodge, 144:4-145:12, 147:13-148:6, 148:16-20 (spending five hours and ten hours supervising constitutes the same amount of time supervising); Gonzalez, 17:7-22 (spending eight hours with one group of employees is no different than spending two hours with another group of employees)); and

- Some deponents admitted lying during the certification process. (See e.g., Armstrong, 26:2-27:6; Ayala, 133:21-135:20; Dougherty, 68:3-70:4; Fierro, 219:6-14; Lugo, 25:6-25; Martinez, 51:25-52:20; Mayhew, 127:11-129:16; Penunuri, 38:12-15, Walton, 41:5-43:10, 48:16-20; and Whitton, 23:25-26:6.)

Plaintiffs' proposed method of trying these claims, through representational testimony, is not a fair process for establishing liability regarding 718 Class Members in light of the numerous factual issues. As such, a class action is not the superior method of trying this case.

### D.   Class Certification Is Not Appropriate For Meal And Rest Period Claims.

Plaintiffs' claims for meal and rest period violations arise from their misclassification claims, and for the reasons set forth above, are not appropriate for class treatment. In addition, the status of the law of meal and rest periods is uncertain regarding the issue of whether meal and rest periods must be "provided" or whether employers must "ensure" that they are taken. *See Brinker v. Superior*

////

////

////

////

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108-2693
415.433.1940

DEFT'S MOTION TO DECERTIFY THE CLASS;
MEMORANDUM IN SUPPORT THEREOF

29.

CASE NOS. C 07 2050 SC
and C 07 04012 SC

*Court*, 165 Cal.App.4th 25 (2008) (depub., rev. grant. Oct. 22, 2008) and *Brinkley v. Public Storage, Inc.*, 167 Cal.App.4th 1278 (2008) (depub. rev. grant. Jan. 14, 2009).[18]

Individualized proof is required to determine whether individual CMs missed a meal break and, if so, whether the CM was forced to work through the break or simply chose to skip it. *See Brown*, 249 F.R.D. at 584-585 (in light of the "provide" standard applicable to meal periods, individualized factual inquiries predominate over the few common legal and factual issues); *Salazar*, 251 F.R.D. at 534 (the "provide" standard applicable to meal period claims forecloses class-wide adjudication; *Blackwell v. SkyWest Airlines, Inc.*, 245 F.R.D. 453, 467 (S.D. Cal. 2007) ("to determine which employees were not provided with a timely 30-minute meal period requires a highly individualized factual inquiry."). Even if DT was required to ensure that CMs took meal and rest periods, there are numerous factual differences here that would have to be explored regarding CM practices regarding meal and rest periods.

## IV.   CONCLUSION

Based on the foregoing, the Court should grant this motion for class decertification, because Plaintiffs cannot carry their burden of proving that they meet the requirements of Rule 23.

Dated: June 18, 2010

           */s/ Maureen E. McClain*
           MAUREEN E. McCLAIN
           LITTLER MENDELSON
           A Professional Corporation
           Attorneys for Defendant
           DOLLAR TREE STORES, INC.

Firmwide:95906832.2 061603.1004

---

[18] In addition, numerous federal courts that have determined that liability under these statutes requires proof that the employee was forced to forego his or her meal period. *See, e.g., White v. Starbucks*, 497 F.Supp.2d 1080, 1089 (N.D. Cal. 2007); *Brown v. Federal Express*, 249 F.R.D. 580, 585 (C.D. Cal. 2008) (denying certification of meal and rest period claims and explaining that an "ensure" standard for meal breaks would "create perverse incentives, encouraging employees to violate company meal break policy in order to receive extra compensation"); *Kenny v. Supercuts, Inc.*, 252 F.R.D. 641 (N.D. Cal. 2008) (the Labor Code does "not require an employer to ensure that an employee take a meal break"); *Perez v. Safety-Kleen Sys., Inc.*, 253 F.R.D. 508 (N.D. Cal. 2008); *Salazar v. Avis Budget Group, Inc.*, 251 F.R.D. 529, 533 (S.D. Cal. 2008) ("provide" means "'make available' rather than 'ensure taken'").

LITTLER MENDELSON
PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA
94108.2693
415 433 1940

DEFT'S MOTION TO DECERTIFY THE CLASS;
MEMORANDUM IN SUPPORT THEREOF
    30.
    CASE NOS. C 07 2050 SC
and C 07 04012 SC