# EXHIBIT 1

1              UNITED STATES DISTRICT COURT
2   NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION
3
    MIGUEL A. CRUZ, and JOHN D.
4   HANSEN, individually, and on behalf
    of all others similarly situated,
5
                    Plaintiffs,
6
        vs.                            Case No. C-07-2050 SC
7                                      (Consolidated Action)
    DOLLAR TREE STORES, INC.
8
                    Defendant.
9   _____/
10  ROBERT RUNNINGS, individually,
    and on behalf of all others
11  similarly situated,
12                  Plaintiff,
13      vs.                            Case No. C-07-4012 SC
                                       (Consolidated Action)
14  DOLLAR TREE STORES, INC.
15                  Defendant.
    _____/
16
17
18         DEPOSITION OF ROBERT CRANDALL, MBA
19              Thursday, June 3, 2010
20
21       REPORTER'S TRANSCRIPT OF PROCEEDINGS
         BY JANICE CASTATER, CSR NO. 11879
22

23        CLARK REPORTING & VIDEOCONFERENCING
           2140 SHATTUCK AVENUE, SUITE 405
24              BERKELEY, CA  94704
                  (510) 486-0700
25

1       Q.   And why did you feel like the observations of

2  store managers in Arizona would give you insight as to

3  what store managers were doing in California?

4       A.   I just wanted to get a basic understanding of

5  the operating procedures.  I wanted to examine customer

6  flow.  I wanted to examine how tasks are allocated among

7  the various people who work in the store, how the

8  process of receiving freight was conducted at Dollar

9  Tree, things -- things that nature.

10      Q.   Did the store managers in Arizona have the

11  same job description as the store managers in California

12  at that time?

13      A.   I believe so.

14      Q.   Did the store managers in Arizona and

15  California share the same policies and procedures?

16      A.   I believe the policies were similar, yes.

17      Q.   Was the training any different between

18  managers in those two states?

19      A.   I am not certain.  I don't believe so.

20      Q.   You don't believe that it was the same or

21  different?

22      A.   I think the training manuals were the same.

23      Q.   As far as the evaluation process of store

24  managers by their superiors, was there any difference

25  between how that was done in Arizona versus California

1      Q.    Are you holding yourself out as a legal expert

2    in this case?

3      A.    I am not a legal expert.

4      Q.    Do you believe that the determination of what

5    constitutes exempt work is a legal question?

6      A.    Certainly it is the province of the court.

7      Q.    Or a jury?

8      A.    Well, in the cases I have been involved in,

9    usually the court will make a determination before the

10   trial happens.

11     Q.    As to what?

12     A.    As to what duties constitute a -- an exempt

13   versus nonexempt duty from a legal perspective.

14     Q.    Okay.  But you are not offering opinions in

15   this case as to what work is exempt or nonexempt,

16   correct?

17     A.    I am not offering opinions related to the

18   legal determination of a duty.  Obviously I -- I and

19   Dr. Lewin have opinions of what things we consider to be

20   managerial and nonmanagerial.  But that is still --

21   the Court will make a final determination on exempt

22   status versus nonexempt.

23     Q.    Do you believe the term "exempt" is synonymous

24   with managerial?

25     A.    Well, I mean, in this context, perhaps.  In

1    the administrative exemption, it may not be.  In the

2    outside sales, duties that fit the criteria for

3    exemption would be different.  So, you know, it is

4    different contexts will have different categories for

5    what things would constitute duties in connection with

6    the exemption.

7         Q.   But you understand that the -- the exemption

8    analysis requires something more than a determination

9    that a person is doing managerial work, right?

10        A.   I understand there is a -- I was going to say

11   a three- or four-prong test.

12        Q.   Which goes beyond just whether the work is

13   managerial, correct?

14        A.   That is correct.

15        Q.   I note that in your reports -- or rather the

16   reports that you have created for purposes of this

17   present case, you use the term "exempt" quite a bit.  Is

18   it fair to say -- we can go through the report if you

19   want to.

20             Is it fair to say that you meant to say

21   "managerial"?

22        A.   Yes.  I think I might have used it two or

23   three times.  And if you look in the report, mostly it

24   says "managerial," "nonmanagerial."

25        Q.   I can tell you it is quite more than two or

1   do a survey in this matter.

2          Q.    Nevertheless, you believe that the survey

3   conducted back in the '02/'03 time frame was a reliable

4   study, correct?

5          A.    I believe it is a valid study.  We did a

6   series of validation tests.

7                And do you know the distinction between

8   validity and reliability or would you like --

9          Q.    Yes.

10         A.    Okay.

11         Q.    For the record, I would like you to --

12         A.    Reliability is -- sort of functions about how

13  consistent the response is.  In other words, if I ask

14  you if the sky is blue today and I ask you a month from

15  now, "Is the sky blue?" you answer "Yes, it is blue"

16  both times.  So you can have a reliable survey that can

17  give you a consistently inaccurate answer if you answer,

18  "The sky is red" both times.

19               However, a valid survey means that you are

20  actually measuring what you intend to measure, and it is

21  more to the accuracy surveys.  So a valid survey is

22  inherently reliable because it is an accurate survey,

23  whereas a reliable survey may not be valid.

24               From that perspective, we did do some

25  validation testing, and we validated the survey results.

1   duties?

2           Putting aside the amount of time they spent on

3   various duties, do you have any reason to believe that

4   the job is different from store manager to store

5   manager?

6      A.   Do I think they are doing fundamentally

7   different duties?  I think you can collect a universe of

8   potential duties they may perform.

9      Q.   Isn't that what you have done in your survey?

10     A.   Yes.

11     Q.   And isn't that what was done in the

12   certification?

13     A.   Yes.  But I don't think that the universe of

14   duties is meaningful in this context unless you

15   understand how much time was spent doing them.

16     Q.   So you would have a liability determination

17   before you could figure out if the case is certifiable?

18     A.   No.  I think you need to understand whether or

19   not potential class members are spending similar or

20   different amounts of time doing various duties they may

21   perform.  Certainly it impacts the ability to utilize

22   representative testimony and make extrapolations.  Let

23   me provide a two -- a brief example if you forgive me --

24     Q.   Sure.

25     A.   -- to do so.  Suppose we had a hundred people,

1     A.   Well, certainly the process of determining

2   tasks that -- I have sort of detached those two

3   processes.  One is you can make determinations, yes or

4   no, about which tasks are legally going to be considered

5   exempt or nonexempt, but that only gets you, you know,

6   part of the way there.  To make any determinations for

7   an individual or for a collection of individuals or the

8   class as a whole, you still have to collect information

9   related to how much time they spend performing those

10   tasks so you can make determinations about the liability

11   portion of the case.

12     Q.   Well, as you put it -- strike that.

13        Do you see any efficiencies in getting, as you

14   put it, part of the way there on a class-wide basis?

15     A.   Do I see any efficiencies of getting part of

16   the way there -- well, explain what "part of the way

17   there" means.

18     Q.   Well, I wrote down the phrase that you used.

19   You seemed to indicate that -- first of all, that you

20   recognize that the exemption test is a multipart test

21   and that ultimately you believe that there would have to

22   be either an extrapolation to determine the amount of

23   time spent on tasks or that have to be a sort of a

24   polling of the entire class to figure that out.  I

25   understand your testimony in that regard.  What I am

1   until we actually understand the extent of variability

2   among class members.

3        Q.   So breaking it down sort chronologically, the

4   first step as far as -- let me see if I can figure out

5   where we are on the same page and where we go off page.

6             You would agree that there is uniformity and

7   commonality with regard to the duties that class members

8   perform, correct?

9        A.   I would agree --

10       Q.   Just duties themselves.

11       A.   I would agree that the universe of tasks that

12   class members perform could be enumerated.

13       Q.   Okay.

14       A.   Whether or not they all do all those tasks is

15   an empirical question.

16       Q.   But that is no different than any job in the

17   world, right?

18             Is there probably no two people in the same

19   job position that do exactly the same work day after

20   day?

21       A.   I am thinking "Laverne and Shirley" and the

22   bottle capping, but it depends on the job.

23       Q.   But that was only during the intro to the

24   show.

25       A.   But generally to the extent that the more that

1  you have the ability to self-direct your work, the more

2  variability you would expect to see.  So to the

3  extent -- I think I gave an example of a policy in my

4  report where I talk about if a cashier -- had a

5  cashiering policy that said, "You must spend 90 percent

6  of your time during an eight-hour shift at the cash

7  register waiting to cash -- or waiting to cashier,

8  actually cashiering."  Such a policy would actually

9  limit variability in people's experiences because the

10  policy controlled how they allocated their time.

11          To the extent the store manager is a

12  self-directing which tasks they perform and which tasks

13  they assign to others, individual preferences begin to

14  play a role which drives variability.  To utilize

15  Dr. Lewin's example from his Tuesday morning report,

16  Keith -- I think it was Keith.  Some K. name.

17          Keith spent almost all of his time that day

18  that Dr. Lewin observed him in the back room.  Whether

19  Keith wanted to do that because the truck was there or

20  he enjoyed being in the back room and that is the kind

21  of thing he wanted to do, that remains to be seen.  But

22  some people, if you look at the survey, spent different

23  amounts of time in different areas of the store.

24          So there is certainly not a systematic policy

25  during the survey period that allocated you will spend X

1        Q.    That is the gist of my question, yes.

2              Does that make one more or less managerial

3    than the other?

4        A.    The speed at which they do the job is not a

5    condition on whether it is a managerial function or not.

6    Of course, that opens up a whole can of worms about

7    whether or not people are moving quickly or slowly, if

8    that were the issue.

9        Q.    And by saying that, by testifying as you have,

10   is that to say that -- well, strike that.

11             You talked earlier about sort of a three-step

12   process where the first step would be to figure out what

13   managers actually do, the second step being whether the

14   tasks are exempt or nonexempt, and then thirdly

15   whether -- how much time is spent by each manager on the

16   exempt versus nonexempt duties.  That was kind of the

17   scenario that I presented to you.  All right.

18             In the second phase of that adjudicating

19   whether the tasks are exempt or nonexempt, are we on the

20   same page?  Would you agree that that can be done on a

21   class-wide basis?

22       A.    In my experience, that is generally done

23   through a law in motion practice.

24       Q.    On a classified basis, though?

25       A.    Court will make a determination, yes or no

1    about certain tasks.

2         Q.   Take a look, if you will, at page 19 of your

3    declaration.  In the last full sentence, you say,

4    "However, if stores and districts were operating under

5    common policies and fixed procedures that dictated

6    manager behavior, such wide variability in 'yes'

7    responses at the individual, store, and district level

8    would be unexpected."   .

9              Isn't it possible that the work of a store

10   manager could be -- well, strike that.

11             Isn't it possible that the work of say two

12   store managers could be entirely controlled, but one

13   store manager is found to be exempt and one is found to

14   be nonexempt because of the pace at which they work?

15        A.   Well, I think I just indicated to you that the

16   pace of work is not a factor about whether or not a

17   specific duty is a managerial duty or nonmanagerial duty

18   from my perspective.  But if you are suggesting that a

19   Store Manager A is a very slow stocker, for example,

20   does stocking and does it incredibly slowly and maybe he

21   stocks, you know, a 4-by-4, and it takes him eight hours

22   a day in which case he is doing nonexempt duties, and

23   Store Manager B is a fast stocker, and he gets it done

24   in 30 minutes, the same task, well, certainly in that

25   example, the pace of work would influence the amount of

1        Q.    So we talked earlier about the Court's class

2    certification order in this case that was entered into,

3    rather, in 2009.

4             Are you aware of any -- of any -- strike that.

5             Since the Court entered its class

6    certification order in roughly the middle of 2009, are

7    you aware of any changes in store manager job duties

8    since then?

9        A.    I am not aware of any -- it is called

10   materially systematically different job duties between

11   '09 and present.

12       Q.    Are you aware of any policies and procedures

13   that have changed since then?

14       A.    Not specifically.

15       Q.    Generally?

16       A.    No.

17       Q.    Okay.  Are you aware of -- are you aware of

18   any circumstances that have changed with regard to how

19   store managers do their work in that time frame?

20       A.    I am aware that Dollar Tree has not instituted

21   a policy that governs how managers spend their time

22   among the various tasks they perform.

23       Q.    Do you have any reason whatsoever to think

24   that the work being done by store managers is

25   fundamentally different now than it was a year ago?

1   Woolweaver, W-O-O-L-W-E-A-V-E-R, as you can see -- I

2   guess his or her.  I am not sure.  It is like the

3   "Saturday Night Live" character.

4           MR. VANDALL:  Exhibit 6.

5           THE WITNESS:  Exhibit 6, yeah.

6           One DM, that person was -- he or she was at

7   40 percent.  The next DM 100 percent.  The next one back

8   down to 85 or so, it looks like.  You see other people

9   that are also inconsistent.  So I don't think that you

10  generalize a pattern of increasing number of yeses or

11  increasing number of nos, and I haven't looked at it in

12  that way.  But visually looking at some of these charts,

13  I would say that is probably not the case.

14      Q.   (By Mr. Cole)  I appreciate that.  I guess

15  I am trying to get generally if there are any

16  changes in -- any factual changes that you are aware

17  of in the circumstances of this case since a year

18  ago.

19      A.   Not that I am aware of, at least nothing

20  material to my knowledge has happened.

21      Q.   Okay.  Get you out of here in the next few

22  minutes.  I promise you.

23           Take a look, if you will, at Exhibit No. 8,

24  which you have testified to be your follow-up report,

25  rebuttal.

# EXHIBIT 2

# CONFIDENTIAL    DOLLAR TREE STORES, INC

## PAYROLL CERTIFICATION -- DATE DUE_____

**Position Description & Responsibilities** – Job Title: Store Manager – California Only Department: Field Division: Operations Reports To (Title): District Manager Date Written: Date Revised: April 19, 2005 Exempt / Non-exempt Exempt Direct Reports: Store Associates

**Summary of Position (Job Purpose)** - *Major purpose and functions of the position.* Management of a retail variety store. Responsible for efficient, profitable and safe operations. Recruit, employ, supervise, train and develop store personnel. From an individual standpoint, the Store Manager must comply with the percentage limitations on the actual work s/he performs as set forth below.

**Principal Duties and Responsibilities**
Store Manager is to spend the majority (more than 50%) of his/her actual work time each work week performing the following duties and responsibilities:

1. Supervision of associates.
2. Oversee daily store activities, including opening and closing of store.
3. Ensure customer and associate safety.
4. Protect all company assets, including store cash, merchandise and equipment.
5. Maintain proper sales, banking, inventory, accounting, productivity, payroll and time records.
6. Responsible for adequate staffing of store. Recruit, interview, hire, employ, and train sales associates. Train associates to properly use all equipment and technology as well as provide thorough merchandise display training.
7. Schedule and assign work to store personnel. Evaluate, motivate, counsel, develop, discipline and discharge sales associates appropriately. Maintain production reports to evaluate job performance of sales associates.
8. Provide leadership and direction to store personnel.
9. Communicate company policies to sales associates. Ensure associates comply with company policies and procedures, including safety guidelines and human resources policies.
10. Analyze sales, expenses and profit, review reports, analyze competition, determine customer preferences, manage sales forecasting, meet sales and profit objectives and goals, determine product mix, determine most effective placement of product and ensure standards of merchandise presentation, displays and signage to maximize sales. Assist in developing promotions and advertisements as appropriate.
11. Control inventory. Supervise ordering, receiving, stocking and pricing of goods. Ensure goods are properly marked and mark downs are properly recorded.
12. Responsible for overall cleanliness and appearance of store.
13. Ensure highest level of customer service. Handle customer complaints and problems.
14. Ensure accident reports and damage reports are completed in timely and accurate manner.
15. Complete management reports in a timely and accurate manner.
16. Ensure compliance with applicable laws and regulations.
17. Communicate professionally and effectively with customers, subordinates and supervisors

Store Manager may not spend more than a total of 35% of his/her actual work time each week receiving product, distributing and storing product, stocking product and cashiering.

Store Managers in California must comply with the percentage limitations on actual work time as set forth in this job description and verify compliance each week. If for any reason the store manager has not complied, s/he must immediately provide an explanation to both Payroll and Human Resources. No salary or wage will be withheld because of non-compliance.

Y_____ N_____
Explanation:
_____
_____
_____
_____

Signature: _____

DTC00389

# CONFIDENTIAL

I hereby certify that the time records I am submitting for week-ending

....

are accurate, to the best of my knowledge, and that I, as Store Manager, spent more than 50% of my actual work time during this payroll period on the principal, supervisory job duties and responsibilities listed on the company's job description for Store Manager ... a copy of which I have reviewed and agree accurately describes my job duties and responsibilities.

I understand that if, for any reason, I have not complied with any of the requirements set forth herein, I cannot make this Certification and I must immediately give an explanation. In addition, I must contact the Human Resources Department and give an explanation.

I further understand that no salary or wage will be withheld because of non-compliance.

DTC00390

# EXHIBIT 3

**DECLARATION OF DAVID LEWIN IN**

**RUNNINGS, ET AL. v. DOLLAR TREE STORES, INC. &**

**CRUZ, HANSEN, ET AL. v. DOLLAR TREE STORES, INC.**

**MAY 7, 2010**

1. I am the Neil H. Jacoby Professor of Management, Human Resources and Organizational Behavior in the Anderson Graduate School of Management at the University of California at Los Angeles (UCLA). My primary area of specialization is human resource management and employment relations. I have published 19 books and more than 150 articles in such journals as Industrial and Labor Relations Review, Human Resource Management, Industrial Relations, British Journal of Industrial Relations, The Review of Economics and Statistics, Journal of Conflict Resolution, Labor History, Harvard Business Review, and California Management Review. Among my books are International Perspectives and Challenges in Human Resource Management (1994), Human Resource Management: An Economic Approach (1995), The Human Resource Management Handbook (1997), Contemporary Issues in Employment Relations (2006), and Advances in Industrial and Labor Relations, Volume 17 (2010). My next two books, currently in progress, are Conflict Management in the Modern Corporation and The Dual Theory of Human Resources and Business Performance.

2. I have held National Science Foundation, Ford Foundation, National Institute for Dispute Resolution, Society for Human Resource Management, Human Resource Planning Society, and U.S. Department of Labor research grants. I previously served as President of the University Council on Industrial Relations and Human Resource Programs, member of the Executive Board of the Industrial Relations Research Association, Chairman of the UCLA Human Resources Round Table, Director of the UCLA Institute of Industrial Relations, Senior Associate Dean for the UCLA Anderson School MBA Program, and Co-Chair of Los Angeles Mayor Riordan's Task Force on General Manager Compensation and Performance Evaluation. In 1995, I was elected a Fellow of the National Academy of Human Resources. I am senior editor of Advances in Industrial and Labor Relations and a member of the

1

editorial boards of <u>Industrial Relations,</u> <u>Industrial and Labor Relations Review,</u> <u>California Management Review</u> and <u>Journal of Change Management.</u> In 1996 and 1999, respectively, I co-chaired the first and second National Conference on Innovative Teaching in Human Resources and Industrial Relations.

3. I have taught numerous MBA and Ph.D. courses at the Columbia University Graduate School of Business, on whose faculty I served for 20 years, and at the UCLA Anderson School of Management, on whose faculty I have served for 19 years. These courses include Human Resource Management; Managing Employee Relations; Managing & Leading Organizations; Leadership Foundations; Regulation of the Employment Relationship; Pay & Rewards in Organizations; and Research Methods.

4. I have consulted widely with business, government and voluntary organizations in the U.S. and abroad. I serve as Faculty Director of the UCLA Anderson School Advanced Program in Human Resource Management, and for many years served as Faculty Director of the Columbia University Graduate School of Business Senior Executive Program. Further, from 2001 to 2009 I served as a Director of K-Swiss, Inc., a member of the K-Swiss Board's Compensation Committee, and a member of the K-Swiss Board's Governance Committee. I am presently a Director of the National Academy of Human Resources, a Director of LECG, a member of The Conference Board's Evidence-Based Human Resources Advisory Panel, and previously served as a member of the Research Advisory Board of World at Work, Inc. (formerly The American Compensation Association).

5. I hold a Ph.D. degree in Management with a specialization in human resource management and industrial relations as well as an MBA degree and a BS degree with a specialization in accounting. I received extensive training during the course of my Ph.D. studies in primary research methods (*i.e.,* experimental designs, observational and participant-observation research methods, interviewing, and survey design and analysis), secondary research methods (*i.e.,* the use of published data bases and reference sources in conducting research), and quantitative research methods (*i.e.,* probability theory, univariate statistics, multivariate statistics); I have taught primary research methods courses to Ph.D. students at Columbia

2

Business School and the UCLA Anderson School on many occasions during the past 39 years; and I have written extensively about the topics of human resource strategy, human resource management and business performance, job/work design, hiring and selection, compensation and rewards, performance management and evaluation, and discipline and due process.

6.  I have been retained as an expert in labor and employment cases (dealing with, as examples, employment discrimination, wrongful termination, constructive discharge, wages and hours, executive compensation, employee compensation, performance evaluation, and human resource management practices) on 208 occasions between 1979 and the present. Of these cases, I served as an expert for defendants 124 times, for plaintiffs 83 times, and jointly for plaintiff and defendant once. In these cases, I have rendered deposition testimony on approximately 80 occasions and trial testimony (including arbitration testimony) on 37 occasions. My trial testimony has been rendered in federal courts, state courts, administrative law courts and U.S. Tax Court.

7.  I have specific experience analyzing the managerial versus non-managerial nature of job duties on a class-wide basis. In this regard, I have conducted secondary research, meaning the analysis of documents and data bases, approximately 40 times, and have conducted primary research, meaning surveys, interviews and observational studies, approximately 20 times. As examples, I have designed surveys that were administered to classes of store managers in vehicle service companies and large retail food companies and to classes of account executives in financial service companies;[1] designed interview protocols that were administered to classes of insurance claims adjusters and managers; and designed observational studies that were administered to classes of call center managers, food court

---

[1] I have also frequently critiqued the survey design, administration, analysis and reports of other experts in managerial misclassification cases, in effect serving as a rebuttal expert. For examples, see *Metzler, et al. v. Food-4-Less* (2001) in which I wrote a report and submitted a declaration; *Jenkins, Barnhardt, et al. v. Stater Brothers Markets* (2002) in which I wrote a report and rendered deposition testimony; *Archie, et al. v. UPS* (2001) in which I submitted a declaration; *Collins v. Aaron Brothers* (2001) in which I wrote a report and rendered deposition testimony; and *Walker, et al. v. Office Max* (2001) in which I submitted a declaration. I provided a similar critique of the work of a survey expert and submitted a declaration in a case involving the issue of off-the-clock work, namely, *Barton, et al. v. Albertson's* (1998).

managers, and retail food store managers.[2] In these cases I have also frequently analyzed, both quantitatively and qualitatively, the data derived from secondary and primary research sources. Hence, I am very familiar with the methods and techniques required to perform these types of studies and analyses as well as with the requirements for the positions that are necessary to allow expert analysis of liability on a class-wide basis.

8. I have reviewed the Store Manager Position Description and Responsibilities, Point-of-Sale Manual, Merchandising Display Standards, Back Office Procedures, Weekly Work Schedule Instructions, Freight Flow form, Forms and Procedures Manual, Store Management Routine and Guidelines, Management Performance Evaluations, a District Manager Store Visit Report, Payroll Certification forms, the Certification of Job Duties for Store Managers in California, Ops Store Visit forms, Driving Profitable Sales through Management Training - MIT Learning Guide, Communication Section Documents, Store Management Routine, Sales Planner, Back Office Checklist, Store layout Maps, Compass - Store and Assistant Manager User's Guide, Store Manager Shrink Bonus Plan, Delegation - Store Manager Responsibilities, Store Manager Transitional Training, email correspondence, deposition testimony and other documents as they pertain to individuals who hold or held the position of Store Manager at Dollar Tree Stores, Inc. (hereafter "Dollar Tree") in California during the time period covered by this matter. These documents indicate that Dollar Tree specifies standard operating procedures (SOPs) for its stores and store managers in great detail, and replicates these procedures in all of its stores. Such SOPs are intended to strengthen an employer's control over the work performed by its employees, and thereby reduce the amount of independent judgment and discretion exercised by employees in performing their work. For this reason, the job title "Store Manager," the summary of the "Major purpose and functions of the position," and the "Principal Duties and Responsibilities" of this position specified by Dollar Tree are too broadly defined.[3] In order to determine the actual work performed by employees who hold or held the Dollar

---

[2] I have also critiqued observational studies performed by other experts. For example, in *Crandall, et al. v. U-Haul* (2001), a case that dealt with managerial misclassification, I critiqued an observational study conducted by two experts and rendered both deposition and trial testimony. In *FedEx Ground Package Systems, Inc. Consolidated Cases* (2006), a case that dealt with the issue of independent contractor versus employee status, I critiqued an observational study performed by one expert and twice rendered deposition testimony.

[3] See Dollar Tree Stores, Inc., "Position Description and Responsibilities," September 25, 2006, p. 1.

Tree Store Manager position, it is necessary to carefully review and analyze the documentary evidence in this matter <u>and</u> to use class-wide primary research methods.

9. The use and replication of standard operating procedures (SOPs) across multiple locations of a business is one of the factors analyzed in my article on managerial misclassification. (*See* D. Lewin & D.I. Levine, "The New 'Managerial Misclassification' Challenge to Old Wage and Hour Law; Or, What is Managerial Work?", in D. Lewin, Ed., *Contemporary Issues in Employment Relations*. Champaign, IL: Labor and Employment Relations Association, 2006, pp. 189-222). The main theme of this article is that the managerial misclassification issue is real rather than having been "manufactured" by plaintiffs or their representatives. In particular, the combination of businesses' rapid growth, centralization of decision-making, supply chain optimization, national (and in some cases global) branding, and use of SOPs has reduced the amount of independent judgment and discretion exercised by lower-level managers, such as store managers. In addition, the widespread use of incentive compensation, notably bonus type compensation, for store managers that is typically based on the difference (or "spread") between budgeted labor costs and actual labor costs provides an incentive for such managers to substitute their labor for that of subordinate, hourly-paid employees.

10. I have also reviewed an order issued by the United States District Court in this matter.[4] In ruling favorably on plaintiffs' motion for class certification, the Court concluded, "...the question is whether common issues predominate, and the fact that all California SMs [Store Managers] share the same job description, which requires them to spend most of their time performing tasks on a list consisting of seventeen duties, supports the conclusion that they do."[5] Based on the documents I have reviewed, my aforementioned analysis of the managerial misclassification issue, and my experience in numerous other managerial misclassification cases, I believe that the court's analysis in the instant matter was well reasoned and that its order was well-founded.

---

[4] United States District Court, Northern District of California, "Order Granting Amended Motion for Class Certification," May 26, 2009.
[5] *Ibid.*, pp. 19-20.

11. It is my understanding that, subsequent to the Court's order, additional discovery has been conducted in this matter. Unless that discovery shows that the job duties and responsibilities of Dollar Tree Store Managers are not common to all class members, there is no reason to decertify the class.

David Lewin

7

**DECLARATION OF DAVID LEWIN IN**

**RUNNINGS, ET AL. v. DOLLAR TREE STORES, INC. &**

**CRUZ, HANSEN, ET AL. v. DOLLAR TREE STORES, INC.**

**MAY 7, 2010**

1. I am the Neil H. Jacoby Professor of Management, Human Resources and Organizational Behavior in the Anderson Graduate School of Management at the University of California at Los Angeles (UCLA). My primary area of specialization is human resource management and employment relations. I have published 19 books and more than 150 articles in such journals as <u>Industrial and Labor Relations Review</u>, <u>Human Resource Management</u>, <u>Industrial Relations</u>, <u>British Journal of Industrial Relations</u>, <u>The Review of Economics and Statistics</u>, <u>Journal of Conflict Resolution</u>, <u>Labor History</u>, <u>Harvard Business Review</u>, and <u>California Management Review</u>. Among my books are <u>International Perspectives and Challenges in Human Resource Management</u> (1994), <u>Human Resource Management: An Economic Approach</u> (1995), The <u>Human Resource Management Handbook</u> (1997), <u>Contemporary Issues in Employment Relations</u> (2006), and <u>Advances in Industrial and Labor Relations</u>, Volume 17 (2010). My next two books, currently in progress, are <u>Conflict Management in the Modern Corporation</u> and <u>The Dual Theory of Human Resources and Business Performance.</u>

2. I have held National Science Foundation, Ford Foundation, National Institute for Dispute Resolution, Society for Human Resource Management, Human Resource Planning Society, and U.S. Department of Labor research grants. I previously served as President of the University Council on Industrial Relations and Human Resource Programs, member of the Executive Board of the Industrial Relations Research Association, Chairman of the UCLA Human Resources Round Table, Director of the UCLA Institute of Industrial Relations, Senior Associate Dean for the UCLA Anderson School MBA Program, and Co-Chair of Los Angeles Mayor Riordan's Task Force on General Manager Compensation and Performance Evaluation. In 1995, I was elected a Fellow of the National Academy of Human Resources. I am senior editor of <u>Advances in Industrial and Labor Relations</u> and a member of the

editorial boards of <u>Industrial Relations, Industrial and Labor Relations Review, California Management Review</u> and <u>Journal of Change Management</u>. In 1996 and 1999, respectively, I co-chaired the first and second National Conference on Innovative Teaching in Human Resources and Industrial Relations.

3.  I have taught numerous MBA and Ph.D. courses at the Columbia University Graduate School of Business, on whose faculty I served for 20 years, and at the UCLA Anderson School of Management, on whose faculty I have served for 19 years. These courses include Human Resource Management; Managing Employee Relations; Managing & Leading Organizations; Leadership Foundations; Regulation of the Employment Relationship; Pay & Rewards in Organizations; and Research Methods.

4.  I have consulted widely with business, government and voluntary organizations in the U.S. and abroad. I serve as Faculty Director of the UCLA Anderson School Advanced Program in Human Resource Management, and for many years served as Faculty Director of the Columbia University Graduate School of Business Senior Executive Program. Further, from 2001 to 2009 I served as a Director of K-Swiss, Inc., a member of the K-Swiss Board's Compensation Committee, and a member of the K-Swiss Board's Governance Committee. I am presently a Director of the National Academy of Human Resources, a Director of LECG, a member of The Conference Board's Evidence-Based Human Resources Advisory Panel, and previously served as a member of the Research Advisory Board of World at Work, Inc. (formerly The American Compensation Association).

5.  I hold a Ph.D. degree in Management with a specialization in human resource management and industrial relations as well as an MBA degree and a BS degree with a specialization in accounting. I received extensive training during the course of my Ph.D. studies in primary research methods (*i.e.,* experimental designs, observational and participant-observation research methods, interviewing, and survey design and analysis), secondary research methods (*i.e.,* the use of published data bases and reference sources in conducting research), and quantitative research methods (*i.e.,* probability theory, univariate statistics, multivariate statistics); I have taught primary research methods courses to Ph.D. students at Columbia

Business School and the UCLA Anderson School on many occasions during the past 39 years; and I have written extensively about the topics of human resource strategy, human resource management and business performance, job/work design, hiring and selection, compensation and rewards, performance management and evaluation, and discipline and due process.

6. I have been retained as an expert in labor and employment cases (dealing with, as examples, employment discrimination, wrongful termination, constructive discharge, wages and hours, executive compensation, employee compensation, performance evaluation, and human resource management practices) on 208 occasions between 1979 and the present. Of these cases, I served as an expert for defendants 124 times, for plaintiffs 83 times, and jointly for plaintiff and defendant once. In these cases, I have rendered deposition testimony on approximately 80 occasions and trial testimony (including arbitration testimony) on 37 occasions. My trial testimony has been rendered in federal courts, state courts, administrative law courts and U.S. Tax Court.

7. I have specific experience analyzing the managerial versus non-managerial nature of job duties on a class-wide basis. In this regard, I have conducted secondary research, meaning the analysis of documents and data bases, approximately 40 times, and have conducted primary research, meaning surveys, interviews and observational studies, approximately 20 times. As examples, I have designed surveys that were administered to classes of store managers in vehicle service companies and large retail food companies and to classes of account executives in financial service companies;[1] designed interview protocols that were administered to classes of insurance claims adjusters and managers; and designed observational studies that were administered to classes of call center managers, food court

---

[1] I have also frequently critiqued the survey design, administration, analysis and reports of other experts in managerial misclassification cases, in effect serving as a rebuttal expert. For examples, see *Metzler, et al. v. Food-4-Less* (2001) in which I wrote a report and submitted a declaration; *Jenkins, Barnhardt, et al. v. Stater Brothers Markets* (2002) in which I wrote a report and rendered deposition testimony; *Archie, et al. v. UPS* (2001) in which I submitted a declaration; *Collins v. Aaron Brothers* (2001) in which I wrote a report and rendered deposition testimony; and *Walker, et al. v. Office Max* (2001) in which I submitted a declaration. I provided a similar critique of the work of a survey expert and submitted a declaration in a case involving the issue of off-the-clock work, namely, *Barton, et al. v. Albertson's* (1998).

managers, and retail food store managers.[2] In these cases I have also frequently analyzed, both quantitatively and qualitatively, the data derived from secondary and primary research sources. Hence, I am very familiar with the methods and techniques required to perform these types of studies and analyses as well as with the requirements for the positions that are necessary to allow expert analysis of liability on a class-wide basis.

8.  I have reviewed the Store Manager Position Description and Responsibilities, Point-of-Sale Manual, Merchandising Display Standards, Back Office Procedures, Weekly Work Schedule Instructions, Freight Flow form, Forms and Procedures Manual, Store Management Routine and Guidelines, Management Performance Evaluations, a District Manager Store Visit Report, Payroll Certification forms, the Certification of Job Duties for Store Managers in California, Ops Store Visit forms, Driving Profitable Sales through Management Training - MIT Learning Guide, Communication Section Documents, Store Management Routine, Sales Planner, Back Office Checklist, Store layout Maps, Compass - Store and Assistant Manager User's Guide, Store Manager Shrink Bonus Plan, Delegation - Store Manager Responsibilities, Store Manager Transitional Training, email correspondence, deposition testimony and other documents as they pertain to individuals who hold or held the position of Store Manager at Dollar Tree Stores, Inc. (hereafter "Dollar Tree") in California during the time period covered by this matter. These documents indicate that Dollar Tree specifies standard operating procedures (SOPs) for its stores and store managers in great detail, and replicates these procedures in all of its stores. Such SOPs are intended to strengthen an employer's control over the work performed by its employees, and thereby reduce the amount of independent judgment and discretion exercised by employees in performing their work. For this reason, the job title "Store Manager," the summary of the "Major purpose and functions of the position," and the "Principal Duties and Responsibilities" of this position specified by Dollar Tree are too broadly defined.[3] In order to determine the actual work performed by employees who hold or held the Dollar

---

[2] I have also critiqued observational studies performed by other experts. For example, in *Crandall, et al. v. U-Haul* (2001), a case that dealt with managerial misclassification, I critiqued an observational study conducted by two experts and rendered both deposition and trial testimony. In *FedEx Ground Package Systems, Inc. Consolidated Cases* (2006), a case that dealt with the issue of independent contractor versus employee status, I critiqued an observational study performed by one expert and twice rendered deposition testimony.

[3] See Dollar Tree Stores, Inc., "Position Description and Responsibilities," September 25, 2006, p. 1.

Tree Store Manager position, it is necessary to carefully review and analyze the documentary evidence in this matter and to use class-wide primary research methods.

9.  The use and replication of standard operating procedures (SOPs) across multiple locations of a business is one of the factors analyzed in my article on managerial misclassification. (*See* D. Lewin & D.I. Levine, "The New 'Managerial Misclassification' Challenge to Old Wage and Hour Law; Or, What is Managerial Work?", in D. Lewin, Ed., *Contemporary Issues in Employment Relations.* Champaign, IL: Labor and Employment Relations Association, 2006, pp. 189-222). The main theme of this article is that the managerial misclassification issue is real rather than having been "manufactured" by plaintiffs or their representatives. In particular, the combination of businesses' rapid growth, centralization of decision-making, supply chain optimization, national (and in some cases global) branding, and use of SOPs has reduced the amount of independent judgment and discretion exercised by lower-level managers, such as store managers. In addition, the widespread use of incentive compensation, notably bonus type compensation, for store managers that is typically based on the difference (or "spread") between budgeted labor costs and actual labor costs provides an incentive for such managers to substitute their labor for that of subordinate, hourly-paid employees.

10. I have also reviewed an order issued by the United States District Court in this matter.[4] In ruling favorably on plaintiffs' motion for class certification, the Court concluded, "...the question is whether common issues predominate, and the fact that all California SMs [Store Managers] share the same job description, which requires them to spend most of their time performing tasks on a list consisting of seventeen duties, supports the conclusion that they do."[5] Based on the documents I have reviewed, my aforementioned analysis of the managerial misclassification issue, and my experience in numerous other managerial misclassification cases, I believe that the court's analysis in the instant matter was well reasoned and that its order was well-founded.

---

[4] United States District Court, Northern District of California, "Order Granting Amended Motion for Class Certification," May 26, 2009.
[5] *Ibid.*, pp. 19-20.

5

11. It is my understanding that, subsequent to the Court's order, additional discovery has been conducted in this matter. Unless that discovery shows that the job duties and responsibilities of Dollar Tree Store Managers are not common to all class members, there is no reason to decertify the class.

David Lewin

7

# EXHIBIT 4

Scott Edward Cole, Esq. (S.B. #160744)
scole@scalaw.com
Molly A. Kuehn, Esq. (S.B. #230763)
mkuehn@scalaw.com
**SCOTT COLE & ASSOCIATES, APC**
1970 Broadway, Ninth Floor
Oakland, California 94612
Telephone: (510) 891-9800
Facsimile: (510) 891-7030
Web: www.scalaw.com

Attorneys for Representative Plaintiffs
And the Plaintiff Class

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| MIGUEL A. CRUZ, and JOHN D. HANSEN, individually, and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> DOLLAR TREE STORES, INC. <br><br> Defendant. | Case No. C-07-2050 SC *(Consolidated Action)* <br><br> **CLASS ACTION** <br><br> **RESPONSE OF DAVID LEWIN TO DECLARATION OF ROBERT CRANDALL** |
| ROBERT RUNNINGS, individually, and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> DOLLAR TREE STORES, INC. <br><br> Defendant. | Case No. C-07-4012 SC *(Consolidated Action)* |

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

1.  In this document, I provide a set of comments about the declaration of Mr. Robert Crandall that was filed on behalf of defendant in this matter.[1] In doing so, I will address what I regard as the main conclusions and opinions offered by Mr. Crandall as well as certain related issues raised by those conclusions and opinions.

2.  It is my understanding that a class of plaintiffs has been certified in this matter, that defendant has filed a motion to decertify the class, and that Mr. Crandall's declaration has been offered in support of that motion.

3.  In Section III of his declaration, Mr. Crandall invokes several hypothetical examples to illustrate what he regards as plaintiffs' inability to show that they constitute a common class for purposes of this litigation.[2] What these hypothetical examples have in common is that they feature store managers (SMs) who each perform a different mix of managerial and non-managerial tasks. Therefore, concludes Mr. Crandall, it is not possible to generalize—"statistically extrapolate"—the work experience (i.e., the allocation of time among the 17 tasks that SMs perform) of one of these hypothetical SMs to any other hypothetical SM or to the class of SMs as a whole. In plainer language this is a <u>variability</u> argument, one that has frequently been used by defendants in similar cases to oppose class certification. But this argument, per se, does not empirically establish whether and to what extent SMs actually perform specific managerial and non-managerial tasks. Further, this argument does not address the questions of whether and to what extent SMs are expected to perform particular tasks or how those expectations are communicated to SMs. This is surprising in light of Mr. Crandall's statement that he has "been asked to discuss the [Dollar Tree] business model" and to address the question "of whether the operating model would be expected to lead to variability in managerial activities."[3] From the documents that I have reviewed in this matter, it appears that Dollar Tree's business and operating models feature one common job description for all SMs, a single description of the major purpose and functions of the SM position, and a single list of

---

[1] "Declaration of Robert Crandall," May 7, 2010, 43 pp. plus exhibits.
[2] *Ibid.*, pp. 3-6.
[3] *Ibid.*, p. 1.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL (510) 891-9800

1   principal duties and responsibilities of the SM position.[4] In these respects, there is no variability at

2   all and Dollar Tree SMs are not only similarly situated, they are identically situated.

3     4.  Mr. Crandall states that "in connection with class certification, plaintiffs did not

4   conduct a survey or implement any other data collection process that would demonstrate that class

5   members had uniform experiences…or address the basic issue [of] whether SMs spent more than

6   half their time performing exempt duties."[5] In this, Mr. Crandall is correct, however, this same

7   conclusion (or criticism) applies to defendant in this matter. While later in his declaration Mr.

8   Crandall relies on Certification Forms that were completed by SMs and on findings from a 2002-

9   2003 survey that Mr. Crandall conducted for Dollar Tree in another matter, neither of these items

10   constitute a "survey or…other data collection process" that was undertaken to address the "basic

11   issue" in the present case.

12     5.  In commenting on the questions that Mr. Crandall claims that plaintiffs have focused

13   on in this matter—what the defendant expected, why it expected it, and how it was communicated—

14   and in concluding that the answers to those questions would not result in class-wide adjudication,

15   Mr. Crandall says that "I imagine that Dollar Tree can answer these questions quickly…Dollar Tree

16   had the results of the survey that I conducted in the 2002-2003 time period that demonstrated that a

17   strong majority of SMs report allocating more than half of their time to exempt duties."[6] Although,

18   as noted above, this survey was not undertaken in conjunction with the present matter, Mr.

19   Crandall's opinion that the survey findings do apply to the instant matter also puts him in the

20   position of countering the variability argument made earlier and at other points in his declaration.

21   That is, Mr. Crandall claims on the one hand that SMs job duties are so varied in practice that one

22   cannot generalize about them, yet on the other hand he is making exactly such a generalization in

23   this instance. As such, this generalization seems to me to support the certification of a class in this

24

25

26     [4] See "Declaration of David Lewin," May 7, 2010, p. 4.
27     [5] Crandall, *op. cit.*, pp. 6-7. Here, as in many other places in his declaration, Mr. Crandall uses the words "exempt" and "non-exempt." It is my understanding that exempt versus non-exempt employee status is a legal determination made by a court, not by plaintiffs' or defendant's representative or by an expert. In my judgment, the
28   proper terminology for use by an expert in this regard is "managerial versus non-managerial" duties or tasks.
  [6] *Ibid.*, p. 7, footnote 2.

1   matter, and also to support the proposition that a post-certification survey or other data collection

2   process should be used to empirically determine how Dollar Tree SMs spend their work time.

3         6.     Mr. Crandall says that "Plaintiffs' view is that one can resolve the legal issues by

4   obtaining representative testimony from a group of randomly selected class members that can then

5   be extrapolated to the remainder of the class."[7] From a statistical perspective—and I have performed

6   hundreds of statistical analyses in conducting scholarly research and in providing expert testimony—

7   it is very common to select a random sample of subjects, administer a survey or other primary

8   research method to those subjects, and generalize the results from that survey (or other method) to

9   the larger population from which the sample was drawn. However, to the best of my knowledge,

10   plaintiffs have not yet decided whether to administer a survey (or other method) to a sample of

11   plaintiffs or to the entire population of SMs in this matter. Instead, I understand that plaintiffs intend

12   to present proposed trial plans to the Court in a pre-trial setting and have endeavored to reach a

13   stipulation with defendant's counsel regarding the structure of such a plan, but defendant's counsel

14   has rejected that proposal. Based on my understanding of the proximate size of the class, that is

15   about 720, my recommendation would be to administer a survey (or other method) to the entire

16   population. This doesn't mean that a sampling method would be unworkable but, rather, that a main

17   benefit of administering the survey to all class members is that it would avoid the pitfalls of

18   sampling and generalization altogether (i.e., a main criticism in Mr. Crandall's report).

19         7.     Further in this regard, Mr. Crandall says that "the question is whether whatever

20   process plaintiffs propose to generate the data on SMs' work activities will produce data that

21   demonstrates variability in SMs' work activities. At present, the detailed data related to SMs work

22   activities consists of the weekly Certification Form data and the 2002-2003 survey data. Since both

23   of these sources of data show patterns of wide variation in SMs' work activities and experiences, it is

24   unlikely that whatever approach plaintiffs use to collect representative evidence on class members'

25   work activities will demonstrate that class members had uniform and consistent experiences."[8] Here,

26   and for the following reasons, Mr. Crandall overreaches. First, it is presumptuous to "forecast" the

27

28        [7] *Ibid.*, p. 8.
        [8] *Ibid.*, pp. 8-9.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

Response of David Lewin to Declaration of Robert Crandall

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL (510) 891-9800

1  findings from an as not yet conducted survey (or other method) in this matter. Stated differently, if

2  one already "knows" what the findings will be, then why conduct a survey? Second, and as noted

3  above, Mr. Crandall uses the term "unlikely" but does not state a probability estimate in this regard.

4  Is it 90% likely or 60% likely or 40% likely that plaintiffs' data collection effort will demonstrate

5  that class members had uniform and consistent experiences? Given his comments about statistical

6  inference and extrapolation at various points in his declaration, one could reasonably expect Mr.

7  Crandall to attach a probability estimate to his "unlikely" characterization. Third, the Certification

8  Forms do not provide any data about SMs performance of specific work activities or, more

9  pointedly, about the amount of time that SMs spent performing specific work activities.[9] Fourth, the

10  2002-2003 survey data were not obtained as part of this proceeding and therefore (consistent with

11  Mr. Crandall's prior reasoning) should not be "extrapolated" to it.

12      8.    In yet another hypothetical, Mr. Crandall says, "suppose class members' reported

13  exempt time ranged between 47% and 53%. Under these circumstances, it is likely that whatever

14  class-wide finding is rendered will be wrong for significant portions of the class. Given this issue,

15  the second prong of the uniformity question is whether 'the uniform experience' results in class

16  members' exempt time being close to the 50%."[10] In a related hypothetical, Mr. Crandall says,

17  "Suppose it were the case that data was collected that showed there is wide variability in experiences

18  across class members. This finding would be the opposite of what would be expected if systematic

19  policies, practices, and procedures governed manager behavior."[11] Such hypotheticals can be

20  multiplied endlessly, but what they basically do is support the conclusion that empirical inquiry

21  needs to be undertaken in this case to determine how Dollar Tree SMs actually spend their work

22  time. If such inquiry finds that a small or a large majority of the class performs primarily non-

23  managerial work, then that finding will be germane to determining damages in this matter. Stated

24  another way, the extent to which Dollar Tree SMs perform managerial versus non-managerial tasks

25

26      [9] The Certification Form requires the SM to check (indicate) "yes" or "no" regarding whether he/she spent more

27  than 50% of his/her "work time during this payroll period on the principal, supervisory job duties and responsibilities listed on the company's job description for Store Manager." See Dollar Tree Stores, "Certification of Job Duties, Store Managers in California," 2005. p. 1.

28      [10] *Ibid.*, p. 9.
    [11] *Ibid.*, p. 10.

Response of David Lewin to Declaration of Robert Crandall

1   and the variation in the extent to which they do so should and can be determined empirically; this

2   should not depend on and cannot be determined by hypotheticals.

3       9.      In discussing Certification Forms for Dollar Tree SMs, Mr. Crandall says that "The

4   'Certification of Duties' forms asked SMs to record at the end of each week whether they had spent

5   more than 50% of their time engaged in managerial tasks. In total Certification Forms are available

6   for 29,431 work weeks during the class period. Analyses of the weekly forms indicate that SMs

7   report spending more than half of their time performing managerial duties for 88% of the weeks

8   reported."[12] This statement seems to indicate that Dollar Tree SMs are primarily and largely

9   performing managerial work. But Mr. Crandall goes on to say that "However, if one delves

10  underneath the aggregate statistic…there is considerable variation across SMs, across stores, across

11  districts, and across regions in terms of the percentage of weeks SMs certified that they were

12  performing exempt duties…Thus, the data suggests that manager-specific and store-specific factors

13  play a role in whether a given manager certified that he or she spent more than half of their time

14  performing managerial duties."[13] Once again, Mr. Crandall seems to come down on both sides of the

15  main issue in this matter, that is, by generalizing that Dollar Tree SMs perform largely managerial

16  work while at the same time arguing against such generalization because of the substantial variation

17  in the extent to which Dollar Tree SMs perform managerial work. More fundamentally, neither of

18  these conclusions is actually supported by the Certification Form data. As noted earlier, the

19  Certification Form does not ask or require SMs to indicate or document the tasks that they performed

20  or the amount of time they spent performing such tasks.[14] Further and even for the limited purpose

21  for which it is intended, the validity of the Certification Form can be called into question. This is

22  because a "yes" response (by an SM) on the form goes unquestioned, whereas a "no" response

23  requires an SM to contact the Human Resources Department and provide an explanation of this

24

25

26

27

28

[12] *Ibid.*, p. 10.
[13] *Ibid.*, pp. 10-11.
[14] Dollar Tree Stores, "Certification of Job Duties, Store Managers in California," 2005. p. 1.

-6-

Response of David Lewin to Declaration of Robert Crandall

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

1   response.[15] In this circumstance, an SM will be more likely to provide a "yes" than a "no" response

2   to the Certification Form irrespective of how that SM actually spent his/her work time.[16]

3        10.     Regarding the effects of manager-specific and store-specific factors on how Dollar

4   Tree SMs spend their work time, I agree with Mr. Crandall that such factors are likely to play a role

5   in this regard—that is, produce variation in the ways in which the SMs spend their work time.

6   However, I do not agree with Mr. Crandall's conclusion that "the Certification Forms provide valid

7   measures…of weeks where SMs did not spend more than 50% of their time performing exempt

8   duties."[17] This is because the Certification Forms do not provide any information about the work

9   activities that SMs performed or the amount of time they spent performing such activities, and

10  because Mr. Crandall apparently did not conduct either multivariate analysis or simpler correlation

11  analysis of the effects of manager-specific and store-specific factors on SMs' performance of

12  managerial or non-managerial work activities.[18] Instead, Mr. Crandall provides a narrative about and

13  some descriptive data concerning relationships between SMs' Certification Form responses and a)

14  percentage of full-time employees in a store, b) sales volume (or "customer flow") per "associate"

15  (i.e., employee), c) average number of employees per store, d) total employee work hours per store,

16  and e) employee turnover per store. From these data, Mr. Crandall concludes that there are certain

17  significant relationships between each of these factors—independent variables—and SMs' yes/no

18  

19      [15] *Ibid.*

20      [16] This statement is supported by the extant literature on motivation theory, survey research methods and statistical inference,

21      [17] Crandall, *op. cit.*, p. 11. Mr. Crandall goes further in this regard by stating the following: "The requirement for SMs to complete certifications presents an interesting question as the case proceeds forward. In order to make a

22  claim, most plaintiffs will be required to recant or explain the information reported on their weekly certification and provide contradictory information several months or years later regarding what happened during a particular week" (p.

23  11). Whether and to what extent any plaintiffs in this matter will "required to recant" the information provided on their certification forms or elsewhere seems to me to be an exercise in pure speculation that casts doubt in the veracity of plaintiffs/Dollar Tree SMs and that ventures into territory that is more properly within the province of counsel for

24  defendant (and plaintiffs) rather than an "expert." Moreover, and as noted earlier, an expert is not qualified to make a legal determination of exempt versus non-exempt employee status; this is for the court to decide.

25      [18] In plainer language, the term "multivariate analysis" refers to an attempt to identify and isolate the effects of two or more factors, as examples, store size, store location, and manager years of work experience, on the behavior or

26  issue of interest, for example, the amount of time a store manager spends performing managerial versus non-managerial work. The statistical technique used for this purpose is regression analysis. If only one factor, such as store size, is

27  considered in terms of its relationship to and possible effect on store manager performance of managerial versus non-managerial work, then the term "correlation analysis" applies. Mr. Crandall apparently did not perform either

28  multivariate analysis or correlation analysis of the Certification Form data in this matter. No such analyses are contained in the text or in Exhibits 1-10 of Mr. Crandall's declaration.

Response of David Lewin to Declaration of Robert Crandall

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE MAGNOLIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

1  responses to the Certification Forms—the dependent variable. To illustrate, Mr. Crandall says, "For

2  SMs with a larger share of full-time employees, the reported percentage of exempt-status weeks was

3  nearly 9% higher (81.4% vs. 90.1%)," "48.3% of the SMs in high customer flow stores also had a

4  'high' rate of weekly non-exempt reporting," and "This analysis shows a statistically significant

5  increase of 6.4% in the reporting of non-exempt status during weeks when a store was

6  understaffed."[19] However, nowhere in the text or exhibits of his declaration does Mr. Crandall report

7  a specific regression coefficient, correlation coefficient or statistical significance test result for any

8  of these putative relationships.[20] In sum, Mr. Crandall has not provided sufficient statistical evidence

9  for the correlations between SMs' Certification Form responses and manager-specific/store-specific

10  relationships he says exist in this matter, and apparently has not conducted either multivariate

11  (regression) analysis or correlation analysis of these relationships.

12    11.    At several points in his declaration, Mr. Crandall uses deposition testimony of

13  selected SMs to support his arguments and conclusions.[21] There is nothing wrong in doing so, and I

14  have also often done so as well. However, the use of such "selective" testimony runs strongly

15  counter to Mr. Crandall's arguments (earlier in his declaration) about the limits of extrapolating

16  "representative testimony" by class members to "non-testifying class members."[22]

17    12.    At pages 32-38 of his declaration, Mr. Crandall discusses the findings from his 2002-

18  2003 survey of 74 "current and former California Dollar Tree SMs."[23] While I have argued that this

19  survey is not germane to the instant case because it was not conducted in conjunction with this case,

20  certain of Mr. Crandall's conclusions based on the survey data warrant comment. First, Mr. Crandall

---

[19] Crandall, *op. cit.*, pp. 22-23 & 25.

[20] The one instance in which Mr. Crandall appears to have applied statistical tests to the Certification Form data involves SMs' "rate of weekly non-exempt reporting" in stores with high customer flow per associate compared to stores with average and low customer flow per associate (pp. 23-24). In this regard, Mr. Crandall says "this analysis was conducted for approximately 67% of the SMs. When dealing with smaller samples, analysts commonly rely on Chi-Squared Statistics and Fisher's Exact Tests…The results here are significant using both…methods" (footnote 15, p. 24). However, the actual results of these two significance tests are not reported in Mr. Crandall's declaration or in the exhibits attached thereto.

[21] Crandall, *op. cit.*, pp. 17-21 & 39-40.

[22] *Ibid.*, pp. 3-5.

[23] *Ibid.*, p. 32. Note that Mr. Crandall does not state the response rate to this survey, meaning that the reader does not know how many SMs were actually surveyed and thus does not know the sample or population to which Mr. Crandall is generalizing his findings and conclusions.

1   says that "this survey indicates that a significant majority of SMs report spending more than half of

2   their time performing managerial duties. Further, the average managerial time across all survey

3   respondents was in excess of 50%."[24] Given this conclusion, which Mr. Crandall is apparently

4   generalizing to all Dollar Tree SMs, these SMs are, in a word, "managers." Shortly thereafter,

5   however, Mr. Crandall says "the data suggests that some SMs perform their job in a manner

6   consistent with the exemption and others do not. Given that this pattern of variability continues to

7   the present day, it is likely that many SMs will report that they worked in a manner that met the

8   requirements for the exemption and some will not."[25]  Given this conclusion, Mr. Crandall is

9   basically arguing against his prior generalization, namely, that the majority of work performed by

10  Dollar Tree SMs is managerial work. Once again, therefore, Mr. Crandall appears to be coming

11  down on both sides of this issue. Second, Mr. Crandall states that "it is clear that whatever common

12  set of policies, practices and procedures exist, they do not influence SMs' behavior with regard to

13  the duties they choose to perform and where the perform them."[26] But this conclusion belies the very

14  existence of the Certification Form in which an SM is required to state that he/she performed more

15  than 50% of his/her weekly work performing managerial duties and, if not having done so, to

16  explain/justify why he/she did not do so.[27]

17      13.    Mr. Crandall conducted a regression analysis of the data obtained from the 2002-2003

18  survey.[28] From this analysis, he concludes that "the statistical models were able to explain only 16%

19  of the total variation in SMs' reported proportions of exempt-status time. In other words, using these

20  measureable factors in a multivariate survey was a very imprecise way to arrive at estimates for SMs

21  that did not complete the survey's 'time diary.' The estimates from such a model are likely to be

22  accompanied by very large margins of error—for example, the model might establish with a 95%

---

24      [24] *Ibid.*, p. 33. Similarly and later in this section of his declaration, Mr. Crandall says "The responses indicate
        that a considerable majority, nearly 67% of the SMs, regularly spent more than 50% of their time performing exempt,

25      managerial work" (p. 35).
        [25] *Ibid.*, p. 34. Note that exhibits 11-21 of Mr. Crandall's declaration present certain descriptive data derived

26      from this survey.
        [26] *Ibid.*, p. 35.

27      [27] Mr. Crandall's conclusion in this regard is also belied by the many documents in which Dollar Tree specifies
        the duties and responsibilities of SMs, store operating procedures, and the like. See "Declaration of David Lewin," May

28      7, 2010, p. 4.
        [28] Crandall, *op. cit.*, pp. 37-38 and Exhibit 21.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
1970 BROADWAY, NINTH FLOOR
THE VALDONIA TOWER
OAKLAND, CA 94612
TEL: (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-8800

1   certainty that a SMs' average [of performing managerial duties] fell somewhere between 20% and

2   80%. This would make an individual-level determination of exempt/non-exempt status impossible in

3   the absence of an extensive individualized fact-gathering effort."[29] The reasons why this regression

4   analysis and the findings derived there from are germane to the present case are as follows. First, the

5   fact that Mr. Crandall did not perform regression analysis of the Certification Form data in the

6   instant case implies that those data are insufficient for conducting such an analysis, which accords

7   with my prior observation that the Certification Forms do not provide any information whatsoever

8   about the tasks that Dollar Tree SMs performed or the amount of time they spent performing such

9   tasks. Second, the role of manager-specific and store-specific factors (variables) highlighted by Mr.

10  Crandall in his declaration in the present matter may in fact not be of much relevance for helping to

11  explain why and how Dollar Tree SMs spend their work time—that is, these factors may not matter

12  much at all. Third, in his declaration in the present matter Mr. Crandall does not actually present the

13  results of his regression analysis of the 2002-2003 survey data, which seems to me to be at odds with

14  his otherwise substantial emphasis on and discussion of the important role of statistical analysis and

15  inference in a case involving managerial misclassification.

16          14.     In the penultimate section of his declaration, Mr. Crandall offers a variety of

17  observations about "How to examine whether a common set of policies, practices, procedures,

18  training and supervision resulted in uniformity of work practices."[30] Here, Mr. Crandall invokes the

19  deposition testimony of several Dollar Tree SMs to counter what he says is plaintiffs' claim that

20  "SMs at Dollar Tree perform their duties without discretion at the behest of regional or District

21  Managers."[31] In doing so, Mr. Crandall appears to contradict his earlier statements to the effect that

22  the testimony of certain individual SMs cannot be used to generalize to the class of SMs in this

23  matter. Mr. Crandall also says that "The reality is that some SMs' performance failed to meet

24  expectations, some SMs' performance met expectations, and some SM's performance failed to meet

25  expectations over the proposed class period. Given this disparity in managerial performance, it is

26

27

28
[29] *Ibid.*, p. 38.
[30] *Ibid*, pp. 38-44.
[31] *Ibid.*, p. 38.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
1970 BROADWAY, NINTH FLOOR
THE WACHOVIA TOWER
OAKLAND, CA 94612
TEL: (510) 891-9800

1    unlikely that all SMs performed their job duties in similar manners."[32] But this conclusion is

2    erroneous because Mr. Crandall fails to consider that among any reasonably large number of

3    employees, such as SMs, job performance is typically measured against a set of specified criteria and

4    also typically yields a normal or bell-shaped distribution—meaning that some employees' job

5    performance will be evaluated/rate as high or superior, most employees' job performance will be

6    rated as average or acceptable, and some employees job performance will be rated as low or not

7    acceptable. Such a distribution of performance appraisals does not imply anything about the extent to

8    which the employees holding the job in question perform their duties in a similar (or different)

9    manner.

10       15.    In the "Conclusion" section of his declaration, Mr. Crandall makes the following

11    statement: "The deposition testimony and certifications data indicate that SMS consistently report

12    having decision-making authority for numerous discretionary tasks...the survey supports this

13    conclusion."[33] As noted above, however, Mr. Crandall's prior reasoning led him to conclude that

14    deposition testimony of selected SMs should not be used to "extrapolate" to (that is, generalize

15    about) other SMs or the class of SMs as a whole. Similarly, the survey to which he refers was not

16    conducted as part of the instant case, and the data derived there from are used by Mr. Crandall to

17    argue both that Dollar Tree SMs perform largely managerial work and that they vary so much in the

18    work they perform that no overriding generalization can be reached about that work. Further, at the

19    end of this section, Mr. Crandall says, "In the presence of such variability it becomes difficult to rely

20    on statistical estimation as a means for determining liability or damages on a class-wide basis...For

21    this reason, the need for extensive individual inquiry is likely, as it is improbable that representative

22    evidence will be useful in making generalizations about the class as a whole without significant

23    error."[34] This conclusion seems to be at odds with Mr. Crandall's efforts throughout his declaration

24    to make statistical arguments against class certification (or, in favor of de-certification). But the

25    conclusion is not at odds with—indeed, it supports—plaintiffs' view that a survey or other research

---

[32] *Ibid.*, p. 42.
[33] *Ibid.*, p. 45
[34] *Ibid.*

1  method can and should be administered to the class in this matter for the purpose of determining

2  damages. I know of no obstacles to conducting such a survey (or other method) and I am willing and

3  able to assist in its design and administration and in the analysis of the data derived there from.

4        16.     In this regard, I have designed and administered surveys of managerial and non-

5  managerial employees, analyzed the data from such surveys, and published the results of such

6  analyses in the form of research studies on many occasions. Examples of such published studies

7  include David Lewin, "Public Sector Compensation: The Management of Change," in R. Todnem &

8  C. Macleod, Eds., Managing Organizational Change in Public Services (London: Routledge, 2009),

9  pp. 135-156; David Lewin, "Employee Voice and Mutual Gains," Proceedings of the 60th Annual

10  Meeting, Labor and Employment Relations Association (Champaign, IL: LERA, 2008), pp. 61-83;

11  David Lewin, "Management Responses to Nonunion Dispute Resolution Outcomes: A Political

12  Analysis," pp. 85-103, Proceedings of the 59th Annual Meeting, Labor and Industrial Relations

13  Association (Champaign, IL, LERA, 2007, pp. 85-103; David Lewin, "Incentive Compensation in

14  the Public Sector: Evidence and Potential," Journal of Labor Research, Vol. 24 (2003), pp. 597-619;

15  David Lewin, "Assessing the Effects of Executive and Management Development on Learning

16  Transfer and Business Results: Some Empirical Findings," Paper presented to the 62[nd] Annual

17  Meeting of the Academy of Management, Denver, CO, August 2002; David Lewin, "Low

18  Involvement Work Practices and Business Performance," Proceedings of the 53rd Annual Meeting,

19  Industrial Relations Research Association (Champaign, IL: IRRA, 2001), pp. 275-292; David Lewin

20  & Richard B. Peterson, "Behavioral Outcomes of Grievance Activity," Industrial Relations, Vol. 34

21  (1999), pp. 554-576; David Lewin & Karen E. Boroff, "Loyalty, Voice and Intent to Exit a Union

22  Firm," Industrial and Labor Relations Review, Vol. 51 (1997), pp. 50-63; David Lewin and Karen E.

23  Boroff, "The Role of Loyalty in Exit and Voice: A Conceptual and Empirical Analysis," Advances

24  in Industrial and Labor Relations, Vol. 7, (1996), pp. 69-96; David Lewin, "Explicit Individual

25  Contracting in the Labor Market," in C. Kerr & P.D. Staudohar, Eds., Labor Economics and

26  Industrial Relations (Boston, MA: Harvard University Press, 1994), pp. 401-428; David Lewin and

27  Peter D. Sherer, "Does Strategic Choice Explain Senior Executives' Preferences on Employee Voice

28  and Representation?," in M.M. Kleiner & B.E. Kaufman, Eds., Employee Representation:

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

1    Alternatives and Future Directions (Madison, WI: Industrial Relations Research Association, 1993),

2    pp. 235-263; David Lewin, "Grievance Procedures in Nonunion Workplaces: An Empirical Analysis

3    of Usage, Dynamics, and Outcomes," Chicago-Kent Law Review, Vol. 66 (1992), pp. 823-844;

4    David Lewin, Daniel J.B. Mitchell and Edward E. Lawler, III, "Alternative Pay Systems, Firm

5    Performance, and Productivity," in A.S. Blinder, Ed., Paying for Productivity: A Look at the

6    Evidence (Washington, D.C.: Brookings, 1990), pp. 15-94; and David Lewin, John T. Delaney and

7    Casey Ichniowski, Human Resource Policies and Practices in American Firms (Washington, D.C.:

8    U.S. Department of Labor, 1989). In addition, as Senior Editor of the journal Advances in Industrial

9    and Labor Relations, member of the editorial boards of the journals Industrial Relations, Industrial

10   and Labor Relations Review, California Management Review and Journal of Change Management,

11   and frequent reviewer for many other scholarly and professional journals, I very frequently provide

12   peer (referee) reports that assess the strengths and weaknesses and validity and reliability of survey

13   design and survey data analysis undertaken by scholars and practitioners in various disciplinary

14   specialties, including industrial/organizational psychology, organizational sociology, labor

15   economics, and human resource management. Such reports become the basis for journal editors' to

16   decide whether to accept or reject papers submitted for publication.

17         17.    Stepping back from individual sections of Mr. Crandall's report and viewing that

18   report as a whole, it seems to me that Mr. Crandall is basically arguing that the varying amounts of

19   time that Dollar Tree SMs spend performing particular tasks cannot be extrapolated to the class of

20   SMs as a whole. But this argument is irrelevant to class certification in this matter. The Court has

21   previously certified the class and, in doing so relied upon defendant's own list of 17 job duties that

22   make up the SM position and that SMs are required by defendant to certify that they perform on a

23   weekly basis. Mr. Crandall also assumes and criticizes a trial plan on the part of plaintiffs that he

24   claims involves the selection of a sample of SMs to be surveyed and the extrapolation of survey

25   findings to the class as a whole. However, and contrary to Mr. Crandall, it is my understanding that

26   it is plaintiffs' trial plan to ask the jury to determine the exempt versus non-exempt status of these

27   job duties, then survey the entire class for the purpose of determining how much time SMs spend

28   performing these duties, and thereby also determine which SMs will subsequently seek damages in

1   this matter. In my judgment, this plan is soundly conceived and a survey can be conducted according

2   to existing social science research standards.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

David Lewin

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

-15-

Response of David Lewin to Declaration of Robert Crandall

# EXHIBIT 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

MIGUEL A. CRUZ, and JOHN D.
HANSEN, individually, and on
behalf of all others similarly
situated,

        Plaintiffs,

vs.                       No. C-07-2050 SC

DOLLAR TREE STORES, INC.,

        Defendant

                   /

ROBERT RUNNINGS, individually,
and on behalf of all others
similarly situation,

        Plaintiffs,

vs.                       No. C-07-4012 SC

DOLLAR TREE STORES, INC.,

        Defendant.

                   /

DEPOSITION OF DAVID LEWIN, Ph.D.

Wednesday, June 2, 2010

Reported by:
SANDRA BUNCH VANDER POL, CSR #3032
Certified Merit Reporter
Certified Realtime Reporter
Realtime Systems Administrator credentialed
Fellow, Academy of Professional Reporters
Job No. 25253LR

1    mean that.  Your question reminds me that the word

2    "management" is surprisingly absent from much of the

3    published material on wages and hours, including a lot of

4    wage and hour law.  It's administrative or supervisory or

5    executive.  Just my observation.

6    Q.        That was my next question.  Do you equate

7    management with exempt?

8    A.        Oh.  Now, on that question, Counsel -- look, you

9    asked me before am I a lawyer; do I have any expertise in

10   it.  No and no.

11           I try my best, I can't always do it, to use

12   words like "managerial" or "managerial responsibilities"

13   or "nonmanagerial ones," rather than "exempt" or

14   "nonexempt."  The Court, as in Exhibit 4, can decide

15   what's exempt or nonexempt, but I can't do that.

16           I know what you're asking.  If somebody is truly

17   doing executive work or managerial work that is

18   performing executive duties and/or performing managerial

19   duties, then they are managers, not nonmanagers, and not

20   nonemployees.  That's what it means to me.

21   Q.        Is it correct that you use the term "management"

22   to distinguish from hourly functions?

23   A.        I have used it that way.  I generally say

24   managerial versus nonmanagerial work or managerial versus

25   employee work.  But, again, how -- see, hourly gets

                                                            53

# EXHIBIT 6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


MIGUEL A. CRUZ and JOHN D.
HANSEN, individually and on
behalf of all others similarly
situated,

        Plaintiffs,

-vs-                             Nos. C 07 2050 SC
                                  C 07 04012 SC

DOLLAR TREE STORES, INC.,

        Defendant.
_____/
ROBERT RUNNINGS, individually,
and on behalf of all others
similarly situated,

        Plaintiff,

-vs-

DOLLAR TREE STORES, INC.,

        Defendant.
_____/


Videotaped Deposition of

MARK GORE

Wednesday, May 26, 2010

Reported by:
KACY PARKER BARAJAS, RPR, CRR
CSR No. 10915

Mark Gore, Volume 1                                    5/26/2010

```
 1  decision making.

 2  Q.        Did you ever provide recommendations to your

 3  district manager about your store?

 4  A.        No.

 5  Q.        Did anyone else from the company visit your

 6  stores?

 7  A.        No.

 8  Q.        Were you responsible for monitoring the

 9  performance of employees in the Santa Rosa store?

10  A.        Certain part of the time.

11  Q.        How did you do that?

12  A.        I don't understand the question.

13  Q.        How did you monitor performance?

14  A.        Can't really think of any circumstances on that.

15  I -- I'm sort of drawing a blank.

16  Q.        Okay.  Let's take the cashiers for a second.

17  How would you monitor the performance of the cashiers?

18  A.        You would see if they -- I mean, when you walked

19  by, you would see if they were talking too much.  You'd

20  see if they were giving a customer their full attention.

21  Q.        Now for those examples, let's say you walked by

22  and you felt that a cashier was talking too much, would

23  you -- what would you do to correct that situation?

24  A.        If it was happening on a recurring basis, I

25  would call my DM and find out what I should do next.
```
                                                        65

1   that someone should be disciplined?

2   A.       No.

10:56:15   3   Q.       What tasks did you typically delegate to your

4   sales associates?

10:56:24   5   A.       Stocking, recovery.  Can't think of anything

6   else.

7   Q.       What does recovery mean?

8   A.       Going throughout the store and picking up the

9   items that don't belong in that spot and putting them

10   back where they belong.

11   Q.       How did you make the determination of when to

12   delegate those tasks to sales associates?

10:57:00   13   A.       That would be something that you would -- if you

14   had enough hours, you could do.

15   Q.       Did you walk the store and determine that, for

16   instance, recovery was necessary and then go and delegate

17   those tasks?

18   A.       Either I or my associate -- or my assistants

19   would do that.

10:57:28   20   Q.       So sometimes you would delegate to the assistant

21   managers to go and walk the store?

22   A.       No.  They might do it on their own, and if I

23   wasn't there, they might do it on their own.

24   Q.       So the assistant managers also had the ability

25   to delegate tasks to associates?

73

# EXHIBIT 7

1  Scott Edward Cole, Esq. (S.B. #160744)
   Molly A. Kuehn, Esq. (S.B. #230763)
2  **SCOTT COLE & ASSOCIATES, APC**
   1970 Broadway, Ninth Floor
3  Oakland, California 94612
   Telephone: (510) 891-9800
4  Facsimile: (510) 891-7030
   web:    www.scalaw.com
5
   Attorneys for Representative Plaintiffs
6  and the Plaintiff Class

7

8              **UNITED STATES DISTRICT COURT**

9     **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

10

11  MIGUEL A. CRUZ and JOHN D.          )  **Case No.: C-07-02050 SC** (*Consolidated Action*)
    HANSEN, individually, and on behalf )
12  of all others similarly situated,   )  **CLASS ACTION**
                                        )
13                    Plaintiffs,       )
                                        )
14  vs.                                 )
                                        )
15  DOLLAR TREE STORES, INC.            )
                                        )
16                    Defendant.        )
    _____ )
17  ROBERT RUNNINGS, individually,      )  **Case No.: C-07-4012 SC**
    and on behalf of all others similarly )
18  situated,                           )  **CLASS ACTION**
                                        )
19                    Plaintiffs,       )  **DECLARATION OF JOSE ADAME**
                                        )
20  vs.                                 )
                                        )
21  DOLLAR TREE STORES, INC.            )
                                        )
22                    Defendant.        )
                                        )

23        I, Jose Adame, do hereby declare as follows:

24        1.      My address is 14237 Victory Boulevard, Van Nuys, California 91401. I have personal

25  knowledge of the facts set forth in this declaration and could and would testify competently thereto.

26        2.      Upon being hired as a Store Manager I underwent a mandatory eight-week training

27  period at the Dollar Tree store in Van Nuys. Thereafter I was assigned to work at the Dollar Tree

28  store in Van Nuys, and I did not receive additional training after being transferred.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

3.   I am employed by Dollar Tree Stores, Inc. (hereinafter "Dollar Tree") as a Store Manager from approximately October 2004 through the present. During that time I worked at the Dollar Tree stores located in Santa Clarita and Van Nuys, California.

4.   It is my understanding that Store Managers are required to follow the same policies and procedures, as dictated by Dollar Tree, at every Dollar Tree store in California.

5.   I am familiar with Dollar Tree's Store Manger Position and Responsibilities. The Store Manager duties require completion of various tasks, including those set forth below.

    a.   Ensure compliance with applicable laws and regulations:

       i.   Instructing associates to take meal and rest breaks;

       ii.   Ensuring the fire extinguisher is not outdated;

       iii.   Ensuring all licenses and permits are properly displayed;

       iv.   Ensuring all accidents are reported;

       v.   Instructing associates to accurately record their time; and

       vi.   Reviewing and approving time records and releasing timekeeping information to ensure proper payment of wages.

    b.   Ensure the highest level of customer service. Handle customer complaints and problems:

       i.   Keeping a friendly environment in the store, talking to and greeting customers.

    c.   Analyze sales, expenses and profit, review reports, analyze competition, determine customer preferences, manages sales forecasts, meet sales and profit objectives and goals, determine product mix, determine most effective placement of product and ensure standards of merchandise presentation, displays and signage to maximize sales. Assist in developing promotions and advertisements as appropriate:

       i.   Making appropriate assignments to keep shelves, end caps, displays, wow tables, and refrigerators/coolers clean and fully stocked;

       ii.   Reviewing the Monthly Planner;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

iii.    Using a PDT gun to order items in the store according to Dollar Tree's requirements; and

iv.    Reviewing reports of department sales, Top 200 SKUs and the Top 10 items sold.

d.    Complete management reports in a timely and accurate manner:

i.    Completing the Safe Fund Log at change of safe "ownership" from one member of management to another at shift change;

ii.    Printing out the order scorecard, department sales, pull and hold, and Top 200 SKUs reports and putting them in the Playbook and/or posting them in the store office;

iii.    Ordering merchandise according to Dollar Tree's requirements;

iv.    Completing cycle count reports;

v.    Completing the Certification of Duties;

vi.    Completing and submitting the Tax Exempt Log;

vii.    Using and accessing the Dollar Tree computer system to complete and access reports as necessary;

viii.    Completing the Deposit Log of all store deposits; and

ix.    Reconciling selective Receiving Reports for DSD billing.

e.    Provide leadership and direction to store personnel:

i.    Meeting the delivery trucks and directing where merchandise should be placed on the sales floor and in the stock room;

ii.    Preparing notes to assistant managers; and

iii.    Preparing assignment lists and three by five cards with associate assignments.

f.    Supervision of Associates:

i.    Posting associate schedules;

ii.    Preparing checklists of job assignments;

iii.    Walking the store using the Daily Tour Sheet;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

iv.    Counting stockroom boxes or cartons to monitor and keep track of associate productivity;

v.    Assigning markdowns and checking to ensure they are properly completed based on Dollar Tree's polices;

vi.    Conducting new associate training and orientation by reviewing applicable rules and policies with associates and ensuring new associate paperwork is completed and entered into the computer;

vii.    Preparing associate work schedules by filling in data fields on the Kronos Timekeeping System;

viii.    Communicating and interacting with associates and customers throughout the day; and

ix.    Keeping track of associate attendance.

g.    <u>Maintain proper sales, banking, inventory, accounting, productivity, payroll and time records:</u>

i.    Monitoring and completing required company paperwork;

ii.    Conducting store walks by department;

iii.    Completing cycle-counts before opening;

iv.    Preparing or checking the preparation of the bank deposit;

v.    Correcting time records as necessary using the Kronos Timekeeping System;

vi.    Reviewing reports of Department Sales, the Top 200 SKUs and the Top 10 selling items;

vii.    Monitoring associate attendance using the Kronos Timekeeping System;

viii.    Taking the deposit to the bank;

ix.    Using the Order Scorecard to determine what items to order; and

x.    Ordering merchandise according to Dollar Tree's instructions.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

h.   Communicate professionally and effectively with customers, subordinates and supervisors:

i.   Walking the floor and talking to customers and associates;

ii.   Talking to District Managers in person, by telephone, and by email; and

iii.   Reading and printing all emails from Dollar Tree Human Resources and higher-level management.

i.   Schedule and assign work to store personnel. Evaluate, motivate, counsel, develop, discipline and discharge sales associates appropriately. Maintain production reports to evaluate job performance of sales associates:

i.   Scheduling and assigning meal and rest breaks;

ii.   Preparing performance evaluations according to Dollar Tree's policies;

iii.   Using the COMPASS computer system to evaluate and prepare cashier schedules;

iv.   Communicating with District Manager and Human Resources representatives as necessary in relation to personnel decisions;

v.   Printing associate rosters;

vi.   Preparing associate schedules according to Dollar Tree's requirements;

vii.   Preparing written performance warnings according to Dollar Tree's polices; and

viii.   Reviewing daily SUC reports showing use the of payroll hours.

j.   Protect all company assets including store cash, merchandise and equipment:

i.   Counting money and ensuring the receipts are balanced;

ii.   Ensuring doors are properly locked and secured;

iii.   Checking emails for cycle counts and ensuring cycle count reports are filled out;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

1     iii.    Reviewing job applications;

2     iv.    Calling applicants to give them a job offer;

3     v.    Communicating with District Managers and Human Resources

4        representatives as necessary in relation to personnel decisions;

5     vi.    Conducting new associate orientation, which includes ensuring that

6        the associate filled out all forms in the new hire packet, entering

7        required information into the Dollar Tree computer system, providing

8        new associates with an Associate Handbook and sexual harassment

9        brochure, filling out the New Hire Checklist, and telling associates

10       Dollar Tree's meal and rest break policies; and

11     vii.    Counseling, providing written and verbal discipline of store

12        associates and assistant managers in accordance with Dollar Tree's

13        polices.

14    m.    Oversee daily store activities, including opening and closing the store:

15     i.    Correcting any time and attendance issues from the previous day;

16     ii.    Ensuring the store opens on time and closes on time;

17     iii.    Timely posting of associate schedules;

18     iv.    Counting money and ensuring the receipts were balanced;

19     v.    Assigning cashiers to cash registers and giving them a till;

20     vi.    Walking the store for general overview of store appearance using the

21        Daily Tour Sheet;

22     vii.    Completing cycle-counts before opening, per Dollar Tree procedures;

23     viii.    Unlocking and/or locking the store;

24     ix.    Calling the store as necessary to ensure proper opening and closing;

25     x.    Preparing associate schedules according to Dollar Tree's

26        requirements by filling in data fields on the Kronos Timekeeping

27        System;

28     xi.    Taking the deposit to the bank;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

   xii. Ensuring there are no customers in the bathroom or back room prior to closing; and

   xiii. Checking all door seals and ensuring door seal numbers match the most recent entry on the Door Seal Log.

  n. <u>Responsible for overall cleanliness and appearance of store:</u>

   i. Assigning individuals to retrieve shopping carts from the parking lot;

   ii. Assigning associates to mop, vacuum, clean windows, and clean restrooms;

   iii. Modifying window signage as appropriate; and

   iv. Training cashiers to keep their cash registers clean.

  o. <u>Ensure customer and associate safety:</u>

   i. Ensuring that merchandise is properly placed on shelves according to Dollar Tree's requirements;

   ii. Completing paperwork in connection with associate on-the-job injuries;

   iii. Checking all door seals and ensuring the door seal numbers match the most recent entry on the Door Seal Log;

   iv. Taking the deposit to the bank;

   v. Ensuring workers are properly trained on state and federal safety laws by providing them with materials sent from Dollar Tree Corporate;

   vi. Viewing store security tapes;

   vii. Preparing or checking the preparation of the bank deposit; and

   viii. Ensuring associates who are injured on the job received proper medical care.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

p.   Ensure accident reports and damage reports are completed in a timely and accurate manner:

    i.   Preparing reports on associate and/or customer injuries and accidents, explaining how an accident happened and why, including a claim and confirmation number; faxing the reports to the corporate office.

q.   Control inventory, supervise ordering, receiving, stocking and pricing of goods. Ensure goods are properly marked and mark downs are properly recorded:

    i.   Making decisions and assignments to put stock in "grab bags" or to mark down stock;

    ii.  Generating and using the online Order Book to determine inventory on hand, what merchandise to order, and to order merchandise;

    iii. Making appropriate assignments to keep shelves, end caps, displays, wow tables, and refrigerators/coolers clean and fully stocked;

    iv.  Reviewing reports of department sales, Top 200 SKUs and the Top 10 items sold;

    v.   Ensuring proper security of the building and proper accounting for markdowns according to Dollar Tree's requirements; and

    vi.  Requesting cycle counts.

6.   All of the tasks listed above are very basic and require little or no complex thought; I complete each of them in accordance with Dollar Tree's specific requirements and instructions.

7.   The task of cashiering includes posting transaction voids for customer refunds and covering the register as needed. Store Managers also have to do this.

8.   Store Managers are required to adhere to the Merchandising Display Guidelines that Dollar Tree's Corporate management selects for the stores. They are not permitted to decide how to stock merchandise throughout the store.

9.   Store Managers routinely clean up spills, vacuum, clean the bathroom, take trash to the dumpster outside the store and personally handle merchandise recovery. As a Store Manager

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

1  maintaining the cleanliness of the store is[was] a duty required of me.

2    10.    Dollar Tree sets the price for all items; Store Managers have no authority to mark
3  products down without express approval from Dollar Tree.

4    11.    In addition to the duties listed above, Dollar Tree also requires its Store Managers to
5  physically receive retail product by unloading trucks delivering merchandise from Dollar Tree
6  Distribution Centers. Store Managers have to verify that the inventory received from the Distribution
7  Center or a Direct Store Delivery service is consistent with store needs, orders placed or other
8  delivery standards or protocols. Once merchandise is received, Store Managers are required to
9  organize it in the stockroom and to physically place it on the shelves.

10    12.    My typical workweek consists of six days that vary in length from 11 to 12 hours. It
11  is not rare for me to work seven days per week in order to accomplish all of the duties required of
12  me as a Store Manager.

13    13.    The Store Manager job includes performing routine customer service. Specifically,
14  Store Managers respond to customer questions, handle certain transactions that only management
15  can carry out (such as voids), and cashier. On average, I spend four to five hours about hours each
16  workday cashiering.

17    14.    I am paid the same amount of fixed compensation regardless of how many hours I
18  work during each pay period, and there is no connection between the number of hours I work and
19  the amount of my salary.

20    15.    Store Managers can not write up, suspend or terminate any employee, they are
21  required to get approval from Dollar Tree Corporate. As such, Store Managers have no authority to
22  discipline the employees working at their stores.

23    16.    The detailed polices and procedures that Dollar Tree publishes require Store
24  Managers to perform the same job tasks and duties on a week-to week basis. Store Managers are
25  rarely, if ever, allowed to deviate from these guidelines.

26    17.    I am rarely, if ever, able to take an uninterrupted meal period during a workday. When
27  I do get a meal period, it is seldom a half hour or more, and I often do not get to take any meal
28  periods during the first five hours of my shift. The vast majority of the rest breaks I take are on-duty

1   and frequently interrupted by work duties like responding to inquiries from employees, Dollar Tree

2   management and customers.

3       18.    Dollar Tree Corporate routinely sends its Store Managers Merchandising Display

4   Guidelines and Weekly Bulletins via email, which provide detailed instructions on where and how

5   merchandise should be displayed throughout the store. To my knowledge, every California Dollar

6   Tree Store Manager receives these Merchandising Display Guidelines and Weekly Bulletins.

7       19.    Store Managers are also required to perform routine data entry on the computer and

8   to complete paperwork using pre-fabricated forms prepared by Dollar Tree.

9       20.    Dollar Tree restricts the payroll hours that Store Managers are permitted to schedule

10   to such a degree that they are required to personally unload shipments alongside the hourly

11   employees who work at their stores. As such, the duties of Store Manager include unloading the

12   trucks when they arrive with new shipments of products, counting the loads after they are removed

13   from the trucks, carrying the loads to the stock room, and organizing them.

14       21.    Store Managers do not have the authority to order the vast majority, if any, of the

15   supplies for their stores.

16       22.    I am glad that the Court certified this case as a class action so that I do not have to

17   expend the time and energy that it could take to bring a case against Dollar Tree on my own. I would

18   like this Court to expand the class definition to include Store Managers who worked for Dollar Tree

19   in California through the conclusion of this case. I believe that nothing about the Store Manager

20   position has changed since May 26, 2009, and that class treatment is no less appropriate now than

21   it was then.

22       I declare under penalty of perjury under the laws of the United States and the State of

23   California that the foregoing is true and correct. Executed this ____ day of February, 2010 in Van

24   Nuys, California.

25

26   _____

27   JOSE ADAME

28

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WAKEFIELD TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

1   and frequently interrupted by work duties like responding to inquiries from employees, Dollar Tree

2   management and customers.

3       18.    Dollar Tree Corporate routinely sends its Store Managers Merchandising Display

4   Guidelines and Weekly Bulletins via email, which provide detailed instructions on where and how

5   merchandise should be displayed throughout the store. To my knowledge, every California Dollar

6   Tree Store Manager receives these Merchandising Display Guidelines and Weekly Bulletins.

7       19.    Store Managers are also required to perform routine data entry on the computer and

8   to complete paperwork using pre-fabricated forms prepared by Dollar Tree.

9       20.    Dollar Tree restricts the payroll hours that Store Managers are permitted to schedule

10  to such a degree that they are required to personally unload shipments alongside the hourly

11  employees who work at their stores. As such, the duties of Store Manager include unloading the

12  trucks when they arrive with new shipments of products, counting the loads after they are removed

13  from the trucks, carrying the loads to the stock room, and organizing them.

14      21.    Store Managers do not have the authority to order the vast majority, if any, of the

15  supplies for their stores.

16      22.    I am glad that the Court certified this case as a class action so that I do not have to

17  expend the time and energy that it could take to bring a case against Dollar Tree on my own. I would

18  like this Court to expand the class definition to include Store Managers who worked for Dollar Tree

19  in California through the conclusion of this case. I believe that nothing about the Store Manager

20  position has changed since May 26, 2009, and that class treatment is no less appropriate now than

21  it was then.

22      I declare under penalty of perjury under the laws of the United States and the State of

23  California that the foregoing is true and correct. Executed this ____day of February, 2010 in Van

24  Nuys, California.

25

26

27   JOSE ADAME

28

# EXHIBIT 8

1  Scott Edward Cole, Esq. (S.B. #160744)
2  Molly A. Kuehn, Esq. (S.B. #230763)
   **SCOTT COLE & ASSOCIATES, APC**
3  1970 Broadway, Ninth Floor
   Oakland, California 94612
4  Telephone: (510) 891-9800
   Facsimile:  (510) 891-7030
   web:    www.scalaw.com
5
6  Attorneys for Representative Plaintiffs
   and the Plaintiff Class
7
8              **UNITED STATES DISTRICT COURT**
9     **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**
10

11  MIGUEL A. CRUZ and JOHN D.        ) **Case No.: C-07-02050 SC** (*Consolidated Action*)
    HANSEN, individually, and on behalf )
12  of all others similarly situated,    ) **CLASS ACTION**
                                          )
13              Plaintiffs,              )
                                          )
14  vs.                                   )
                                          )
15  DOLLAR TREE STORES, INC.            )
                                          )
16              Defendant.               )
    _____)
17  ROBERT RUNNINGS, individually,    ) **Case No.: C-07-4012 SC**
    and on behalf of all others similarly )
18  situated,                            ) **CLASS ACTION**
                                          )
19              Plaintiffs,              ) **DECLARATION OF RUBEN AGUIRRE**
                                          )
20  vs.                                   )
                                          )
21  DOLLAR TREE STORES, INC.            )
                                          )
22              Defendant.               )
    _____)

23       I, Ruben Aguirre, do hereby declare as follows:

24       1.    My address is 25859 Margaret Avenue, Moreno Valley, California 92551. I have

25  personal knowledge of the facts set forth in this declaration and could and would testify competently

26  thereto.

27       2.    I am employed by Dollar Tree Stores, Inc. (hereinafter "Dollar Tree") as a Store

28  Manager from approximately March 20, 2007 through the present. During that time I worked at the

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

1  Dollar Tree stores located in Rancho Cucamonga and Murrietta, California.

2      3.    When I was hired as a Store Manager I underwent a mandatory eight-week training

3  period at the Dollar Tree store in Rancho Cucamonga. Thereafter I was assigned to work at the

4  Dollar Tree store in Murrietta, and I did not receive additional training after being transferred.

5      4.    It is my understanding that Store Managers are required to follow the same policies

6  and procedures, as dictated by Dollar Tree, at every Dollar Tree store in California.

7      5.    I am familiar with Dollar Tree's Store Manger Position and Responsibilities. The

8  Store Manager duties require completion of various tasks, including those set forth below.

9          a.    Supervision of Associates:

10              i.    Preparing associate work schedules by filling in data fields on the

11                  Compass Timekeeping System;

12              ii.    Posting associate schedules;

13              iii.    Conducting new associate training and orientation by reviewing

14                  applicable rules and policies with associates and ensuring new

15                  associate paperwork is completed and entered into the computer;

16              iv.    Preparing checklists of job assignments;

17              v.    Walking the store using the Daily Tour Sheet;

18              vi.    Communicating and interacting with associates and customers

19                  throughout the day;

20              vii.    Assigning markdowns and checking to ensure they are properly

21                  completed based on Dollar Tree's polices;

22             viii.    Keeping track of associate attendance; and

23              ix.    Counting stockroom boxes or cartons to monitor and keep track of

24                  associate productivity.

25          b.    Oversee daily store activities, including opening and closing the store:

26              i.    Walking the store for general overview of store appearance using the

27                  Daily Tour Sheet;

28

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

ii.    Checking all door seals and ensuring door seal numbers match the most recent entry on the Door Seal Log;

iii.    Correcting any time and attendance issues from the previous day;

iv.    Completing cycle-counts before opening, per Dollar Tree procedures;

v.    Ensuring the store opens on time and closes on time;

vi.    Preparing associate schedules according to Dollar Tree's requirements by filling in data fields on the Compass Timekeeping System;

vii.    Timely posting of associate schedules;

viii.    Calling the store as necessary to ensure proper opening and closing;

ix.    Ensuring there are no customers in the bathroom or back room prior to closing;

x.    Counting money and ensuring the receipts were balanced;

xi.    Taking the deposit to the bank;

xii.    Unlocking and/or locking the store; and

xiii.    Assigning cashiers to cash registers and giving them a till.

c.    <u>Ensure customer and associate safety:</u>

i.    Completing paperwork in connection with associate on-the-job injuries;

ii.    Ensuring associates who are injured on the job received proper medical care;

iii.    Ensuring workers are properly trained on state and federal safety laws by providing them with materials sent from Dollar Tree Corporate;

iv.    Ensuring that merchandise is properly placed on shelves according to Dollar Tree's requirements;

v.    Viewing store security tapes;

vi.    Preparing or checking the preparation of the bank deposit;

vii.    Taking the deposit to the bank; and

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

viii.   Checking all door seals and ensuring the door seal numbers match the most recent entry on the Door Seal Log.

d.   <u>Protect all company assets including store cash, merchandise and equipment:</u>

i.   Ensuring doors are properly locked and secured;

ii.   Ensuring the alarm systems are on;

iii.   Ensuring markdowns are properly completed and completing markdown reports according to Dollar Tree's requirements;

iv.   Viewing store security tapes;

v.   Ensuring there are no customers in the bathroom or back room prior to closing;

vi.   Counting money and ensuring the receipts are balanced;

vii.   Interacting and communicating with upper management regarding asset protection issues;

viii.   Ensuring merchandise is not brought into the break room; and

ix.   Checking emails for cycle counts and ensuring cycle count reports are filled out.

e.   <u>Maintain proper sales, banking, inventory, accounting, productivity, payroll and time records:</u>

i.   Preparing or checking the preparation of the bank deposit;

ii.   Taking the deposit to the bank;

iii.   Ordering merchandise according to Dollar Tree's instructions;

iv.   Monitoring and completing required company paperwork;

v.   Using the Order Scorecard to determine what items to order;

vi.   Monitoring associate attendance using the Compass Timekeeping System;

vii.   Correcting time records as necessary using the Compass Timekeeping System;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

viii.   Reviewing reports of Department Sales, the Top 200 SKUs and the Top 10 selling items;

ix.   Completing cycle-counts before opening; and

x.   Conducting store walks by department.

f.   <u>Maintain adequate staffing of the store, recruit, interview, hire, employ and train sales associates. Train associates to properly use all equipment and technology as well as provide thorough merchandise display training:</u>

i.   Reviewing job applications;

ii.   Scheduling job interviews;

iii.   Calling applicants to give them a job offer;

iv.   Conducting new associate orientation, which includes ensuring that the associate filled out all forms in the new hire packet, entering required information into the Dollar Tree computer system, providing new associates with an Associate Handbook and sexual harassment brochure, filling out the New Hire Checklist, and telling associates Dollar Tree's meal and rest break policies;

v.   Counseling, providing written and verbal discipline of store associates and assistant managers in accordance with Dollar Tree's polices;

vi.   Communicating with District Managers and Human Resources representatives as necessary in relation to personnel decisions; and

vii.   Using the computer system to access Dollar Tree's Human Resources functions including performance evaluations, hire documents, and termination documents.

g.   <u>Schedule and assign work to store personnel. Evaluate, motivate, counsel, develop, discipline and discharge sales associates appropriately. Maintain production reports to evaluate job performance of sales associates:</u>

SCOTT COLE & ASSOCIATES, APC
ATTORNEY AT LAW
THE WAGENSIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

1    i.    Preparing associate schedules according to Dollar Tree's

2          requirements;

3    ii.   Reviewing daily SUC reports showing use the of payroll hours;

4    iii.  Using the COMPASS computer system to evaluate and prepare

5          cashier schedules;

6    iv.   Preparing written performance warnings according to Dollar Tree's

7          polices;

8    v.    Preparing performance evaluations according to Dollar Tree's

9          policies;

10   vi.   Communicating with District Manager and Human Resources

11         representatives as necessary in relation to personnel decisions;

12   vii.  Printing associate rosters; and

13   viii. Scheduling and assigning meal and rest breaks.

14   h.    <u>Provide leadership and direction to store personnel:</u>

15   i.    Preparing notes to assistant managers; and

16   ii.   Meeting the delivery trucks and directing where merchandise should

17         be placed on the sales floor and in the stock room.

18   i.    <u>Communicate company policies to sales associates. Ensure associates comply</u>

19         <u>with company policies and procedures, including safety guidelines and</u>

20         <u>human resources policies:</u>

21   i.    Training and orientation of store associates, which includes ensuring

22         that the associate filled out all forms in the new hire packet, entering

23         required information into the Dollar Tree computer system, providing

24         new associates with an Associate Handbook and sexual harassment

25         brochure, filling out the New Hire Checklist, and telling associates

26         Dollar Tree's meal and rest break policies;

27   ii.   Advising associates regarding the store's security procedures; and

28

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

iii.   Instructing associates to follow rules and regulations regarding alcohol sales and food stamp/EBT requirements.

j.   <u>Analyze sales, expenses and profit, review reports, analyze competition, determine customer preferences, manages sales forecasts, meet sales and profit objectives and goals, determine product mix, determine most effective placement of product and ensure standards of merchandise presentation, displays and signage to maximize sales. Assist in developing promotions and advertisements as appropriate:</u>

i.   Reviewing reports of department sales, Top 200 SKUs and the Top 10 items sold;

ii.   Using a PDT gun to order items in the store according to Dollar Tree's requirements;

iii.   Ensuring store compliance with state regulations;

iv.   Reviewing the Monthly Planner; and

v.   Making appropriate assignments to keep shelves, end caps, displays, wow tables, and refrigerators/coolers clean and fully stocked.

k.   <u>Control inventory, supervise ordering, receiving, stocking and pricing of goods. Ensure goods are properly marked and mark downs are properly recorded:</u>

i.   Reviewing reports of department sales, Top 200 SKUs and the Top 10 items sold;

ii.   Requesting cycle counts;

iii.   Generating and using the online Order Book to determine inventory on hand, what merchandise to order, and to order merchandise;

iv.   Ensuring proper security of the building and proper accounting for markdowns according to Dollar Tree's requirements;

v.   Making appropriate assignments to keep shelves, end caps, displays, wow tables, and refrigerators/coolers clean and fully stocked; and

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

vi.    Making decisions and assignments to put stock in "grab bags" or to mark down stock.

l.    <u>Responsible for overall cleanliness and appearance of store:</u>

i.    Assigning associates to mop, vacuum, clean windows, and clean restrooms;

ii.    Training cashiers to keep their cash registers clean;

iii.    Modifying window signage as appropriate; and

iv.    Assigning individuals to retrieve shopping carts from the parking lot.

m.    <u>Ensure the highest level of customer service. Handle customer complaints and problems:</u>

i.    Keeping a friendly environment in the store, talking to and greeting customers.

n.    <u>Ensure accident reports and damage reports are completed in a timely and accurate manner:</u>

i.    Preparing reports on associate and/or customer injuries and accidents, explaining how an accident happened and why, including a claim and confirmation number; faxing the reports to the corporate office.

o.    <u>Complete management reports in a timely and accurate manner:</u>

i.    Printing out the order scorecard, department sales, pull and hold, and Top 200 SKUs reports and putting them in the Playbook and/or posting them in the store office;

ii.    Preparing schedules according to Dollar Tree's requirements;

iii.    Ordering merchandise according to Dollar Tree's requirements;

iv.    Completing the Certification of Duties;

v.    Completing cycle count reports;

vi.    Using and accessing the Dollar Tree computer system to complete and access reports as necessary;

vii.    Completing the Deposit Log of all store deposits;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

viii.    Completing the Safe Fund Log at change of safe "ownership" from one member of management to another at shift change;

ix.    Reconciling selective Receiving Reports for DSD billing; and

x.    Completing and submitting the Tax Exempt Log.

p.    <u>Ensure compliance with applicable laws and regulations:</u>

i.    Ensuring all licenses and permits are properly displayed;

ii.    Ensuring the fire extinguisher is not outdated;

iii.    Instructing associates to take meal and rest breaks;

iv.    Instructing associates to accurately record their time;

v.    Reviewing and approving time records and releasing timekeeping information to ensure proper payment of wages; and

vi.    Ensuring all accidents are reported.

q.    <u>Communicate professionally and effectively with customers, subordinates and supervisors:</u>

i.    Talking to District Managers in person, by telephone, and by email;

ii.    Reading and printing all emails from Dollar Tree Human Resources and higher-level management; and

iii.    Walking the floor and talking to customers and associates.

6.    All of the tasks listed above are very basic and require little or no complex thought; I complete each of them in accordance with Dollar Tree's specific requirements and instructions.

7.    In addition to the duties listed above, Dollar Tree also requires its Store Managers to physically receive retail product by unloading trucks delivering merchandise from Dollar Tree Distribution Centers. Store Managers have to verify that the inventory received from the Distribution Center or a Direct Store Delivery service is consistent with store needs, orders placed or other delivery standards or protocols. Once merchandise is received, Store Managers are required to organize it in the stockroom and to physically place it on the shelves.

8.    Store Managers also have to cashier. This task includes posting transaction voids for customer refunds and covering the register as needed.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

9.     Dollar Tree sets the price for all items; Store Managers have no authority to mark products down without express approval from Dollar Tree.

10.     Store Managers are not permitted to decide how to stock merchandise throughout the store any way they like. Instead, they are required to adhere to the Merchandising Display Guidelines that Dollar Tree's Corporate management selects for the stores.

11.     Dollar Tree Corporate routinely sends its Store Managers Merchandising Display Guidelines and Weekly Bulletins via email, which provide detailed instructions on where and how merchandise should be displayed throughout the store. To my knowledge, every California Dollar Tree Store Manager receives these Merchandising Display Guidelines and Weekly Bulletins.

12.     The duties of Store Manager include unloading the trucks when they arrive with new shipments of products, counting the loads after they are removed from the trucks, carrying the loads to the stock room, and organizing them. Dollar Tree restricts the payroll hours that Store Managers are permitted to schedule to such a degree that they are required to personally unload shipments alongside the hourly employees who work at their stores.

13.     The Store Manager job includes performing routine customer service. Specifically, Store Managers respond to customer questions, handle certain transactions that only management can carry out (such as voids), and cashier. On average, I spend about 30 minutes to one hour each workday cashiering.

14.     The duties of Store Manager also include maintaining the cleanliness of the store and, as such, Store Managers routinely clean up spills, vacuum, clean the bathroom, take trash to the dumpster outside the store and personally handle merchandise recovery.

15.     Store Managers are also required to perform routine data entry on the computer and to complete paperwork using pre-fabricated forms prepared by Dollar Tree.

16.     Store Managers do not have the authority to order the vast majority, if any, of the supplies for their stores.

17.     Store Managers perform the same job tasks and duties on a week-to-week basis. They are rarely, if ever, allowed to deviate from the detailed policies and procedures that Dollar Tree publishes.

1    18.    As a Store Manager I can write up an employee, but I can not suspend or terminate

2    any employee, without pre-approval from Dollar Tree Corporate.

3    19.    I am rarely, if ever, able to take an uninterrupted meal period during a workday.

4    When I do get a meal period, it is seldom a half hour or more, and I often do not get to take any meal

5    periods during the first five hours of my shift. The vast majority of the rest breaks I take are on-duty

6    and frequently interrupted by work duties like responding to inquiries from employees, Dollar Tree

7    management and customers.

8    20.    My typical workweek consists of six days that vary in length from 10 to 12 hours.

9    It is not rare for me to work seven days per week in order to accomplish all of the duties required

10    of me as a Store Manager.

11    21.    I am paid the same amount of fixed compensation regardless of how many hours I

12    work during each pay period, and there is no connection between the number of hours I work and

13    the amount of my salary.

14    22.    I am glad that the Court certified this case as a class action so that I do not have to

15    expend the time and energy that it could take to bring a case against Dollar Tree on my own. I would

16    like this Court to expand the class definition to include Store Managers who worked for Dollar Tree

17    in California through the conclusion of this case. I believe that nothing about the Store Manager

18    position has changed since May 26, 2009, and that class treatment is no less appropriate now than

19    it was then.

20    I declare under penalty of perjury under the laws of the United States and the State of

21    California that the foregoing is true and correct. Executed this _7_ day of February 2010 in Moreno

22    Valley, California.

23

24

25    RUBEN AGUIRRE

26

27

28

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

# EXHIBIT 9

1    Scott Edward Cole, Esq. (S.B. #160744)
    Molly A. Kuehn, Esq. (S.B. #230763)
2    SCOTT COLE & ASSOCIATES, APC
    1970 Broadway, Ninth Floor
3    Oakland, California 94612
    Telephone: (510) 891-9800
4    Facsimile: (510) 891-7030
    web:    www.scalaw.com

5

6    Attorneys for Representative Plaintiffs
    and the Plaintiff Class

7

8                 UNITED STATES DISTRICT COURT

9      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

10

11    MIGUEL A. CRUZ and JOHN D.         **Case No.: C-07-02050 SC** (*Consolidated Action*)
    HANSEN, individually, and on behalf
12    of all others similarly situated,           **CLASS ACTION**

13              Plaintiffs,
    vs.
14
    DOLLAR TREE STORES, INC.
15
             Defendant.
16
    ROBERT RUNNINGS, individually,       **Case No.: C-07-4012 SC**
17    and on behalf of all others similarly
    situated,                        **CLASS ACTION**
18
             Plaintiffs,         **DECLARATION OF THOMAS ALLEN**
19    vs.

20    DOLLAR TREE STORES, INC.

21              Defendant.

22

23       I, Thomas Allen, do hereby declare as follows:

24         1.     My address is 3200 Azevedo Drive, Sacramento, California 95833. I have personal

25   knowledge of the facts set forth in this declaration and could and would testify competently thereto.

26         2.     I was employed by Dollar Tree Stores, Inc. (hereinafter "Dollar Tree") as a Store

27   Manager from approximately August 2007 through approximately July 2008. During that time I

28   worked at six Dollar Tree stores located in Sacramento, California.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, 9TH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

3.  When I was hired as a Store Manager I underwent a mandatory eight-week training period at the Dollar Tree store located on 65th and Folsom in Sacramento. Thereafter I was assigned to work at another Dollar Tree store in Sacramento (Store #1215), and I did not receive additional training after being transferred.

4.  It is my understanding that Store Managers are required to follow the same policies and procedures, as dictated by Dollar Tree, at every Dollar Tree store in California.

5.  I am familiar with Dollar Tree's Store Manger Position and Responsibilities. The Store Manager duties require completion of various tasks, including those set forth below.

a.  Supervision of Associates:

  i.  Preparing associate work schedules by filling in data fields on the Kronos Timekeeping System;

  ii.  Posting associate schedules;

  iii.  Conducting new associate training and orientation by reviewing applicable rules and policies with associates and ensuring new associate paperwork is completed and entered into the computer;

  iv.  Preparing checklists of job assignments;

  v.  Walking the store using the Daily Tour Sheet;

  vi.  Communicating and interacting with associates and customers throughout the day;

  vii.  Assigning markdowns and checking to ensure they are properly completed based on Dollar Tree's polices;

  viii.  Keeping track of associate attendance; and

  ix.  Counting stockroom boxes or cartons to monitor and keep track of associate productivity.

b.  Oversee daily store activities, including opening and closing the store:

  i.  Walking the store for general overview of store appearance using the Daily Tour Sheet;

ii.   Checking all door seals and ensuring door seal numbers match the most recent entry on the Door Seal Log;

iii.   Correcting any time and attendance issues from the previous day;

iv.   Completing cycle-counts before opening, per Dollar Tree procedures;

v.   Ensuring the store opens on time and closes on time;

vi.   Preparing associate schedules according to Dollar Tree's requirements by filling in data fields on the Kronos Timekeeping System;

vii.   Timely posting of associate schedules;

viii.   Calling the store as necessary to ensure proper opening and closing;

ix.   Ensuring there are no customers in the bathroom or back room prior to closing;

x.   Counting money and ensuring the receipts were balanced;

xi.   Taking the deposit to the bank;

xii.   Unlocking and/or locking the store; and

xiii.   Assigning cashiers to cash registers and giving them a till.

c.   Ensure customer and associate safety:

i.   Completing paperwork in connection with associate on-the-job injuries;

ii.   Ensuring associates who are injured on the job received proper medical care;

iii.   Ensuring workers are properly trained on state and federal safety laws by providing them with materials sent from Dollar Tree Corporate;

iv.   Ensuring that merchandise is properly placed on shelves according to Dollar Tree's requirements;

v.   Viewing store security tapes;

vi.   Preparing or checking the preparation of the bank deposit;

vii.   Taking the deposit to the bank; and

- 3 -
Declaration of Thomas Allen

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE PACIFICA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

      viii.    Checking all door seals and ensuring the door seal numbers match the most recent entry on the Door Seal Log.

d.    <u>Protect all company assets including store cash, merchandise and equipment:</u>

      i.    Ensuring doors are properly looked and secured;

      ii.    Ensuring the alarm systems are on;

      iii.    Ensuring markdowns are properly completed and completing markdown reports according to Dollar Tree's requirements;

      iv.    Viewing store security tapes;

      v.    Ensuring there are no customers in the bathroom or back room prior to closing;

      vi.    Counting money and ensuring the receipts are balanced;

      vii.    Interacting and communicating with upper management regarding asset protection issues;

      viii.    Ensuring merchandise is not brought into the break room; and

      ix.    Checking emails for cycle counts and ensuring cycle count reports are filled out.

e.    <u>Maintain proper sales, banking, inventory, accounting, productivity, payroll and time records:</u>

      i.    Preparing or checking the preparation of the bank deposit;

      ii.    Taking the deposit to the bank;

      iii.    Ordering merchandise according to Dollar Tree's instructions;

      iv.    Monitoring and completing required company paperwork;

      v.    Using the Order Scorecard to determine what items to order;

      vi.    Monitoring associate attendance using the Kronos Timekeeping System;

      vii.    Correcting time records as necessary using the Kronos Timekeeping System;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
1939 HARRISON STREET, 9TH FLOOR
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL (510) 891-9800

     viii.    Reviewing reports of Department Sales, the Top 200 SKUs and the Top 10 selling items;

     ix.    Completing cycle-counts before opening; and

     x.    Conducting store walks by department.

f.    <u>Maintain adequate staffing of the store, recruit, interview, hire, employ and train sales associates. Train associates to properly use all equipment and technology as well as provide thorough merchandise display training:</u>

     i.    Reviewing job applications;

     ii.    Scheduling job interviews;

     iii.    Calling applicants to give them a job offer;

     iv.    Conducting new associate orientation, which includes ensuring that the associate filled out all forms in the new hire packet, entering required information into the Dollar Tree computer system, providing new associates with an Associate Handbook and sexual harassment brochure, filling out the New Hire Checklist, and telling associates Dollar Tree's meal and rest break policies;

     v.    Counseling, providing written and verbal discipline of store associates and assistant managers in accordance with Dollar Tree's polices;

     vi.    Communicating with District Managers and Human Resources representatives as necessary in relation to personnel decisions; and

     vii.    Using the computer system to access Dollar Tree's Human Resources functions including performance evaluations, hire documents, and termination documents.

g.    <u>Schedule and assign work to store personnel. Evaluate, motivate, counsel, develop, discipline and discharge sales associates appropriately. Maintain production reports to evaluate job performance of sales associates:</u>

i. Preparing associate schedules according to Dollar Tree's requirements;

ii. Reviewing daily SUC reports showing use the of payroll hours;

iii. Using the COMPASS computer system to evaluate and prepare cashier schedules;

iv. Preparing written performance warnings according to Dollar Tree's polices;

v. Preparing performance evaluations according to Dollar Tree's policies;

vi. Communicating with District Manager and Human Resources representatives as necessary in relation to personnel decisions;

vii. Printing associate rosters; and

viii. Scheduling and assigning meal and rest breaks.

h. Provide leadership and direction to store personnel:

i. Preparing notes to assistant managers;

ii. Preparing assignment lists and three by five cards with associate assignments; and

iii. Meeting the delivery trucks and directing where merchandise should be placed on the sales floor and in the stock room.

i. Communicate company policies to sales associates. Ensure associates comply with company policies and procedures, including safety guidelines and human resources policies:.

i. Training and orientation of store associates, which includes ensuring that the associate filled out all forms in the new hire packet, entering required information into the Dollar Tree computer system, providing new associates with an Associate Handbook and sexual harassment brochure, filling out the New Hire Checklist, and telling associates Dollar Tree's meal and rest break policies;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
1500 WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

ii.     Advising associates regarding the store's security procedures; and

iii.    Instructing associates to follow rules and regulations regarding alcohol sales and food stamp/EBT requirements.

j.  Analyze sales, expenses and profit, review reports, analyze competition, determine customer preferences, manages sales forecasts, meet sales and profit objectives and goals, determine product mix, determine most effective placement of product and ensure standards of merchandise presentation, displays and signage to maximize sales. Assist in developing promotions and advertisements as appropriate:

i.      Reviewing reports of department sales, Top 200 SKUs and the Top 10 items sold;

ii.     Using a PDT gun to order items in the store according to Dollar Tree's requirements;

iii.    Ensuring store compliance with state regulations;

iv.     Reviewing the Monthly Planner; and

v.      Making appropriate assignments to keep shelves, end caps, displays, wow tables, and refrigerators/coolers clean and fully stocked.

k.  Control inventory, supervise ordering, receiving, stocking and pricing of goods. Ensure goods are properly marked and mark downs are properly recorded:

i.      Reviewing reports of department sales, Top 200 SKUs and the Top 10 items sold;

ii.     Requesting cycle counts;

iii.    Generating and using the online Order Book to determine inventory on hand, what merchandise to order, and to order merchandise;

iv.     Ensuring proper security of the building and proper accounting for markdowns according to Dollar Tree's requirements;

v.   Making appropriate assignments to keep shelves, end caps, displays, wow tables, and refrigerators/coolers clean and fully stocked; and

vi.   Making decisions and assignments to put stock in "grab bags" or to mark down stock.

l.   Responsible for overall cleanliness and appearance of store:

i.   Assigning associates to mop, vacuum, clean windows, and clean restrooms;

ii.   Training cashiers to keep their cash registers clean;

iii.   Modifying window signage as appropriate; and

iv.   Assigning individuals to retrieve shopping carts from the parking lot.

m.   Ensure the highest level of customer service. Handle customer complaints and problems:

i.   Keeping a friendly environment in the store, talking to and greeting customers.

n.   Ensure accident reports and damage reports are completed in a timely and accurate manner:

i.   Preparing reports on associate and/or customer injuries and accidents, explaining how an accident happened and why, including a claim and confirmation number; faxing the reports to the corporate office.

o.   Complete management reports in a timely and accurate manner:

i.   Printing out the order scorecard, department sales, pull and hold, and Top 200 SKUs reports and putting them in the Playbook and/or posting them in the store office;

ii.   Preparing schedules according to Dollar Tree's requirements;

iii.   Ordering merchandise according to Dollar Tree's requirements;

iv.   Completing the Certification of Duties;

v.   Completing cycle count reports;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

- 8 -
Declaration of Thomas Allen

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
1970 BROADWAY, NINTH FLOOR
THE WAKENA TOWER
OAKLAND, CA 94612
TEL (510) 891-9800

          vi.     Using and accessing the Dollar Tree computer system to complete and access reports as necessary;

          vii.    Completing the Deposit Log of all store deposits;

          viii.   Completing the Safe Fund Log at change of safe "ownership" from one member of management to another at shift change;

          ix.     Reconciling selective Receiving Reports for DSD billing; and

          x.     Completing and submitting the Tax Exempt Log.

    p.    Ensure compliance with applicable laws and regulations:

          i.     Ensuring all licenses and permits are properly displayed;

          ii.    Ensuring the fire extinguisher is not outdated;

          iii.   Instructing associates to take meal and rest breaks;

          iv.   Instructing associates to accurately record their time;

          v.     Reviewing and approving time records and releasing timekeeping information to ensure proper payment of wages; and

          vi.    Ensuring all accidents are reported.

    q.    Communicate professionally and effectively with customers, subordinates and supervisors:

          i.     Talking to District Managers in person, by telephone, and by email;

          ii.    Reading and printing all emails from Dollar Tree Human Resources and higher-level management; and

          iii.   Walking the floor and talking to customers and associates.

6.    All of the tasks listed above are very basic and require little or no complex thought; I completed each of them in accordance with Dollar Tree's specific requirements and instructions.

7.    In addition to the duties listed above, Dollar Tree also requires its Store Managers to physically receive retail product by unloading trucks delivering merchandise from Dollar Tree Distribution Centers. Store Managers have to verify that the inventory received from the Distribution Center or a Direct Store Delivery service is consistent with store needs, orders placed or other delivery standards or protocols. Once merchandise is received, Store Managers are required to

1    organize it in the stockroom and to physically place it on the shelves.

2         8.      Store Managers also have to cashier. This task includes posting transaction voids for

3    customer refunds and covering the register as needed.

4         9.      Dollar Tree sets the price for all items; Store Managers have no authority to mark

5    products down without express approval from Dollar Tree.

6         10.     Store Managers are not permitted to decide how to stock merchandise throughout the

7    store any way they like. Instead, they are required to adhere to the Merchandising Display

8    Guidelines that Dollar Tree's Corporate management selects for the stores.

9         11.     Dollar Tree Corporate routinely sends its Store Managers Merchandising Display

10   Guidelines and Weekly Bulletins via email, which provide detailed instructions on where and how

11   merchandise should be displayed throughout the store. To my knowledge, every California Dollar

12   Tree Store Manager receives these Merchandising Display Guidelines and Weekly Bulletins.

13        12.     The duties of Store Manager include unloading the trucks when they arrive with new

14   shipments of products, counting the loads after they are removed from the trucks, carrying the loads

15   to the stock room, and organizing them. Dollar Tree restricts the payroll hours that Store Managers

16   are permitted to schedule to such a degree that they are required to personally unload shipments

17   alongside the hourly employees who work at their stores.

18        13.     The Store Manager job includes performing routine customer service. Specifically,

19   Store Managers respond to customer questions, handle certain transactions that only management

20   can carry out (such as voids), and cashier. On average, I spent about four to five hours each workday

21   cashiering.

22        14.     The duties of Store Manager also include maintaining the cleanliness of the store and,

23   as such, Store Managers routinely clean up spills, vacuum, clean the bathroom, take trash to the

24   dumpster outside the store and personally handle merchandise recovery.

25        15.     Store Managers are also required to perform routine data entry on the computer and

26   to complete paperwork using pre-fabricated forms prepared by Dollar Tree.

27        16.     Store Managers do not have the authority to order the vast majority, if any, of the

28   supplies for their stores.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

- 10 -
Declaration of Thomas Allen

17.    Store Managers perform the same job tasks and duties on a week-to-week basis. They are rarely, if ever, allowed to deviate from the detailed policies and procedures that Dollar Tree publishes.

18.    Store Managers do not have the authority to discipline the employees working at their stores. Before Store Managers can write up, suspend or terminate any employee, they are required to get approval from Dollar Tree Corporate.

19.    I was rarely, if ever, able to take an uninterrupted meal period during a workday. When I did get a meal period, it was seldom a half hour or more, and I often did not get to take any meal periods during the first five hours of my shift. The vast majority of the rest breaks I took were on-duty and frequently interrupted by work duties like responding to inquiries from employees, Dollar Tree management and customers.

20.    My typical workweek consisted of six days that varied in length from 11 to 13 hours. It was not rare for me to work seven days per week in order to accomplish all of the duties required of me as a Store Manager.

21.    I was paid the same amount of fixed compensation regardless of how many hours I worked during each pay period, and there is no connection between the number of hours I worked and the amount of my salary.

22.    I am glad that the Court certified this case as a class action so that I do not have to expend the time and energy that it could take to bring a case against Dollar Tree on my own. I would like this Court to expand the class definition to include Store Managers who worked for Dollar Tree in California through the conclusion of this case. I believe that nothing about the Store Manager position has changed since May 26, 2009, and that class treatment is no less appropriate now than it was then.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this _21_ day of January 2010 in Sacramento, California.

THOMAS ALLEN

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

# EXHIBIT 10

Scott Edward Cole, Esq. (S.B. #160744)
Molly A. Kuehn, Esq. (S.B. #230763)
**SCOTT COLE & ASSOCIATES, APC**
1970 Broadway, Ninth Floor
Oakland, California 94612
Telephone: (510) 891-9800
Facsimile: (510) 891-7030
web:    www.scalaw.com

Attorneys for Representative Plaintiffs
and the Plaintiff Class

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| MIGUEL A. CRUZ and JOHN D. HANSEN, individually, and on behalf of all others similarly situated, | **Case No.: C-07-02050 SC** (*Consolidated Action*) |
| Plaintiffs, | **CLASS ACTION** |
| vs. | |
| DOLLAR TREE STORES, INC. | |
| Defendant. | |
| ROBERT RUNNINGS, individually, and on behalf of all others similarly situated, | **Case No.: C-07-4012 SC** |
| | **CLASS ACTION** |
| Plaintiffs, | **DECLARATION OF RALPH BADDERS** |
| vs. | |
| DOLLAR TREE STORES, INC. | |
| Defendant. | |

I, Ralph Badders, do hereby declare as follows:

1.      My address is 9021 Warm Springs Circle, Stockton, California 95210. I have personal knowledge of the facts set forth in this declaration and could and would testify competently thereto.

2.      I was employed by Dollar Tree Stores, Inc. (hereinafter "Dollar Tree") as a Store Manager from approximately December 2007 through approximately February 2009, after which

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY AT NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL (510) 891-9800

1    I was demoted to Assistant Manager. During that time I worked at two Dollar Tree stores in

2    Stockton (Store #'s 1263 and 1260) and Galt (Store #2271), California.

3        3.    When I was hired as a Store Manager I underwent a mandatory eight-week training

4    period at the Dollar Tree store in Stockton (Store #1263). Thereafter I was assigned to work at the

5    Dollar Tree store in Galt, and I did not receive additional training after being transferred.

6        4.    It is my understanding that Store Managers are required to follow the same policies

7    and procedures, as dictated by Dollar Tree, at every Dollar Tree store in California.

8        5.    I am familiar with Dollar Tree's Store Manger Position and Responsibilities. The

9    Store Manager duties require completion of various tasks, including those set forth below.

10            a.    <u>Supervision of Associates:</u>

11                i.    Preparing associate work schedules by filling in data fields on the

12                      Kronos Timekeeping System;

13                ii.   Posting associate schedules;

14                iii.  Conducting new associate training and orientation by reviewing

15                      applicable rules and policies with associates and ensuring new

16                      associate paperwork is completed and entered into the computer;

17                iv.   Preparing checklists of job assignments;

18                v.    Walking the store using the Daily Tour Sheet;

19                vi.   Communicating and interacting with associates and customers

20                      throughout the day;

21                vii.  Assigning markdowns and checking to ensure they are properly

22                      completed based on Dollar Tree's polices;

23                viii. Keeping track of associate attendance; and

24                ix.   Counting stockroom boxes or cartons to monitor and keep track of

25                      associate productivity.

26            b.    <u>Oversee daily store activities, including opening and closing the store:</u>

27                i.    Walking the store for general overview of store appearance using the

28                      Daily Tour Sheet;

- 2 -
Declaration of Ralph Badders

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE VALENCIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

ii.      Checking all door seals and ensuring door seal numbers match the most recent entry on the Door Seal Log;

iii.     Correcting any time and attendance issues from the previous day;

iv.     Completing cycle-counts before opening, per Dollar Tree procedures;

v.      Ensuring the store opens on time and closes on time;

vi.     Preparing associate schedules according to Dollar Tree's requirements by filling in data fields on the Compass Timekeeping System;

vii.    Timely posting of associate schedules;

viii.   Calling the store as necessary to ensure proper opening and closing;

ix.     Ensuring there are no customers in the bathroom or back room prior to closing;

x.      Counting money and ensuring the receipts were balanced;

xi.     Taking the deposit to the bank;

xii.    Unlocking and/or locking the store; and

xiii.   Assigning cashiers to cash registers and giving them a till.

c.   Ensure customer and associate safety:

i.      Completing paperwork in connection with associate on-the-job injuries;

ii.     Ensuring associates who are injured on the job received proper medical care;

iii.    Ensuring workers are properly trained on state and federal safety laws by providing them with materials sent from Dollar Tree Corporate;

iv.    Ensuring that merchandise is properly placed on shelves according to Dollar Tree's requirements;

v.     Viewing store security tapes;

vi.    Preparing or checking the preparation of the bank deposit;

vii.   Taking the deposit to the bank; and

1               viii.    Checking all door seals and ensuring the door seal numbers match the

2                     most recent entry on the Door Seal Log.

3       d.    <u>Protect all company assets including store cash, merchandise and equipment:</u>

4               i.      Ensuring doors are properly locked and secured;

5               ii.     Ensuring the alarm systems are on;

6               iii.    Ensuring markdowns are properly completed and completing

7                     markdown reports according to Dollar Tree's requirements;

8               iv.     Viewing store security tapes;

9               v.      Ensuring there are no customers in the bathroom or back room prior

10                    to closing;

11              vi.     Counting money and ensuring the receipts are balanced;

12              vii.    Interacting and communicating with upper management regarding

13                     asset protection issues;

14             viii.    Ensuring merchandise is not brought into the break room; and

15              ix.     Checking emails for cycle counts and ensuring cycle count reports

16                    are filled out.

17       e.    <u>Maintain proper sales, banking, inventory, accounting, productivity, payroll</u>

18        <u>and time records:</u>

19               i.      Preparing or checking the preparation of the bank deposit;

20               ii.     Taking the deposit to the bank;

21               iii.    Ordering merchandise according to Dollar Tree's instructions;

22               iv.     Monitoring and completing required company paperwork;

23               v.      Using the Order Scorecard to determine what items to order;

24              vi.     Monitoring associate attendance using the Compass Timekeeping

25                    System;

26              vii.    Correcting time records as necessary using the Compass

27                    Timekeeping System;

28

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
1970 BROADWAY, NINTH FLOOR
TREE MAGNOLIA TOWER
OAKLAND, CA 94612
TEL: (510) 891-9800

| | | |
|---|---|---|
| 1 | viii. | Reviewing reports of Department Sales, the Top 200 SKUs and the Top 10 selling items; |
| 2 | | |
| 3 | ix. | Completing cycle-counts before opening; and |
| 4 | x. | Conducting store walks by department. |
| 5 | f. | Maintain adequate staffing of the store, recruit, interview, hire, employ and |
| 6 | | train sales associates. Train associates to properly use all equipment and |
| 7 | | technology as well as provide thorough merchandise display training: |
| 8 | i. | Reviewing job applications; |
| 9 | ii. | Scheduling job interviews; |
| 10 | iii. | Calling applicants to give them a job offer; |
| 11 | iv. | Conducting new associate orientation, which includes ensuring that |
| 12 | | the associate filled out all forms in the new hire packet, entering |
| 13 | | required information into the Dollar Tree computer system, providing |
| 14 | | new associates with an Associate Handbook and sexual harassment |
| 15 | | brochure, filling out the New Hire Checklist, and telling associates |
| 16 | | Dollar Tree's meal and rest break policies; |
| 17 | v. | Counseling, providing written and verbal discipline of store |
| 18 | | associates and assistant managers in accordance with Dollar Tree's |
| 19 | | polices; |
| 20 | vi. | Communicating with District Managers and Human Resources |
| 21 | | representatives as necessary in relation to personnel decisions; and |
| 22 | vii. | Using the computer system to access Dollar Tree's Human Resources |
| 23 | | functions including performance evaluations, hire documents, and |
| 24 | | termination documents. |
| 25 | g. | Schedule and assign work to store personnel. Evaluate, motivate, counsel, |
| 26 | | develop, discipline and discharge sales associates appropriately. Maintain |
| 27 | | production reports to evaluate job performance of sales associates: |
| 28 | | |

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

i.      Preparing associate schedules according to Dollar Tree's requirements;

ii.     Reviewing daily SUC reports showing use of payroll hours;

iii.    Using the COMPASS computer system to evaluate and prepare cashier schedules;

iv.     Preparing written performance warnings according to Dollar Tree's polices;

v.      Preparing performance evaluations according to Dollar Tree's policies;

vi.     Communicating with District Manager and Human Resources representatives as necessary in relation to personnel decisions;

vii.    Printing associate rosters; and

viii.   Scheduling and assigning meal and rest breaks.

h.  Provide leadership and direction to store personnel:

i.      Preparing notes to assistant managers;

ii.     Preparing assignment lists and three by five cards with associate assignments; and

iii.    Meeting the delivery trucks and directing where merchandise should be placed on the sales floor and in the stock room.

i.  Communicate company policies to sales associates. Ensure associates comply with company policies and procedures, including safety guidelines and human resources policies:

i.      Training and orientation of store associates, which includes ensuring that the associate filled out all forms in the new hire packet, entering required information into the Dollar Tree computer system, providing new associates with an Associate Handbook and sexual harassment brochure, filling out the New Hire Checklist, and telling associates Dollar Tree's meal and rest break policies;

ii.    Advising associates regarding the store's security procedures; and

iii.   Instructing associates to follow rules and regulations regarding alcohol sales and food stamp/EBT requirements.

j.   Analyze sales, expenses and profit, review reports, analyze competition, determine customer preferences, manages sales forecasts, meet sales and profit objectives and goals, determine product mix, determine most effective placement of product and ensure standards of merchandise presentation, displays and signage to maximize sales. Assist in developing promotions and advertisements as appropriate:

i.    Reviewing reports of department sales, Top 200 SKUs and the Top 10 items sold;

ii.   Using a PDT gun to order items in the store according to Dollar Tree's requirements;

iii.  Ensuring store compliance with state regulations;

iv.   Reviewing the Monthly Planner; and

v.    Making appropriate assignments to keep shelves, end caps, displays, wow tables, and refrigerators/coolers clean and fully stocked.

k.   Control inventory, supervise ordering, receiving, stocking and pricing of goods. Ensure goods are properly marked and mark downs are properly recorded:

i.    Reviewing reports of department sales, Top 200 SKUs and the Top 10 items sold;

ii.   Requesting cycle counts;

iii.  Generating and using the online Order Book to determine inventory on hand, what merchandise to order, and to order merchandise;

iv.   Ensuring proper security of the building and proper accounting for markdowns according to Dollar Tree's requirements;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NORTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

v. Making appropriate assignments to keep shelves, end caps, displays, wow tables, and refrigerators/coolers clean and fully stocked; and

vi. Making decisions and assignments to put stock in "grab bags" or to mark down stock.

l. Responsible for overall cleanliness and appearance of store:

 i. Assigning associates to mop, vacuum, clean windows, and clean restrooms;

 ii. Training cashiers to keep their cash registers clean;

 iii. Modifying window signage as appropriate; and

 iv. Assigning individuals to retrieve shopping carts from the parking lot.

m. Ensure the highest level of customer service. Handle customer complaints and problems:

 i. Keeping a friendly environment in the store, talking to and greeting customers.

n. Ensure accident reports and damage reports are completed in a timely and accurate manner:

 i. Preparing reports on associate and/or customer injuries and accidents, explaining how an accident happened and why, including a claim and confirmation number; faxing the reports to the corporate office.

o. Complete management reports in a timely and accurate manner:

 i. Printing out the order scorecard, department sales, pull and hold, and Top 200 SKUs reports and putting them in the Playbook and/or posting them in the store office;

 ii. Preparing schedules according to Dollar Tree's requirements;

 iii. Ordering merchandise according to Dollar Tree's requirements;

 iv. Completing the Certification of Duties;

 v. Completing cycle count reports;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL (510) 891-9800

1          vi.     Using and accessing the Dollar Tree computer system to complete

2               and access reports as necessary;

3          vii.    Completing the Deposit Log of all store deposits;

4          viii.   Completing the Safe Fund Log at change of safe "ownership" from

5               one member of management to another at shift change;

6          ix.     Reconciling selective Receiving Reports for DSD billing; and

7          x.      Completing and submitting the Tax Exempt Log.

8      p.    Ensure compliance with applicable laws and regulations:

9          i.       Ensuring all licenses and permits are properly displayed;

10          ii.      Ensuring the fire extinguisher is not outdated;

11          iii.    Instructing associates to take meal and rest breaks;

12          iv.     Instructing associates to accurately record their time;

13          v.      Reviewing and approving time records and releasing timekeeping

14               information to ensure proper payment of wages; and

15          vi.     Ensuring all accidents are reported.

16      q.    Communicate professionally and effectively with customers, subordinates

17         and supervisors:

18          i.       Talking to District Managers in person, by telephone, and by email;

19          ii.      Reading and printing all emails from Dollar Tree Human Resources

20               and higher-level management; and

21          iii.    Walking the floor and talking to customers and associates.

22      6.      All of the tasks listed above are very basic and require little or no complex thought;

23 I completed each of them in accordance with Dollar Tree's specific requirements and instructions.

24      7.      In addition to the duties listed above, Dollar Tree also requires its Store Managers

25 to physically receive retail product by unloading trucks delivering merchandise from Dollar Tree

26 Distribution Centers. Store Managers have to verify that the inventory received from the Distribution

27 Center or a Direct Store Delivery service is consistent with store needs, orders placed or other

28 delivery standards or protocols. Once merchandise is received, Store Managers are required to

1   organize it in the stockroom and to physically place it on the shelves.

2       8.      Store Managers also have to cashier. This task includes posting transaction voids for
3   customer refunds and covering the register as needed.

4       9.      Dollar Tree sets the price for all items; Store Managers have no authority to mark
5   products down without express approval from Dollar Tree.

6       10.     Store Managers are not permitted to decide how to stock merchandise throughout the
7   store any way they like. Instead, they are required to adhere to the Merchandising Display
8   Guidelines that Dollar Tree's Corporate management selects for the stores.

9       11.     Dollar Tree Corporate routinely sends its Store Managers Merchandising Display
10  Guidelines and Weekly Bulletins via email, which provide detailed instructions on where and how
11  merchandise should be displayed throughout the store. To my knowledge, every California Dollar
12  Tree Store Manager receives these Merchandising Display Guidelines and Weekly Bulletins.

13      12.     The duties of Store Manager include unloading the trucks when they arrive with new
14  shipments of products, counting the loads after they are removed from the trucks, carrying the loads
15  to the stock room, and organizing them. Dollar Tree restricts the payroll hours that Store Managers
16  are permitted to schedule to such a degree that they are required to personally unload shipments
17  alongside the hourly employees who work at their stores.

18      13.     The Store Manager job includes performing routine customer service. Specifically,
19  Store Managers respond to customer questions, handle certain transactions that only management
20  can carry out (such as voids), and cashier. On average, I spent about two to three hours each
21  workday cashiering.

22      14.     The duties of Store Manager also include maintaining the cleanliness of the store and,
23  as such, Store Managers routinely clean up spills, vacuum, clean the bathroom, take trash to the
24  dumpster outside the store and personally handle merchandise recovery.

25      15.     Store Managers are also required to perform routine data entry on the computer and
26  to complete paperwork using pre-fabricated forms prepared by Dollar Tree.

27      16.     Store Managers do not have the authority to order the vast majority, if any, of the
28  supplies for their stores.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

17.   Store Managers perform the same job tasks and duties on a week-to-week basis. They are rarely, if ever, allowed to deviate from the detailed policies and procedures that Dollar Tree publishes.

18.   As a Store Manager I could write up an employee, but I could not suspend or terminate any employee, without pre-approval from Dollar Tree Corporate.

19.   I was rarely, if ever, able to take an uninterrupted meal period during a workday. When I did get a meal period, it was seldom a half hour or more, and I often did not get to take any meal periods during the first five hours of my shift. The vast majority of the rest breaks I took were on-duty and frequently interrupted by work duties like responding to inquiries from employees, Dollar Tree management and customers.

20.   My typical workweek consisted of five days that varied in length from 10 to 13 hours. It was not rare for me to work seven days per week in order to accomplish all of the duties required of me as a Store Manager.

21.   I was paid the same amount of fixed compensation regardless of how many hours I worked during each pay period, and there is no connection between the number of hours I worked and the amount of my salary.

22.   I am glad that the Court certified this case as a class action so that I do not have to expend the time and energy that it could take to bring a case against Dollar Tree on my own. I would like this Court to expand the class definition to include Store Managers who worked for Dollar Tree in California through the conclusion of this case. I believe that nothing about the Store Manager position has changed since May 26, 2009, and that class treatment is no less appropriate now than it was then.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this _12_ day of January, 2010 in Stockton, California.

_Ralph Badders_

RALPH BADDERS

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

# EXHIBIT 11

1  Scott Edward Cole, Esq. (S.B. #160744)
   Molly A. Kuehn, Esq. (S.B. #230763)
2  **SCOTT COLE & ASSOCIATES, APC**
   1970 Broadway, Ninth Floor
3  Oakland, California 94612
   Telephone: (510) 891-9800
4  Facsimile: (510) 891-7030
   web:    www.scalaw.com
5
   Attorneys for Representative Plaintiffs
6  and the Plaintiff Class

7

8                    UNITED STATES DISTRICT COURT

9      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

10

11  MIGUEL A. CRUZ and JOHN D.          )  Case No.: C-07-02050 SC (*Consolidated Action*)
    HANSEN, individually, and on behalf )
12  of all others similarly situated,    )  CLASS ACTION
                                         )
13                  Plaintiffs,          )
                                         )
14  vs.                                  )
                                         )
15  DOLLAR TREE STORES, INC.             )
                                         )
16                  Defendant.           )
                                         )
17  ROBERT RUNNINGS, individually,       )  Case No.: C-07-4012 SC
    and on behalf of all others similarly)
18  situated,                            )  CLASS ACTION
                                         )
19                  Plaintiffs,          )  DECLARATION OF JOHN BAKER
                                         )
20  vs.                                  )
                                         )
21  DOLLAR TREE STORES, INC.             )
                                         )
22                  Defendant.           )
                                         )

23      I, John Baker, do hereby declare as follows:

24      1.      My address is 6042 Crescent #23, Buena Park, California 90620. I have personal

25  knowledge of the facts set forth in this declaration and could and would testify competently thereto.

26      2.      I was employed by Dollar Tree Stores, Inc. (hereinafter "Dollar Tree") as a Store

27  Manager from approximately August 2007 through approximately April 7, 2008. During that time

28  I worked at the Dollar Tree stores located in Fullerton and Norwalk, California.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

1    3.    When I was hired as a Store Manager I underwent a mandatory eight-week training

2    period at the Dollar Tree store in Fullerton. Thereafter I was assigned to work at the Dollar Tree

3    store in Norwalk, and I did receive some additional training after being transferred.

4    4.    It is my understanding that Store Managers are required to follow the same policies

5    and procedures, as dictated by Dollar Tree, at every Dollar Tree store in California.

6    5.    I am familiar with Dollar Tree's Store Manger Position and Responsibilities. The

7    Store Manager duties require completion of various tasks, including those set forth below.

8         a.    <u>Supervision of Associates:</u>

9              i.    Preparing associate work schedules by filling in data fields on the

10                  Kronos Timekeeping System;

11             ii.    Posting associate schedules;

12             iii.   Conducting new associate training and orientation by reviewing

13                  applicable rules and policies with associates and ensuring new

14                  associate paperwork is completed and entered into the computer;

15             iv.    Preparing checklists of job assignments;

16             v.    Walking the store using the Daily Tour Sheet;

17             vi.    Communicating and interacting with associates and customers

18                  throughout the day;

19             vii.   Assigning markdowns and checking to ensure they are properly

20                  completed based on Dollar Tree's polices;

21             viii.  Keeping track of associate attendance; and

22             ix.    Counting stockroom boxes or cartons to monitor and keep track of

23                  associate productivity.

24        b.    <u>Oversee daily store activities, including opening and closing the store:</u>

25             i.    Walking the store for general overview of store appearance using the

26                  Daily Tour Sheet;

27             ii.    Checking all door seals and ensuring door seal numbers match the

28                  most recent entry on the Door Seal Log;

- 2 -
Declaration of John Baker

iii.   Correcting any time and attendance issues from the previous day;

iv.   Completing cycle-counts before opening, per Dollar Tree procedures;

v.   Ensuring the store opens on time and closes on time;

vi.   Preparing associate schedules according to Dollar Tree's requirements by filling in data fields on the Kronos Timekeeping System;

vii.   Timely posting of associate schedules; ;

viii.   Ensuring there are no customers in the bathroom or back room prior to closing;

ix.   Counting money and ensuring the receipts were balanced;

x.   Taking the deposit to the bank;

xi.   Unlocking and/or locking the store; and

xii.   Assigning cashiers to cash registers and giving them a till.

c.   <u>Ensure customer and associate safety:</u>

i.   Completing paperwork in connection with associate on-the-job injuries;

ii.   Ensuring associates who are injured on the job received proper medical care;

iii.   Ensuring workers are properly trained on state and federal safety laws by providing them with materials sent from Dollar Tree Corporate;

iv.   Ensuring that merchandise is properly placed on shelves according to Dollar Tree's requirements;

v.   Preparing or checking the preparation of the bank deposit;

vi.   Taking the deposit to the bank; and

vii.   Checking all door seals and ensuring the door seal numbers match the most recent entry on the Door Seal Log.

d.   <u>Protect all company assets including store cash, merchandise and equipment:</u>

i.   Ensuring doors are properly locked and secured;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

ii.     Ensuring markdowns are properly completed and completing markdown reports according to Dollar Tree's requirements;

iii.    Ensuring there are no customers in the bathroom or back room prior to closing;

iv.     Counting money and ensuring the receipts are balanced;

v.      Interacting and communicating with upper management regarding asset protection issues;

vi.     Ensuring merchandise is not brought into the break room; and

vii.    Checking emails for cycle counts and ensuring cycle count reports are filled out.

e.   Maintain proper sales, banking, inventory, accounting, productivity, payroll and time records:

i.      Preparing or checking the preparation of the bank deposit;

ii.     Taking the deposit to the bank;

iii.    Ordering merchandise according to Dollar Tree's instructions;

iv.     Monitoring and completing required company paperwork;

v.      Monitoring associate attendance using the Kronos Timekeeping System;

vi.     Correcting time records as necessary using the Kronos Timekeeping System;

vii.    Reviewing reports of Department Sales, the Top 200 SKUs and the Top 10 selling items;

viii.   Completing cycle-counts before opening; and

ix.     Conducting store walks by department.

f.   Maintain adequate staffing of the store, recruit, interview, hire, employ and train sales associates. Train associates to properly use all equipment and technology as well as provide thorough merchandise display training:

i.      Reviewing job applications;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

ii.     Scheduling job interviews;

iii.    Calling applicants to give them a job offer;

iv.     Conducting new associate orientation, which includes ensuring that the associate filled out all forms in the new hire packet, entering required information into the Dollar Tree computer system, providing new associates with an Associate Handbook and sexual harassment brochure, filling out the New Hire Checklist, and telling associates Dollar Tree's meal and rest break policies;

v.      Counseling, providing written and verbal discipline of store associates and assistant managers in accordance with Dollar Tree's polices;

vi.     Communicating with District Managers and Human Resources representatives as necessary in relation to personnel decisions; and

vii.    Using the computer system to access Dollar Tree's Human Resources functions including performance evaluations, hire documents, and termination documents.

g.   Schedule and assign work to store personnel. Evaluate, motivate, counsel, develop, discipline and discharge sales associates appropriately. Maintain production reports to evaluate job performance of sales associates:

i.      Preparing associate schedules according to Dollar Tree's requirements;

ii.     Reviewing daily SUC reports showing use the of payroll hours;

iii.    Using the COMPASS computer system to evaluate and prepare cashier schedules;

iv.     Preparing written performance warnings according to Dollar Tree's polices;

v.      Preparing performance evaluations according to Dollar Tree's policies;

     vi.    Communicating with District Manager and Human Resources representatives as necessary in relation to personnel decisions;

     vii.    Printing associate rosters; and

     viii.    Scheduling and assigning meal and rest breaks.

h.    <u>Provide leadership and direction to store personnel:</u>

     i.    Preparing notes to assistant managers;

     ii.    Preparing assignment lists and three by five cards with associate assignments; and

     iii.    Meeting the delivery trucks and directing where merchandise should be placed on the sales floor and in the stock room.

i.    <u>Communicate company policies to sales associates. Ensure associates comply with company policies and procedures, including safety guidelines and human resources policies:</u>

     i.    Training and orientation of store associates, which includes ensuring that the associate filled out all forms in the new hire packet, entering required information into the Dollar Tree computer system, providing new associates with an Associate Handbook and sexual harassment brochure, filling out the New Hire Checklist, and telling associates Dollar Tree's meal and rest break policies;

     ii.    Advising associates regarding the store's security procedures; and

     iii.    Instructing associates to follow rules and regulations regarding alcohol sales and food stamp/EBT requirements.

j.    <u>Analyze sales, expenses and profit, review reports, analyze competition, determine customer preferences, manages sales forecasts, meet sales and profit objectives and goals, determine product mix, determine most effective placement of product and ensure standards of merchandise presentation, displays and signage to maximize sales. Assist in developing promotions and advertisements as appropriate:</u>

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

1               i.     Reviewing reports of department sales, Top 200 SKUs and the Top

2                    10 items sold;

3               ii.    Using a PDT gun to order items in the store according to Dollar

4                    Tree's requirements;

5               iii.   Ensuring store compliance with state regulations;

6               iv.   Reviewing the Monthly Planner; and

7               v.    .Making appropriate assignments to keep shelves, end caps, displays,

8                    wow tables, and refrigerators/coolers clean and fully stocked.

9      k.    Control inventory, supervise ordering, receiving, stocking and pricing of

10         goods. Ensure goods are properly marked and mark downs are properly

11         recorded:

12            i.     Reviewing reports of department sales, Top 200 SKUs and the Top

13                 10 items sold;

14           ii.    Requesting cycle counts;

15           iii.   Generating and using the online Order Book to determine inventory

16               on hand, what merchandise to order, and to order merchandise;

17           iv.   Ensuring proper security of the building and proper accounting for

18               markdowns according to Dollar Tree's requirements;

19           v.    Making appropriate assignments to keep shelves, end caps, displays,

20               wow tables, and refrigerators/coolers clean and fully stocked; and

21           vi.   Making decisions and assignments to put stock in "grab bags" or to

22               mark down stock.

23      l.     Responsible for overall cleanliness and appearance of store:

24            i.     Assigning associates to mop, vacuum, clean windows, and clean

25                 restrooms;

26           ii.    Training cashiers to keep their cash registers clean;

27           iii.   Modifying window signage as appropriate; and

28           iv.   Assigning individuals to retrieve shopping carts from the parking lot.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

1     m.     Ensure the highest level of customer service. Handle customer complaints

2     and problems:

3          i.     Keeping a friendly environment in the store, talking to and greeting

4     customers.

5     n.     Ensure accident reports and damage reports are completed in a timely and

6     accurate manner:

7          i.     Preparing reports on associate and/or customer injuries and accidents,

8     explaining how an accident happened and why, including a claim and

9     confirmation number; faxing the reports to the corporate office.

10     o.     Complete management reports in a timely and accurate manner:

11          i.     Printing out the order scorecard, department sales, pull and hold, and

12     Top 200 SKUs reports and putting them in the Playbook and/or

13     posting them in the store office;

14          ii.     Preparing schedules according to Dollar Tree's requirements;

15          iii.     Ordering merchandise according to Dollar Tree's requirements;

16          iv.     Completing the Certification of Duties;

17          v.     Completing cycle count reports;

18          vi.     Using and accessing the Dollar Tree computer system to complete

19     and access reports as necessary;

20          vii.     Completing the Deposit Log of all store deposits;

21          viii.     Completing the Safe Fund Log at change of safe "ownership" from

22     one member of management to another at shift change;

23          ix.     Reconciling selective Receiving Reports for DSD billing; and

24          x.     Completing and submitting the Tax Exempt Log.

25     p.     Ensure compliance with applicable laws and regulations:

26          i.     Ensuring all licenses and permits are properly displayed;

27          ii.     Ensuring the fire extinguisher is not outdated;

28          iii.     Instructing associates to take meal and rest breaks;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

1                          iv.     Instructing associates to accurately record their time;

2                          v.      Reviewing and approving time records and releasing timekeeping

3                                  information to ensure proper payment of wages; and

4                          vi.     Ensuring all accidents are reported.

5                  q.      Communicate professionally and effectively with customers, subordinates

6                          and supervisors:

7                          i.      Talking to District Managers in person, by telephone, and by email;

8                          ii.     Reading and printing all emails from Dollar Tree Human Resources

9                                  and higher-level management; and

10                         iii.    Walking the floor and talking to customers and associates.

11         6.      All of the tasks listed above are very basic and require little or no complex thought;

12  I completed each of them in accordance with Dollar Tree's specific requirements and instructions.

13         7.      In addition to the duties listed above, Dollar Tree also requires its Store Managers

14  to physically receive retail product by unloading trucks delivering merchandise from Dollar Tree

15  Distribution Centers. Store Managers have to verify that the inventory received from the Distribution

16  Center or a Direct Store Delivery service is consistent with store needs, orders placed or other

17  delivery standards or protocols. Once merchandise is received, Store Managers are required to

18  organize it in the stockroom and to physically place it on the shelves.

19         8.      Store Managers also have to cashier. This task includes posting transaction voids for

20  customer refunds and covering the register as needed.

21         9.      Dollar Tree sets the price for all items; Store Managers have no authority to mark

22  products down without express approval from Dollar Tree.

23         10.     Store Managers are not permitted to decide how to stock merchandise throughout the

24  store any way they like. Instead, they are required to adhere to the Merchandising Display

25  Guidelines that Dollar Tree's Corporate management selects for the stores.

26         11.     Dollar Tree Corporate routinely sends its Store Managers Merchandising Display

27  Guidelines and Weekly Bulletins via email, which provide detailed instructions on where and how

28  merchandise should be displayed throughout the store. To my knowledge, every California Dollar

1    Tree Store Manager receives these Merchandising Display Guidelines and Weekly Bulletins.

2       12.     The duties of Store Manager include unloading the trucks when they arrive with new

3 shipments of products, counting the loads after they are removed from the trucks, carrying the loads

4 to the stock room, and organizing them. Dollar Tree restricts the payroll hours that Store Managers

5 are permitted to schedule to such a degree that they are required to personally unload shipments

6 alongside the hourly employees who work at their stores.

7       13.     The Store Manager job includes performing routine customer service. Specifically,

8 Store Managers respond to customer questions, handle certain transactions that only management

9 can carry out (such as voids), and cashier. On average, I spent about five hours each workday

10 cashiering.

11       14.     The duties of Store Manager also include maintaining the cleanliness of the store and,

12 as such, Store Managers routinely clean up spills, vacuum, clean the bathroom, take trash to the

13 dumpster outside the store and personally handle merchandise recovery.

14       15.     Store Managers are also required to perform routine data entry on the computer and

15 to complete paperwork using pre-fabricated forms prepared by Dollar Tree.

16       16.     Store Managers perform the same job tasks and duties on a week-to-week basis. They

17 are rarely, if ever, allowed to deviate from the detailed policies and procedures that Dollar Tree

18 publishes.

19       17.     Store Managers do not have the authority to discipline the employees working at their

20 stores. Before Store Managers can write up, suspend or terminate any employee, they are required

21 to get approval from Dollar Tree Corporate.

22       18.     I was rarely, if ever, able to take an uninterrupted meal period during a workday.

23 When I did get a meal period, it was seldom a half hour or more, and I often did not get to take any

24 meal periods during the first five hours of my shift. The vast majority of the rest breaks I took were

25 on-duty and frequently interrupted by work duties like responding to inquiries from employees,

26 Dollar Tree management and customers.

27       19.     My typical workweek consisted of six days that varied in length from 12 to 13 hours.

28 It was not rare for me to work seven days per week in order to accomplish all of the duties required

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

1 | of me as a Store Manager.

2 |      20.    I was paid the same amount of fixed compensation regardless of how many hours I

3 | worked during each pay period, and there is no connection between the number of hours I worked

4 | and the amount of my salary.

5 |      21.    I am glad that the Court certified this case as a class action so that I do not have to

6 | expend the time and energy that it could take to bring a case against Dollar Tree on my own. I would

7 | like this Court to expand the class definition to include Store Managers who worked for Dollar Tree

8 | in California through the conclusion of this case. I believe that nothing about the Store Manager

9 | position has changed since May 26, 2009, and that class treatment is no less appropriate now than

10 | it was then.

11 |      I declare under penalty of perjury under the laws of the United States and the State of

12 | California that the foregoing is true and correct. Executed this **1ST** day of February 2010 in Buena

13 | Park, California.

14 |

15 |

16 | JOHN BAKER

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

# EXHIBIT 12

1   Scott Edward Cole, Esq. (S.B. #160744)
    Molly A. Kuehn, Esq. (S.B. #230763)
2   **SCOTT COLE & ASSOCIATES, APC**
    1970 Broadway, Ninth Floor
3   Oakland, California 94612
    Telephone: (510) 891-9800
4   Facsimile: (510) 891-7030
    web:    www.scalaw.com
5
    Attorneys for Representative Plaintiffs
6   and the Plaintiff Class

7

8               UNITED STATES DISTRICT COURT

9      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

10

11  MIGUEL A. CRUZ and JOHN D.          )   Case No.: C-07-02050 SC (*Consolidated Action*)
    HANSEN, individually, and on behalf )
12  of all others similarly situated,   )   **CLASS ACTION**
                                        )
13                    Plaintiffs,       )
                                        )
14  vs.                                 )
                                        )
15  DOLLAR TREE STORES, INC.            )
                                        )
16               Defendant.            )
    _____ )
17  ROBERT RUNNINGS, individually,      )   Case No.: C-07-4012 SC
    and on behalf of all others similarly )
18  situated,                           )   **CLASS ACTION**
                                        )
19                    Plaintiffs,       )   **DECLARATION OF FRANCIS BARRETT**
    vs.                                 )
20                                      )
    DOLLAR TREE STORES, INC.            )
21                                      )
                 Defendant.            )
22  _____ )

23       I, Francis Barrett, do hereby declare as follows:

24       1.      My address is 11185 Racetrack Road, Sonora, California 95370. I have personal

25  knowledge of the facts set forth in this declaration and could and would testify competently thereto.

26       2.      I was employed by Dollar Tree Stores, Inc. (hereinafter "Dollar Tree") as a Store

27  Manager from approximately March 2005 through approximately March 2008. During that time I

28  worked at a Dollar Tree Store located in Sonora, California.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL (510) 891-9800

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

3.      When I was hired as a Store Manager I never underwent a mandatory eight-week training period at any Dollar Tree store.

4.      It is my understanding that Store Managers are required to follow the same policies and procedures, as dictated by Dollar Tree, at every Dollar Tree store in California.

5.      I am familiar with Dollar Tree's Store Manger Position and Responsibilities. The Store Manager duties require completion of various tasks, including those set forth below.

 a. <u>Supervision of Associates:</u>

  i. Preparing associate work schedules by filling in data fields on the Kronos Timekeeping System;

  ii. Posting associate schedules;

  iii. Conducting new associate training and orientation by reviewing applicable rules and policies with associates and ensuring new associate paperwork is completed and entered into the computer;

  iv. Preparing checklists of job assignments;

  v. Walking the store using the Daily Tour Sheet;

  vi. Communicating and interacting with associates and customers throughout the day;

  vii. Assigning markdowns and checking to ensure they are properly completed based on Dollar Tree's polices;

  viii. Keeping track of associate attendance; and

  ix. Counting stockroom boxes or cartons to monitor and keep track of associate productivity.

 b. <u>Oversee daily store activities, including opening and closing the store:</u>

  i. Walking the store for general overview of store appearance using the Daily Tour Sheet;

  ii. Checking all door seals and ensuring door seal numbers match the most recent entry on the Door Seal Log;

  iii. Correcting any time and attendance issues from the previous day;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
1970 BROADWAY, NINTH FLOOR
1970 WEB VALENCIA TOWER
OAKLAND, CA 94612
TEL: (510) 891-9800

iv.    Completing cycle-counts before opening, per Dollar Tree procedures;

v.    Ensuring the store opens on time and closes on time;

vi.    Preparing associate schedules according to Dollar Tree's requirements by filling in data fields on the Kronos Timekeeping System;

vii.    Timely posting of associate schedules;

viii.    Ensuring there are no customers in the bathroom or back room prior to closing;

ix.    Counting money and ensuring the receipts were balanced;

x.    Taking the deposit to the bank;

xi.    Unlocking and/or locking the store; and

xii.    Assigning cashiers to cash registers and giving them a till.

c.    <u>Ensure customer and associate safety:</u>

i.    Completing paperwork in connection with associate on-the-job injuries;

ii.    Ensuring associates who are injured on the job received proper medical care;

iii.    Ensuring workers are properly trained on state and federal safety laws by providing them with materials sent from Dollar Tree Corporate;

iv.    Ensuring that merchandise is properly placed on shelves according to Dollar Tree's requirements;

v.    Viewing store security tapes;

vi.    Preparing or checking the preparation of the bank deposit;

vii.    Taking the deposit to the bank; and

viii.    Checking all door seals and ensuring the door seal numbers match the most recent entry on the Door Seal Log.

d.    <u>Protect all company assets including store cash, merchandise and equipment:</u>

i.    Ensuring doors are properly locked and secured;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL (510) 891-9800

| | | | |
|---|---|---|---|
| 1 | | ii. | Ensuring the alarm systems are on; |
| 2 | | iii. | Ensuring markdowns are properly completed and completing |
| 3 | | | markdown reports according to Dollar Tree's requirements; |
| 4 | | iv. | Viewing store security tapes; |
| 5 | | v. | Ensuring there are no customers in the bathroom or back room prior |
| 6 | | | to closing; |
| 7 | | vi. | Counting money and ensuring the receipts are balanced; |
| 8 | | vii. | Interacting and communicating with upper management regarding |
| 9 | | | asset protection issues; |
| 10 | | viii. | Ensuring merchandise is not brought into the break room; and |
| 11 | | ix. | Checking emails for cycle counts and ensuring cycle count reports |
| 12 | | | are filled out. |
| 13 | e. | | Maintain proper sales, banking, inventory, accounting, productivity, payroll |
| 14 | | | and time records: |
| 15 | | i. | Preparing or checking the preparation of the bank deposit; |
| 16 | | ii. | Taking the deposit to the bank; |
| 17 | | iii. | Ordering merchandise according to Dollar Tree's instructions; |
| 18 | | iv. | Monitoring and completing required company paperwork; |
| 19 | | v. | Using the Order Scorecard to determine what items to order; |
| 20 | | vi. | Monitoring associate attendance using the Kronos Timekeeping |
| 21 | | | System; |
| 22 | | vii. | Correcting time records as necessary using the Kronos Timekeeping |
| 23 | | | System; |
| 24 | | viii. | Reviewing reports of Department Sales, the Top 200 SKUs and the |
| 25 | | | Top 10 selling items; |
| 26 | | ix. | Completing cycle-counts before opening; and |
| 27 | | x. | Conducting store walks by department. |
| 28 | | | |

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

f.    <u>Maintain adequate staffing of the store, recruit, interview, hire, employ and train sales associates. Train associates to properly use all equipment and technology as well as provide thorough merchandise display training;</u>

    i.    Reviewing job applications;

    ii.    Scheduling job interviews;

    iii.    Calling applicants to give them a job offer;

    iv.    Conducting new associate orientation, which includes ensuring that the associate filled out all forms in the new hire packet, entering required information into the Dollar Tree computer system, providing new associates with an Associate Handbook and sexual harassment brochure, filling out the New Hire Checklist, and telling associates Dollar Tree's meal and rest break policies;

    v.    Counseling, providing written and verbal discipline of store associates and assistant managers in accordance with Dollar Tree's polices;

    vi.    Communicating with District Managers and Human Resources representatives as necessary in relation to personnel decisions; and

    vii.    Using the computer system to access Dollar Tree's Human Resources functions including performance evaluations, hire documents, and termination documents.

g.    <u>Schedule and assign work to store personnel. Evaluate, motivate, counsel, develop, discipline and discharge sales associates appropriately. Maintain production reports to evaluate job performance of sales associates;</u>

    i.    Preparing associate schedules according to Dollar Tree's requirements;

    ii.    Reviewing daily SUC reports showing use the of payroll hours;

    iii.    Using the COMPASS computer system to evaluate and prepare cashier schedules;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACKOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

iv.   Preparing written performance warnings according to Dollar Tree's polices;

v.   Preparing performance evaluations according to Dollar Tree's policies;

vi.   Communicating with District Manager and Human Resources representatives as necessary in relation to personnel decisions;

vii.   Printing associate rosters; and

viii.   Scheduling and assigning meal and rest breaks.

h.   Provide leadership and direction to store personnel:

i.   Preparing notes to assistant managers;

ii.   Preparing assignment lists and three by five cards with associate assignments; and

iii.   Meeting the delivery trucks and directing where merchandise should be placed on the sales floor and in the stock room.

i.   Communicate company policies to sales associates. Ensure associates comply with company policies and procedures, including safety guidelines and human resources policies:

i.   Training and orientation of store associates, which includes ensuring that the associate filled out all forms in the new hire packet, entering required information into the Dollar Tree computer system, providing new associates with an Associate Handbook and sexual harassment brochure, filling out the New Hire Checklist, and telling associates Dollar Tree's meal and rest break policies;

ii.   Advising associates regarding the store's security procedures; and

iii.   Instructing associates to follow rules and regulations regarding alcohol sales and food stamp/EBT requirements.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WAGEOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL (510) 891-9800

j. <u>Analyze sales, expenses and profit, review reports, analyze competition, determine customer preferences, manages sales forecasts, meet sales and profit objectives and goals, determine product mix, determine most effective placement of product and ensure standards of merchandise presentation, displays and signage to maximize sales. Assist in developing promotions and advertisements as appropriate:</u>

   i. Reviewing reports of department sales, Top 200 SKUs and the Top 10 items sold;

   ii. Using a PDT gun to order items in the store according to Dollar Tree's requirements;

   iii. Ensuring store compliance with state regulations;

   iv. Reviewing the Monthly Planner; and

   v. Making appropriate assignments to keep shelves, end caps, displays, wow tables, and refrigerators/coolers clean and fully stocked.

k. <u>Control inventory, supervise ordering, receiving, stocking and pricing of goods. Ensure goods are properly marked and mark downs are properly recorded:</u>

   i. Reviewing reports of department sales, Top 200 SKUs and the Top 10 items sold;

   ii. Requesting cycle counts;

   iii. Generating and using the online Order Book to determine inventory on hand, what merchandise to order, and to order merchandise;

   iv. Ensuring proper security of the building and proper accounting for markdowns according to Dollar Tree's requirements;

   v. Making appropriate assignments to keep shelves, end caps, displays, wow tables, and refrigerators/coolers clean and fully stocked; and

   vi. Making decisions and assignments to put stock in "grab bags" or to mark down stock.

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800

l.   Responsible for overall cleanliness and appearance of store:

    i.   Assigning associates to mop, vacuum, clean windows, and clean restrooms;

    ii.   Training cashiers to keep their cash registers clean;

    iii.   Modifying window signage as appropriate; and

    iv.   Assigning individuals to retrieve shopping carts from the parking lot.

m.   Ensure the highest level of customer service. Handle customer complaints and problems:

    i.   Keeping a friendly environment in the store, talking to and greeting customers.

n.   Ensure accident reports and damage reports are completed in a timely and accurate manner:

    i.   Preparing reports on associate and/or customer injuries and accidents, explaining how an accident happened and why, including a claim and confirmation number; faxing the reports to the corporate office.

o.   Complete management reports in a timely and accurate manner:

    i.   Printing out the order scorecard, department sales, pull and hold, and Top 200 SKUs reports and putting them in the Playbook and/or posting them in the store office;

    ii.   Preparing schedules according to Dollar Tree's requirements;

    iii.   Ordering merchandise according to Dollar Tree's requirements;

    iv.   Completing the Certification of Duties;

    v.   Completing cycle count reports;

    vi.   Using and accessing the Dollar Tree computer system to complete and access reports as necessary;

    vii.   Completing the Deposit Log of all store deposits;

    viii.   Completing the Safe Fund Log at change of safe "ownership" from one member of management to another at shift change;

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL (510) 891-9800

1            ix.     Reconciling selective Receiving Reports for DSD billing; and

2            x.     Completing and submitting the Tax Exempt Log.

3      p.     Ensure compliance with applicable laws and regulations:

4            i.     Ensuring all licenses and permits are properly displayed;

5            ii.     Ensuring the fire extinguisher is not outdated;

6            iii.     Instructing associates to take meal and rest breaks;

7            iv.     Instructing associates to accurately record their time;

8            v.     Reviewing and approving time records and releasing timekeeping

9                 information to ensure proper payment of wages; and

10           vi.     Ensuring all accidents are reported.

11      q.     Communicate professionally and effectively with customers, subordinates

12          and supervisors:

13            i.     Talking to District Managers in person, by telephone, and by email;

14            ii.     Reading and printing all emails from Dollar Tree Human Resources

15                and higher-level management; and

16            iii.     Walking the floor and talking to customers and associates.

17      6.     All of the tasks listed above are very basic and require little or no complex thought;

18 I completed each of them in accordance with Dollar Tree's specific requirements and instructions.

19      7.     In addition to the duties listed above, Dollar Tree also requires its Store Managers

20 to physically receive retail product by unloading trucks delivering merchandise from Dollar Tree

21 Distribution Centers. Store Managers have to verify that the inventory received from the Distribution

22 Center or a Direct Store Delivery service is consistent with store needs, orders placed or other

23 delivery standards or protocols. Once merchandise is received, Store Managers are required to

24 organize it in the stockroom and to physically place it on the shelves.

25      8.     Store Managers also have to cashier. This task includes posting transaction voids for

26 customer refunds and covering the register as needed.

27      9.     Dollar Tree sets the price for all items; Store Managers have no authority to mark

28 products down without express approval from Dollar Tree.

10.     Store Managers are not permitted to decide how to stock merchandise throughout the store any way they like. Instead, they are required to adhere to the Merchandising Display Guidelines that Dollar Tree's Corporate management selects for the stores.

11.     Dollar Tree Corporate routinely sends its Store Managers Merchandising Display Guidelines and Weekly Bulletins via email, which provide detailed instructions on where and how merchandise should be displayed throughout the store. To my knowledge, every California Dollar Tree Store Manager receives these Merchandising Display Guidelines and Weekly Bulletins.

12.     The duties of Store Manager include unloading the trucks when they arrive with new shipments of products, counting the loads after they are removed from the trucks, carrying the loads to the stock room, and organizing them. Dollar Tree restricts the payroll hours that Store Managers are permitted to schedule to such a degree that they are required to personally unload shipments alongside the hourly employees who work at their stores.

13.     The Store Manager job includes performing routine customer service. Specifically, Store Managers respond to customer questions, handle certain transactions that only management can carry out (such as voids), and cashier. On average, I spent about two to three hours each workday cashiering.

14.     The duties of Store Manager also include maintaining the cleanliness of the store and, as such, Store Managers routinely clean up spills, vacuum, clean the bathroom, take trash to the dumpster outside the store and personally handle merchandise recovery.

15.     Store Managers are also required to perform routine data entry on the computer and to complete paperwork using pre-fabricated forms prepared by Dollar Tree.

16.     Store Managers do not have the authority to order the vast majority, if any, of the supplies for their stores.

17.     Store Managers perform the same job tasks and duties on a week-to-week basis. They are rarely, if ever, allowed to deviate from the detailed policies and procedures that Dollar Tree publishes.

18.     Store Managers do not have the authority to discipline the employees working at their stores. Before Store Managers can write up, suspend or terminate any employee, they are required

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

1 to get approval from Dollar Tree Corporate.

2     19.   I was rarely, if ever, able to take an uninterrupted meal period during a workday.

3 When I did get a meal period, it was seldom a half hour or more, and I often did not get to take any

4 meal periods during the first five hours of my shift. The vast majority of the rest breaks I took were

5 on-duty and frequently interrupted by work duties like responding to inquiries from employees,

6 Dollar Tree management and customers.

7     20.   My typical workweek consisted of six days that varied in length from 10 to 12 hours.

8 It was not rare for me to work seven days per week in order to accomplish all of the duties required

9 of me as a Store Manager.

10     21.   I was paid the same amount of fixed compensation regardless of how many hours I

11 worked during each pay period, and there is no connection between the number of hours I worked

12 and the amount of my salary.

13     22.   I am glad that the Court certified this case as a class action so that I do not have to

14 expend the time and energy that it could take to bring a case against Dollar Tree on my own. I would

15 like this Court to expand the class definition to include Store Managers who worked for Dollar Tree

16 in California through the conclusion of this case. I believe that nothing about the Store Manager

17 position has changed since May 26, 2009, and that class treatment is no less appropriate now than

18 it was then.

19     I declare under penalty of perjury under the laws of the State of California that the foregoing

20 is true and correct. Executed this 12th day of January 2010 in Sonora, California.

21

22                          Francis E Barrett

                              FRANCIS BARRETT

23

24

25

26

27

28

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL. (510) 891-9800